1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The Honorable Barbara J. Rothstein

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| IN RE SANA BIOTECHNOLOGY, INC. SECURITIES LITIGATION | Case No.  2:25-cv-00512-BJR |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CLASS ACTION |
| | FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 5

III.  PARTIES .............................................................................................................. 5

IV.  DEFENDANTS' MISCONDUCT........................................................................ 7

     A.    Sana Takes Its First Product, SC291, Into Clinical Trials ....................... 7

          1.    Sana Disappoints After Its Blockbuster IPO ............................... 7

          2.    Sana Joins a Crowded Field ......................................................... 7

          3.    Sana Genetically Modifies Existing CAR T Treatments To Evade the Immune System ..................................................................... 11

          4.    Defendants Claim Investors Will Know Whether Sana Works Within a Month Of Treating the First Few Patients ................................. 13

     B.    Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024 ................................................................. 18

          1.    Defendants Claim ARDENT Is An Unqualified Success ........................ 18

          2.    Defendants Concealed From Investors That Though CAR T Cells Must Survive At Least Three Months, SC291 Survived At Most Two Months 20

     C.    Defendants' Materially False and Misleading Statements & Omissions.............. 26

     D.    Additional Facts Further Probative Of Scienter.................................... 36

          1.    In Their Stock 2023 Presentation, Defendants Maintained That Sana Would Collect Durability Data By Late 2023 Or Early 2024 And Present It To Investors ....................................................................... 36

          2.    The ARDENT Clinical Trial Protocol Required That Sana Collect Data Showing the Deterioration Of SC291 ....................................... 39

          3.    Defendants' False Statements Helped Sana Raised Cash It Needed To Survive Past 2024 ...................................................................... 41

          4.    The Fraud Implicated Core Operations................................................. 41

     E.    The Truth Begins To Emerge ............................................................... 42

FIRST AMENDED CLASS ACTION
COMPLAINT - i
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

V.      NO SAFE HARBOR ................................................................................. 45

VI.     THE CLAIMS ARE TIMELY.................................................................... 46

VII.    LOSS CAUSATION / ECONOMIC LOSS ............................................. 47

VIII.   PRESUMPTION OF RELIANCE............................................................. 48

IX.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ......................... 50

COUNT I ......................................................................................................... 52

COUNT II ........................................................................................................ 55

PRAYER FOR RELIEF ................................................................................... 56

DEMAND FOR TRIAL BY JURY .................................................................. 57

FIRST AMENDED CLASS ACTION
COMPLAINT - ii
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1.     Lead Plaintiffs Shane Honey and Jonatan Kiskinen, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.     NATURE OF THE ACTION

2.     This is a federal securities class action brought on behalf of all persons and entities other than Defendants who purchased or otherwise acquired the securities of Sana Biotechnology, Inc. between January 9, 2024, and November 4, 2024, both dates inclusive ("Class Period") and held such securities through close of trading on May 8, 2024, or November 4, 2024, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

3.     A darling of the 2021 IPO market, by the beginning of the Class Period, Sana found itself in dire straits. With just enough cash to cover its 2024 expenses, the long-promised early results of its first Phase I clinical trials were at best mixed. Unable to complete the trials and continue with its programs without significant extra cash, Defendants concealed the poor results, misleadingly touted the good results, and told investors Sana had successfully demonstrated that its product worked. One month later, Sana raised nearly $190 million. Yet as the trial continued, the results did not improve. With no good data to present, Sana first delayed an interim public data report and then cancelled development of its lead product candidate entirely. In both cases, Sana's share price fell, damaging investors who were unaware of Defendants' fraud.

4.     Sana's 2021 IPO raised almost $700 million at a nearly $5 billion valuation, an amazing feat for a company formed less than three years prior. However, by late 2023, Sana had abandoned its most promising product candidates, and its share price was down 90% from its

FIRST AMENDED CLASS ACTION
COMPLAINT - 1
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    post-IPO peak.

2        5.    In recent years, researchers have developed cancer treatments that are based on

3    genetically modified cells, called CAR T-cells. Existing CAR T -ell treatments are "autologous,"

4    meaning that the cancer destroying T cells are taken from the patient's own blood, changed in the

5    lab by adding a CAR (chimeric antigen receptor) to help the T-cells attach to a specific cancer

6    cell, and then injected back in the patient. While autologous cell therapies have demonstrated

7    success because they are derived from a patient's own cells—and are thus not likely to be rejected

8    by the patient's immune system—they are expensive and delayed because they are customized

9    for each patient.

10        6.    Sana is one of nearly 200 companies attempting to develop an allogeneic CAR T

11    treatment, meaning one made from donor cells. Sana's technology consists of a series of genetic

12    modifications designed to enable cells to evade recognition and eradication by the immune

13    system. Sana hopes that its genetic modifications will permit a donor's cells to evade the immune

14    system of the recipient patient, thereby replacing expensive and time-consuming autologous

15    treatments with an allogeneic, off-the-shelf remedy.

16        7.    Sana began its first clinical trial, ARDENT, in May 2023. ARDENT tested Sana's

17    product, called SC291, in B-cell cancers. Sana told investors that because all SC291 did was

18    modify existing approved treatments, the critical issue in determining the viability of SC291 was

19    whether its genetically modified cells evaded the patient's immune system. Sana also told

20    investors that it would know the answer to this all-important question within a month of treating

21    just a few patients. Thus, while investors would have to wait longer to know whether the patients

22    entered remission and did not relapse, they would know almost immediately whether Sana's

23    platform worked. Sana CEO Steven Harr boasted to investors that positive news on this front

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 2
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1  would immediately remove 80% of the risk in the company.

2      8.    Sana did not have enough cash to see its ambitions through to achievement.

3  Despite Sana's massive IPO, Sana was rapidly burning cash and by the close of 2023, had only

4  enough funds to cover its expected 2024 expenses. Long delays in starting clinical trials meant

5  that Sana would not be able to complete Phase I clinical trials on its then-lead drug with its

6  available cash.

7      9.    Sana had promised it would disclose early ARDENT data by the end of 2023. Sana

8  did timely collect the data, but they were mixed. B-cell targeting CAR T-cells like SC291 work

9  by ***completely eliminating all*** the target patient's B-cells. SC291 had eliminated B-cells about a

10 month into the treatment. But Sana had previously told investors that patients with B-cell cancers

11 whose B-cells recovered within three months would likely relapse. Yet data in Defendants' hands

12 showed that B-cells recovered within two months, which is not possible unless SC291 cells are

13 completely gone. The data called into question whether SC291 evaded, or merely delayed, the

14 immune system's response.

15     10.   Sana had no hope of timely developing other data, either on ARDENT or on

16 another of its products, to support the capital raise it needed to survive past 2024. It was only just

17 beginning clinical trials of its next most advanced product. So rather than honestly disclosing the

18 mixed result and hoping that investors would interpret them favorably, when they presented the

19 data on January 9, 2024, Defendants told investors only the good, that SC291 had apparently

20 survived a month, while concealing the bad, that it had quickly degraded between month one and

21 month two. Defendants even told investors Sana had "overcome"—past tense—the problem of

22 immune evasion. A month later, Sana raised $190 million from selling its shares, enough cash to

23 survive well past 2024.

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 3
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1
2

11.    Defendants' false and misleading statements artificially inflated Sana's stock price. This artificial inflation dissipated in two partial corrective disclosures.

3
4
5
6
7
8
9
10

12.    Before the Class Period, Sana had told investors to expect SC291 durability data either in late 2023 or in early 2024. This data could slip into 2024 because Sana's cell might actually be durable; Sana would not know that SC291 cells could survive six months unless six months had elapsed. As it happens, Sana's cells lasted less than two months in the patient's body, so the data was ready to be presented in January. Not knowing this, investors expected the data to be presented either by May 2024 or at one of three conferences taking place from late April through June 2024. That's exactly what Defendants told investors they would do in September 2023.

11
12
13
14
15
16
17

13.    On May 8, 2024, Sana issued an earnings release that contained neither durability data nor an indication that Sana would present such data at the two remaining forthcoming conferences. Sana did not present durability data because doing so would show that to date, the data suggested that SC291 did not evade the immune system and would only lead to relapse. Analysts concluded that Sana would not present data until the other major hematology conference, which would take place in December. Disappointed investors bid down Sana's shares, causing its stock price to fall $1.99/share (20.97%) on May 9, 2024.

18
19
20
21

14.    Then, on November 4, 2024, Sana announced it was suspending development of SC291 in oncology, halting enrollment in the ARDENT trial, reducing headcount, and redirecting cash resources.  This disclosure caused Sana's stock to fall $0.37 (9.84%) per share on November 5, 2024.

22

15.    Defendants' fraud caused investors substantial damages.

23
24

FIRST AMENDED CLASS ACTION
COMPLAINT - 4
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

18.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Sana is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

20.    Lead Plaintiff Shane Honey, as set forth in his prior-filed Certification (ECF 18-2), incorporated by reference herein, purchased Sana common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

21.    Lead Plaintiff Jonatan Kiskinen, as set forth in his prior-filed Certification (ECF 21-2), incorporated by reference herein, purchased Sana common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

22.    Defendant Sana is incorporated in Delaware and has its Principal Executive Offices at 188 East Blaine Street, Suite 400, Seattle, Washington. It trades stock on the NASDAQ

FIRST AMENDED CLASS ACTION
COMPLAINT - 5
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

stock market under the ticker symbol "SANA."

23.    Defendant Steven D. Harr, MD co-founded Sana and has served as Sana's CEO and President, and a member of its Board of Directors, at all relevant times. According to his Sana corporate website bio, before Sana, Defendant Harr previously served on Loxo Oncology's Board of Directors until early 2019, served as CFO and Head of Corporate Development for Juno Therapeutics until early 2018, co-founded JW Therapeutics and served on its Board of Directors. Earlier still, Defendant Harr was Managing Director and Head of Biotechnology Investment Banking at Morgan Stanley, after serving as a biotech research analyst and co-head of global healthcare research. Defendant Harr got his MD from Johns Hopkins University School of Medicine, served as an Internal Medicine resident at the University of California, San Francisco, and performed research at Harvard Medical School and Massachusetts General Hospital. Defendant Harr's medical degree, extensive medical research experience, and long history of leading, researching, and investing in pharmaceutical companies enabled him to fully understand the data and science discussed herein, underlying this complaint, how related disclosures are viewed and understood by analysts and investors, and the funding needs of pharmaceutical development. In 2020, before Sana went public, Harr earned $739,000 in non-equity compensation. Each year from 2021-2024, Harr earned more than $1 million in non-equity compensation.

24.    Defendant Nate Hardy served as Sana's Executive VP and CFO at all relevant times, until his resignation, announced September 6, 2024 and effective October 4, 2024, shortly before the last corrective disclosure. According to his Sana corporate website bio, Defendant Hardy previously served as VP of Finance at Juno Therapeutics, leading the Business, Financial Planning, and Treasury organizations, and for over 10 years prior, served in a variety of senior

FIRST AMENDED CLASS ACTION
COMPLAINT - 6
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

finance and operations leadership positions at Amgen, culminating as the Executive Director and Head of Corporate Finance.

25. Defendants Harr and Hardy are the "Individual Defendants."

26. Sana and the Individual Defendants are the "Defendants."

## IV.    DEFENDANTS' MISCONDUCT

### A.    Sana Takes Its First Product, SC291, Into Clinical Trials

#### 1.    *Sana Disappoints After Its Blockbuster IPO*

27. Sana was founded in July 2018. It completed its IPO in January 2021, less than three years later, raising an eye-popping $676.5 million at a nearly $5 billion valuation. It was, according to Renaissance Capital, the largest ever IPO of a biotech company that had yet to start clinical trials.

28. Since its IPO however, Sana has consistently disappointed investors. Sana told investors to expect that it would begin a wave of clinical trials in 2022. It started its first in May 2023, and its second only in early 2024. At the time of its IPO, Sana's most promising technology was a platform that could edit genes inside the human body, in one analyst's opinion rendering CAR T therapies obsolete; Sana dropped the platform in October 2023.

29. In the meantime, Sana burned through its ample cash. From 2021 through 2023, Sana's operating expenses totaled more than $920 million.

30. Sana's share price has suffered. Sana sold its shares in its January 2021 IPO at $25 each. In February, they sold for more than $40 each. By the end of 2022, they had fallen to approximately $4/share, roughly the same price at which they sold at the end of 2023, just before the Class Period's start.

#### 2.    *Sana Joins a Crowded Field*

31. Sana is a development stage biotechnology company, with no approved FDA

FIRST AMENDED CLASS ACTION
COMPLAINT - 7
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

products.  It has not even completed any Phase I clinical trials.  It develops treatments based on cells genetically modified to evade the immune system.

32.    In recent decades, and accelerating since 2017, medical treatments have been developed that involve inserting genetically modified cells into the patient's body to attack harmful organisms like malignant cancer cells. The cells, called CAR T-cells,[1] have primarily been used in oncology.

33.    One particular type of CAR T-cells is used to treat cancers arising from malignant B-cells, a type of immune cell. CAR T-cells attach themselves to particular markers on target cells and destroy the cells bearing the marker. Almost all B-cells bear the marker CD19. CD19-targeting CAR T-cell treatments destroy all the patient's B-cells, thereby eliminating the B-cell cancer. Five of seven approved CAR T-cell treatments for B-cell cancers target CD19.

34.    CD19-targeting CAR T-cell treatments have been shown to be strikingly effective in B-cell cancers. Studies report remission rates well in excess of 50% in patients who had previously failed chemotherapy and/or radiotherapy.

35.    But the CAR T-cell treatments' availability has been limited by the need to overcome the patient's immune system. Existing CD19-targeting CAR T-cell treatments on the market during the Class Period were autologous, i.e. manufactured by genetically modifying the patient's own cells to turn it into a CAR T-cell. The immune system uses markers or combinations thereof on the cells' surfaces to recognize whether the cells are foreign. Because CAR T-cells are the patient's own, the patient's immune system recognizes the cells as self and does not destroy them in the same way it would destroy the cells of a foreign donor.

36.    Autologous treatments, for all their benefits, create bottlenecks, come with

---

[1] The cells are called CAR T-cells because the genetic modification causes them to express (display) a lab-made marker, Chimeric Antigen Receptor (CAR), on their surface.

FIRST AMENDED CLASS ACTION
COMPLAINT - 8
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

significant costs, and have other drawbacks. First, the treatment must occur at a treatment center. As of 2024, there were only slightly over 300 centers that could administer such cell therapies. Many states had none. The treatment itself takes a long time to prepare. The patient must first donate a cell sample. Then, the cells in the sample must be genetically modified. After modification, the cells are put through a process that causes them to multiply until there are enough cells for a treatment. Then, the genetically modified cells are reinjected into the patient's body. This process takes three to five weeks, which is a problem if a patient has a fast-moving cancer. Existing treatment centers have limited capacity,[2] which may delay the treatment. Patients and caregivers may have to travel to get to a treatment center; some patients may find travel difficult, some caregivers may have trouble taking time off work, and insurance may not cover the costs of travel and hotels. Moreover, each treatment must be individually prepared, limiting potential economies of scale.

37.    Because of these limitations, autologous CAR T-cell treatments, while FDA approved and available, have only been administered to a minority of patients who would otherwise be eligible for cell therapy. Defendants claimed in public statements that while in total 100,000 patients die of two B-cell cancers, lymphoma and myeloma, every year across the U.S., France, Germany, Italy, Spain, and the UK, only 11,500 patients received CAR T therapy in these countries in 2022.

38.    To address these limitations, a number of companies, including Sana, are attempting to develop allogeneic treatments based on engineered donor cells. Allogeneic treatments take cells from donors, genetically modify them, and then put them through the same

---

[2] Tony Berberabe, CAR T-Cell Therapy Remains Underutilized, Despite Improvements in Access, Targeted Therapies in Oncology Volume 13 Issue 9, available at https://www.targetedonc.com/view/car-t-cell-therapy-remains-underutilized-despite-improvements-in-access

FIRST AMENDED CLASS ACTION
COMPLAINT - 9
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

manufacturing process that causes autologous cells to multiply. Each manufacturing process can create hundreds of treatments. These treatments can be kept in storage. Patients can receive these treatments immediately, without the delays associated with autologous treatment.

39.    But Sana operates in a crowded field. According to a September 6, 2023 article, there are almost 195 companies attempting to develop allogeneic treatments, a plurality of them in cancers.[3] And despite these many aspirants, no allogeneic CAR T treatments have been approved to treat B-cell cancers.

40.    The main obstacle to allogeneic CAR T-cell treatments is the need to overcome the patient's immune system. The immune system exists to protect the body from pathogens. It attacks, and destroys, harmful bacteria and viruses. But it also destroys organisms it recognizes as foreign. Thus, if the patient's immune system does not recognize the CAR T-cells as being the patient's own cell, then the immune system will attack and destroy them.

41.    Well before the Class Period, doctors and researchers understood that CD19-targeting CAR T-cells must remain in the body for a significant amount of time for the patient to achieve and maintain remission. But the immune system usually rejects fully foreign cells within less than two weeks. While treatments can use chemotherapy to suppress the immune system, the suppression gravely harms patients and inhibits the CAR T-cells. No allogeneic CD19-targeting treatments have been created that could survive in the patient long enough to prevent relapse.

42.    Thus, at the beginning of the Class Period, patients with B-cell cancers could benefit from effective—though inconvenient, delayed, and costly—autologous treatments. There were no allogeneic alternatives.

---

[3] Anshul Mangal, *Scaling Hope: The Growth of Allogeneic Cell Therapy Sector*, September 6, 2023, available at https://www.precisionformedicine.com/blog/article-scaling-hope-the-growth-of-allogeneic-cell-therapy-sector/ .

FIRST AMENDED CLASS ACTION
COMPLAINT - 10
Case No. 2:25-CV-00512-BJR

3.    *Sana Genetically Modifies Existing CAR T Treatments To Evade the Immune System*

43.    The human immune system has two parts. The innate immune system distinguishes between the patient's own cells and foreign objects, and attacks the latter, rapidly responding to an invasion. The innate arm relies heavily on Natural Killer, or NK, cells. The adaptive arm, based principally on T-cells and B-cells, recognizes novel pathogens and develops a specific and longer-term response. The innate and adaptive arms of the immune system employ complementary mechanisms to give the body the best chance possible to fight all pathogens.

44.    Allogeneic CAR T-cells must be genetically modified to evade both the adaptive and the innate arms. But while existing genetic modifications permit partial evasion of the adaptive immune system, these modifications generally make the cells more visible to the innate arm. Thus, while researchers have seen some success evading the adaptive immune system, no allogeneic treatment has successfully evaded both the adaptive and innate arms.

45.    While Sana's ultimate product is cells, its main technology (licensed from Harvard University) consists of specific genetic modifications that attempt to permit the foreign cells to evade the patient's immune system.

46.    The adaptive arm relies on a class of markers to recognize foreign cells. It destroys cells which do not express (display) the right combination of these markers. Sana genetically modifies its CAR T-cells so that they do not express the markers at all, so they are not recognized by the adaptive immune system.

47.    Failing to express these markers usually identifies the cells as foreign to the innate immune system, which then destroys the cells. To evade the innate immune system, Sana also genetically modifies the cells so that they overexpress a marker, CD47. CD47 inhibits innate arm cells from recognizing the CAR T-cells.

48.     Thus, if Sana's genetic modifications work as Defendants claim, neither the adaptive immune system nor the innate immune system will recognize the cells.

49.     During the Class Period, Sana was pursuing four products in seven indications. Yet *all* of these products ultimately involve the application of these genetic modifications to evade the immune system. Showing that its immune evasion technology works is valuable even if the specific treatment evasion supposedly facilitates proves ineffective.

50.     Sana's lead product is SC291. Sana did not treat humans with SC291—or anything else—until it started SC291's Phase I oncology trials in May 2023. Phase I trials are not designed to show efficacy. But Defendants told investors that, through a combination of prior animal studies and SC291's functioning, Sana would know very early in the Phase I trial whether SC291 worked.

51.     Prior to starting human trials, Sana had conducted extensive animal experiments with both primates and mice which had been genetically modified so their immune system resembled humans'. Defendants told investors that these experiments had demonstrated that SC291 remained in the body long term. Specifically, Defendants cited a study they conducted in which Sana successfully treated B-cell cancers in mice using SC291 and then reinjected the mice with cancer 83 days later. The mice quickly beat the cancerous cells. Defendants told investors this was evidence that SC291 cells survived three months.

52.     Second, Sana makes SC291 by using an existing CD19-targeting CAR T-cell which Sana then genetically modifies to modified to evade the immune system. CD19-targeting CAR T-cells themselves have been shown to be safe and effective. Several have been approved by the FDA to treat B-cell cancers. Thus, it is unlikely that any failure of SC291 would be attributable to the ineffectiveness of the CAR T-cell itself.  Instead, any such failure would likely

FIRST AMENDED CLASS ACTION
COMPLAINT - 12
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

result from SC291's novel portion—Sana's proprietary genetic modifications designed for immune evasion.

### 4.  *Defendants Claim Investors Will Know Whether Sana Works Within a Month Of Treating the First Few Patients*

53.    SC291's first Phase I clinical trials tested its use in certain cancers caused by malignant B-cells, such as Non-Hodgkins Lymphoma.

54.    Sana's Phase I SC291 oncology clinical trial, ARDENT, was a standard Phase I dose escalation study. Sana selects three dose levels of SC291, 60 million cells, 120 million cells, and 200 million cells. Sana starts ARDENT by treating a cohort, or group, of three patients at the lowest dose level, with 28-day intervals between treating each patient. If there are no side effects that prevent increasing doses, then Sana repeats the process with the second dose, and then with the third.[4] These steps are all standard in dose escalation studies.

55.    As is common, ARDENT also planned for another cohort of patients called a dose expansion cohort. After demonstrating that SC291 was safe enough for clinical trials, Sana had to select a dose which it would test for efficacy in subsequent pivotal trials. Often denoted as Phase 1b, a dose expansion cohort tests the product at a single dose which the company hopes to use in these pivotal trials. The expansion cohort is a much larger group of patients—Sana planned for about 40—but the study proceeds more quickly because there is no delay between treating patients. Sana elected to give the expansion cohort a dose of 200 million cells.

56.    Sana's ultimate goal is to show that SC291 effectively treats cancers. An effective treatment is one that induces a durable complete response. A complete response means that the cancer is not detectable. While no hard and fast rule dictates when a complete response is

---

[4] The protocol also included steps Sana was required to take if there were dose-limiting side effects, but there were no such side-effects.

FIRST AMENDED CLASS ACTION
COMPLAINT - 13
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

"durable," researchers often look at responses relative to existing standard of care. Thus, a durable complete response typically means complete remission that lasts at least as long as existing treatments.

57. Defendants claimed that investors would not have to wait long to know if SC291 worked.

58. Beginning around May 2023, Defendants claimed to investors that Sana could, within ARDENT, isolate and test various aspects of Sana's platform and SC291, thus serially ruling out risks as the test results came in. Defendants described the discoveries they would make as a "data onion" and described not only what the data would show but when the data would be presented to investors.

59. Defendants told investors the first risk they would retire is that Sana's genetic modifications might not evade the immune system, with results they claimed they would achieve within a month of treating patients. Defendants' tests to retire the risk exploits flaws in the process through which Sana genetically modifies cells to confer immune evasion. In about 15-20% of cells, the gene modification process fails. Then, the cells do not receive all the modifications Defendants claim are necessary to evade the immune system. These cells are vulnerable and will be destroyed promptly by a functional immune system.

60. The cells are not destroyed as soon as they are injected because patients receive chemotherapy before SC291. The chemotherapy knocks out the patient's immune system, which is then unable to kill the defective cells. The CAR T-cells then engraft and multiply in the patient's body.

61. But as the immune system recovers, it begins to attack SC291. If SC291 works, Defendants claimed, the immune system will quickly destroy the 15-20% of cells that did not

FIRST AMENDED CLASS ACTION
COMPLAINT - 14
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

receive all genetic modifications, but it will not destroy the 80-85% of cells in which all the genetic modifications were successfully implemented.

62.     As a result, Defendants stated that they would examine the patient's SC291 cell count after one month, long enough to give the patient's immune system a chance to recover.  If the only remaining SC291 cells have all the genetic mutations, then the patient's immune system has recovered, because it has killed all the defective cells, but SC291 works, because the immune system has not killed the fully modified cells.

63.     As Defendant Harr explained in a September 12, 2023 presentation:

The question number one. We have a lemon, right? You take a healthy volunteer's cells and you gene edit them, it turns out that not 100% of cells get gene edited. It's about 80%-85% have all the gene edits. We can make lemonade. Because what happens here, what we know is that in every allogeneic CAR T-cell to date, the patient's immune system is suppressed. The cells CAR Ts grow. The immune system comes back. Then within a few days, all of the CAR T-cells are gone.

So what should happen here if our drug works like we think it does, that when the immune system comes back, instead of all of it going away, we'll go from 85% to 100% of cells being fully edited. Because then what you know is you have cell survival in the context of an intact immune system. *So that's really, I think, most of the risk of the company, right? Have you actually solved the problem of allogeneic transplant rejection? And that's not a very complicated question to answer, right? You need to see cells grow, then you need to see the non-edited cells go away if it comes back.*

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

64.    And as Defendants showed in Sana's December 2023 corporate presentation:



**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

65.    Moreover, Defendants told investors that they could prove immune evasion worked without waiting for complete Phase I results, but instead with just a few patients. For instance, on Sana's May 23, 2023 Research & Development Day, Defendant Harr stated:

So the way to turn it into medicines is to keep peeling back the evidence. So, we'll have immune evasion data. ***We can figure that out very quickly within a few patients.***

66.    Harr repeated himself at the June 7, 2023 Jefferies Global Healthcare Conference:

What we'll see if we'll actually have really done what we think we will have done is that at the end of a month, two months, three months, it will be a 100% fully modified cells. That's it. So in one or two patients you can know, have all of the data we've generated, more than 40 non-human primates as an example, which show that we can evade the immune system in an allogeneic transplant. Does that translate into people? ***You 'll know in a couple patients. This is actually really straightforward.***

67.    According to Defendants, this "straightforward" finding in "a few patients" would substantially derisk Sana. As Defendant Harr claimed on January 9, 2024:

The real goal is to figure out, do we have a drug here? And the first part of understanding, do you have a drug, is can we overcome allogeneic immune rejection? If we can do that, that's probably 80% of the risk of the program and 80% of the risk of the company.

68.    Then, Sana would retire the risk that its cells were not durable.

69.    Defendants explained that, just as with the initial immune evasion, Sana could present conclusions from just a small number of patients.  As Defendant Harr stated in a September 6, 2023 presentation:

Part two is then do these cells really grow and persist. That takes time to figure out, you want to see cells persist for three to six months. I think that's really where you see things. Now, that may or—***we'll have that data over the next three to six months. I don't really know, maybe we'll have it this year, maybe early next year.***

70.    Defendants also explained that Sana's goal was to create cells that were as durable as autologous cells. As Defendant Harr stated on Sana's May 23, 2023 Research & Development day:

FIRST AMENDED CLASS ACTION
COMPLAINT - 17
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

And our goal is very simple, we want allogeneic cells that behave at least as well as autologous cells. We're not trying to make them kind of good, we're not trying—it won't be a success. There we want them to work at least as well as autologous cells, and we have reasons to believe that they could be better.

71.    Thus, Sana could determine whether the cells persisted from the same patients that would allow it to establish immune evasion. While durability data might be delayed, that's because Sana expected that its cells would last three to six months. Sana cannot determine that its cells last six months until six months have passed.

**B.    Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024**

**1.    *Defendants Claim ARDENT Is An Unqualified Success***

72.    Sana is in the earliest stage of FDA trials, and many years away from producing any revenues. Yet Sana consumes cash prodigiously.

|  | Operating expenses | Net cash used in operating activities | Remaining cash, cash equivalents, and marketable securities |
|---|---|---|---|
| 2021 | $356.9 million | $251.1 million | $762.8 million |
| 2022 | $272.6 million | $290.1 million | $434.1 million |
| 2023 | $293.1 million | $253.6 million | $205.2 million |
| ***Total 2021-2023*** | ***$922.6 million*** | ***$794.8 million*** | |

73.    Sana lacked the cash to take its products through clinical trials. Even as it ran ARDENT, Sana's cash was dwindling. As of December 31, 2023, Sana only had $205.2 million in its coffers, which was roughly how much it planned to spend in 2024. Indeed, it did not even have enough cash to take product through the end of Phase I clinical trials. To raise sufficient cash to permit it to complete Phase I clinical trials, Sana had to convince investors that these trials

FIRST AMENDED CLASS ACTION COMPLAINT - 18
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

were already bearing fruit. If the initial data showed SC291 evades the immune system, then Sana would be able to raise the cash it needed. Without such a showing, investors might shun Sana, precipitating its downfall.

74.    Defendants presented data from the first six patients in ARDENT on January 9, 2024. Three patients had received the lowest 60-million cell dose; three more had received the 120 million cell dose. These data showed, Defendants claimed, evidence of efficacy, with two patients undergoing ongoing complete responses (complete remission).

75.    Defendants' presentation focused on their claim that they had demonstrated immune evasion. Defendants presented a video purporting to show a patient's immune system responding to SC291 in days 13 through 28 after administration. The video showed the immune system attacking the defective SC291 cells that had not been fully modified. The last still of the video, which was also presented as a slide, showed that all the defective cells had been destroyed, but not the fully modified SC291 cells.

76.    Defendants told investors the immune evasion data was the most critical part of the presentation. Defendant Harr called the slide the "killer slide," the "most important slide in many regards." And Defendant Harr explained why: "[B]ecause it tells you that with real patient blood, real patient samples, *we've overcome the large challenge in the field*, which is NK cell recognition of [allogeneic] cells." Defendant Harr continued, that SC291 "is working *exactly as we hoped it would*."

77.    Moreover, Defendants also represented that SC291 successfully demonstrated rapid B-cell depletion.  Defendants presented a slide claiming that the concentration of B-cells in the blood of one patient (patient 4) was measured as zero 28 days after treatment. In oral comments, Defendant Harr added that "what you can see here is that very rapidly we can

FIRST AMENDED CLASS ACTION
COMPLAINT - 19
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

completely deplete the B-cells."

78.    This positive news caused the price of Sana's shares to spike. On January 9, 2024, Sana's stock price closed at $5.16. The next day, it closed at $7.18, a single-day increase of nearly 40%, with trading volume of almost 30 times that of the prior day.

79.    But the data collected by and known to Defendants were far more mixed than Defendants' own statements represented. As Sana's own Head of T-Cell Therapeutics acknowledged in 2023, before Sana had any data from ARDENT, a B-cell recovery shows that the CAR T-cells have already been destroyed. B-cell recovery *in less than three months* also leads to all-but universal relapse within a year. Yet the data Sana had in hand as of the January 9, 2024 presentation showed that B-cells had recovered, and SC291 cells deteriorated, in less than two months. This falls far short of Sana's stated goal of lasting at least as long as autologous cells, or three to six months. Thus, Defendants knew, but did not disclose to investors, that the data suggested Sana had not overcome immune response but only delayed it.

80.    On February 8, Sana sold $189.75 million of its shares in an underwritten offering.

### 2.    *Defendants Concealed From Investors That Though CAR T Cells Must Survive At Least Three Months, SC291 Survived At Most Two Months*

81.    As Defendant Harr himself stated during the January 9, 2024 presentation, "the best B-cell depleter man has created is actually a CD19-targeted CAR T-cell."

82.    Indeed, CAR T-cells targeting CD19 are so effective at killing B-cells that the mere presence of B-cells is treated as showing that the CAR T-cells have been destroyed. [5] According to one article, "B-cell aplasia [i.e., B-cell depletion] ... is an indirect measure of anti-

---

[5] *E.g.* Uri Greenbaum et al, Chimeric Antigen Receptor T-Cells in B-Acute Lymphoblastic Leukemia: State of the Art and Future Directions, Frontiers in Oncology, Volume 10, Article 1594, at 6, available at https://pubmed.ncbi.nlm.nih.gov/32984022/ .

FIRST AMENDED CLASS ACTION
COMPLAINT - 20
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1   CD19 CAR T-cell presence."[6]

2       83.   As Defendant Harr himself acknowledged, CD19-targeting CAR T-cells must

3   persist in the body to effectively treat cancers. For example, in a June 6, 2023 presentation,

4   Defendant Harr stated that "I think the data are very clear. You need three months to six months.

5   These CAR T-cells need to stick around that long." Harr reiterated this in a September 6

6   presentation, stating "you want to see cells persist for three to six months. I think that's where

7   you see things." The clinical literature likewise states that CAR T-cells must persist for some

8   time, though it suggests a slightly higher estimate: six months. Gabelli at al, supra note 7, at 1

9   ("Early ($\leq$ 6 months from infusion) loss of [B-cell aplasia] was associated with high relapse risk

10  in studies with … CD19 CAR T-cell products.").

11      84.   Thus, rapid B-cell recovery is not only a negative indicator for clinical outcomes,

12  it also shows that the CD19-targeting CAR T-cells were quickly destroyed. As Terry Fry, Sana's

13  head of T-Cell Therapeutics, explained at Sana's May 23, 2023 Research & Development Day,

14  B-cell recovery within three months of treatment shows that the CAR T-cells did not persist and

15  results, in the vast majority of cases, the patient relapsed within a year:

16        [T]he other pattern that we saw was that with early B-cell recovery within the first
          three months after CAR T-cell infusion, as evidence of lack of functional CAR T-

17        cell persistence, the vast majority of those patients ultimately relapsed with
          leukemia that retained expression of the CD19 protein on the surface, again

18        indicating the problem with lack of cell persistence.

19      85.   On January 13, 2025, Defendants filed with the SEC slides for a presentation

20  during which they presented data showing that patients in Ardent experienced B-cell recovery

21  within two months:

22

23  _____

[6] Maria Gabelli et al, Maintenance therapy for early loss of B-cell aplasia after anti-CD19 CAR T-cell
therapy, Blood advances, 2024 8 (8) 1959, 1959, available at
https://ashpublications.org/bloodadvances/article/8/8/1959/498307/Maintenance-therapy-for-early-loss-
of-B-cell

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 21
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566



# SC291 can be safely administered and results in deep, dose-dependent B-cell depletion in oncology

### ARDENT Safety Data (N=16)

- No cases of Grade 2 or higher CRS
- 3 cases of Grade 1 CRS
- No cases of ICANS
- 1 case of Grade 1 IEC-HS

Deep B-cell depletion seen in NHL patients

Data cutoff Nov 2024.
Abbreviations: CRS, cytokine release syndrome; ICANS, immune effector cell-associated neurotoxicity syndrome; IEC-HS, immune effector cell associated HLH-like syndrome.

© 2002-2025 Sana Biotechnology. All rights reserved.

24

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

86.     Defendants presented data for patients who received the highest dose, 200 million cells. The data Defendants presented showed that all patients who had measurable B-cells in their bloodstream before the treatment were well on their way to recovering to pre-treatment B-cell levels within two months of treatment. Indeed, two patients actually exceeded their pre-treatment B-cell blood concentration levels within two months. Thus, SC291 cells did not survive past two months in any patients even at the highest dose. More, during the first month, Sana measured patients' B-cell concentration every few days, but only tested monthly thereafter. The B-cells could have easily recovered at day 30. Thus, at most, Defendants can say that the CAR T-cells survived at least 28 days, but no more than two months.

87.     In the slide header, Defendants claimed that they had observed "***dose-dependent*** B-cell depletion." This means that patients who received higher doses saw better results.[7] Thus, patients who received lower doses would have seen shorter depletion, on average.

88.     Only six patients received a dose of less than 200 million cells. Sana had two-month data on four of the six patients by the time Defendants delivered their January 9, 2024 presentation.[8]

89.     It is not possible that the response was dose dependent, that at the highest dose B-cell count rebounded within two months, but that B-cell count took longer to rebound in patients 1-4 because they accounted for two thirds of the patients who received lower doses:

---

[7]     National Cancer Institute, definition of dose-dependent, available at https://www.cancer.gov/publications/dictionaries/cancer-terms/def/dose-dependent
[8] While the slide claims that it is presenting data as of January 5, 2023, that is clearly a typo because Sana did not begin human trials until May 2023.

FIRST AMENDED CLASS ACTION
COMPLAINT - 23
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

90.    Sana claimed to have had 2-month data on patient 4. Further, because Sana had to wait at least 28 days between each treatment, Sana had at least five-month data on patient 1, four-month data on patient 2, and three-month data on patient 3. With these data in hand, Defendants had actual knowledge that that all the patients' SC291 cells had been destroyed within two months.

91.    That the cells deteriorated within two months in all patients with a validated CAR T-cell tends to rule out any cause except immune response. The greatest impediment to allogenic CAR T therapy is immune rejection by the recipient. There is no evidence that SC291 overcame rejection, and strong evidence that the transferred cells were rapidly eradicated through immune rejection within a few weeks. Indeed, Defendants themselves linked deterioration in less than three months to an immune response:

We believe that persistence matters and that persistence will translate to durable complete responses. And if we get data in the three to six month range, we could be comparable to what auto[logous] CAR-T, say, but with a manufacturing platform that lets us provide much more access to patients. If we're in the two to three month range, it looks more like a best-in-class allo[geneic] CAR-T and less than that we're probable seeing responses closer to what we've seen with other allo players.

92.    That allogeneic cells tended to deteriorate before three months, while autologous cells lasted at least three to six months, shows that when allogeneic cells decay rapidly, it is because of an immune response.

93.    The results did not necessarily mean that SC291 would not work at higher doses. It was possible that at higher doses, enough SC291 cells would survive long enough to deplete B-cells for enough time that the treatment will be effective.

94.    Nor did the data preclude SC291's use in other indications. For example, Sana was also pursuing SC291 in autoimmune diseases. As Defendant Harr explained in a September 6, 2024 presentation, a treatment can be effective in the autoimmune context even with less B-cell

FIRST AMENDED CLASS ACTION
COMPLAINT - 25
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

depletion than for cancers:

> I mean, one of the things that we learned in oncology is these cells [SC291] have to stick around for a while to have time to survey the whole body and get rid of all the tumor cells. You're gonna get rid of most likely all B-cells and tumor cells to do that, right, CD19. It's probably true that you have to stick around a lot less long to get rid of all B-cells, right? So the persistence that you need is probably less, which may mean that more allogenic players can compete with us, rather, than could in oncology.

95.     That's because the premise of CAR T autoimmune diseases is that the body merely needs reset the immune system through B-cell depletion, which only requires killing all active B-cells, rather than eliminating all active B-cells and cancerous cells. Indeed, Sana cited the January 13, 2025 slide showing that SC291 did not persist long enough to treat cancers as evidence that SC291 could effectively treat autoimmune diseases. Thus, Sana had a reason to continue with the SC291 oncology trial, either because the drug might be effective at a higher dose, or because the data from the SC291 oncology trial might show that SC291 was effective enough for autoimmune diseases.

96.     But the data showed that Sana had not demonstrated immune evasion at the 60 and 120 million cell doses, and undercut efficacy in cancer treatment at these doses. Defendants' past-tense statement that Sana had overcome immune rejection was just not true.

### C.      Defendants' Materially False and Misleading Statements & Omissions

97.     Beginning on January 9, 2024, with the release of preliminary data for Sana's ARDENT trial, Defendants made material misrepresentations and omissions about the early success of the study, suggesting Sana had solved the immune evasion problem in humans with its allogeneic CAR-T SC291 cells. Defendants also claimed that SC291 was working exactly as Defendants had hoped.

98.     On January 9, 2024, Sana filed a Corporate Presentation as Exhibit 99.1 to a Form 8-K with the SEC signed by Sana's Executive VP and General Counsel, Bernard Cassidy. The

FIRST AMENDED CLASS ACTION
COMPLAINT - 26
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

January 9 8-K explained that Sana intended to discuss the presentation at the 42ⁿᵈ Annual J.P.

Morgan Healthcare Conference, at which Defendant Harr presented that day. The purpose of

Sana's presentation was to disclose new data from ARDENT. In his presentation, Defendant Harr

stated:

> The real goal is to figure out, do we have a drug here? And **the first part** of understanding, do you have a drug, **is can we overcome allogeneic immune rejection?  If we can do that, that's probably 80% of the risk of the program and 80% of the risk of the company, right?**  That is something that we've seen in non-human studies that we are really quite good at. **We want to make sure that the animal data translate into people.**  If they do, can we make great CART-cells? And that's measured by safety and efficacy of the program early.  And then we want to see how does that translate over time into durable, complete responses, and finally, we need to make sure that we have a real scale manufacturing process.

99.     Defendant Harr's statement was false and misleading because: (a) Sana had merely

delayed immune rejection, rather than demonstrate immune evasion, in that SC291 cells were

destroyed by the immune system within two months; (b) even if Sana had demonstrated immune

evasion, the demonstration did not take 80% of the risk out of SC291 because Sana had data

showing that SC291 cells were not durable because B-cells recovered within two months; (c) if

Sana's data shows that its cells are probably not durable enough for an oncology treatment, then

Sana has not retired 80% of the risk; and (c) Sana had previously boasted that SC291 cells lasted

three months in animal studies, and Sana's cells lasted less than two months in humans, so

Defendants already knew that SC291's animal data did not translate into humans.

100.     In prepared remarks, Defendant Harr claimed that Sana saw with SC291 that:

> [A]s a patient's immune system reconstitutes, **our fully hypoimmune cells live**. And we'll know the immune system is reconstituted because you will generate an immune response against the partially edited cells.  **So this is the test of does this really work in humans.  So what we see is what we hoped we would see**.

101.     Defendant Harr's statement that "this really work[s] in humans" was misleading

for omitting evidence, known to Sana, that SC291 did not work in humans, namely that SC291

FIRST AMENDED CLASS ACTION
COMPLAINT - 27
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

cells deteriorated within two months of treatment. Harr's statement that "what we see is what we hoped we would see" was misleading because Harr had previously communicated that Sana hoped to see SC291 cells survive three to six months and, as of the time of Harr's statement, Sana's evidence suggested that SC291 cells survived less than two months. Harr's statement that "our fully hypoimmune cells live" was misleading because SC291 cells survived for less than two months.

102.    Defendant Harr presented a slide purportedly showing that SC291 had evaded the immune system:

FIRST AMENDED CLASS ACTION
COMPLAINT - 28
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

FIRST AMENDED CLASS ACTION
COMPLAINT - 29
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

In the far right image, the slide states, "*NK cells do __NOT kill CAR T cells__.*"

103.    Presenting the slide, Defendant Harr stated:

*So this next slide is, in many regards, my favorite slide in the whole presentation. So it's kind of the killer slide. It's the picture of what happens.* So this is actual, these are NK cells from patients 28 days after being treated. And what you see is when you have double knockout cells. This is what a lot of the field has done with Class I and Class II.

The green cell is the CART-cell and the rest is the NK cell. And very rapidly, the NK cells will recognize and eat and destroy the CART-cell. We're often asked, well, what happens if you knock out Class I and Class II and over express HLA-E? So, we can try that system for you. And, again, the patient's NK cells will rapidly recognize and destroy those cells.

And what you see here on the right-hand side is *what happens to the NK cells and our fully modified CAR T-cells*. And they bump up against it, *but there's absolutely no killing.* And *this is the most important slide in many regards, because it tells you that with real patient blood, real patient samples, we've overcome the large challenge in the field, which is NK cell recognition of these cells.*

And just to be sure, we said, hey, what if there's something else in the blood that might kill these cells? And what you see is against wild-type CAR T-cells, as expected, they're dead. Again, that's just an allogeneic cell, my cells into you. If you knock out Class I and Class II, the blood from the patient will kill those cells. But what you see in the right-hand side is *our fully gene-modified cells, they really do work.*

*So the drug is working exactly as we hoped it would. And the immune evasion that we saw in the preclinical setting seems to be translating into people.* So stay tuned. The early data suggests that we have the safety, the desired immune evasion and the clinical impact that we're hoping to see. We'll have a lot more data as the year goes forward and we'll share it across all these different parameters.

104.    Harr's statement that Sana had overcome immune evasion misleadingly omitted that, based on present data, Sana had not overcome immune response, it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted only two months. Harr's statement that "the drug is working exactly as we hoped it would" misleadingly omitted that SC291 cells were lasting less than two months, which is less than the three to six month benchmark Defendants had told investors they hoped Sana met because

FIRST AMENDED CLASS ACTION
COMPLAINT - 30
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

meeting the benchmark was necessary to prevent relapse. Harr's statement that preclinical work was translating into humans was false because Harr had previously boasted that SC291 cells lasted three months in animal studies, and Sana's cells lasted less than two months in humans, so Defendants already knew that SC291's animal data did not translate into humans.

105.    In prepared remarks, Defendant Harr also stated:

> We've actually used this exact same drug, SC291, in cancer patients. And so we can look at the B-cells in the cancer patients. ***And what you see here is that very rapidly we can completely deplete the B-cells.***

106.    Harr's statement misleadingly omitted that even if B-cells were rapidly depleted, they recovered within two months of treatment, far too quickly for an effective cancer treatment.

107.    On January 9, 2024, at the J.P Morgan conference, Harr also sat for a special CEO chat with Flagship Studio. During the interview, Defendant Harr said:

> And so, we were optimistic that, as we moved through 2023, we started to treat humans. And what we found is we moved from the early patients, and we'll talk about the technicality in a second. Sorry, from the preclinical studies into early patient data is ***we're seeing exactly what we hoped we would see.***

108.    Harr's statement that "we're seeing exactly what we hoped we would see" misleadingly omitted that SC291 cells were lasting less than two months, which is less than the three to six month benchmark Defendants had told investors they hoped Sana met because meeting the benchmark was necessary to prevent relapse.

109.    On February 29, 2024, Sana issued an earnings release and business update for Q4 2023 and YE 2023 to its corporate website ("2/29/2024 Earnings Release"), which quoted Defendant Harr and was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy ("2/29/2024 8-K").  The release said "***Early SC291 data from the ongoing ARDENT trial*** in relapsed/refractory NHL and CLL suggest ability to dose safely, ***demonstrate the desired immune evasion profile,*** and early clinical efficacy using hypoimmune technology."

FIRST AMENDED CLASS ACTION
COMPLAINT - 31
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

110.    Defendants' statement misleadingly omitted to disclose that data from ARDENT had not demonstrated the desired immune evasion profile or clinical efficacy, but rather Sana's available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

111.    On March 6, 2024, Defendant Harr presented at the TD Cowen 44th Annual Healthcare Conference. In response to a question about the ARDENT trial data released to that point, Defendant Harr said:

So what should happen in a CAR T-cell is that if you have an intact immune system, you should generate—should generate an immune response to your unedited cells. And your **fully edited cells, which the** immune—your—my **immune system shouldn't see. So what we showed you is that's exactly what happened, right?**

So patients generated a -- and patients who've been dosed, the study have generated T-cell response, it kills the unedited cells.  They will generate—they will—their NK cells will kill cells that don't overexpress CD47. They generate an antibody response, generally, they come back that the second, some of them will just generate an antibody response to unedited cells. **And edited cells are completely wide, right?  And the immune system just doesn't see them, right?  So that's what we've shown you. There's no immune response as we look out over time to our edited cells.**  We haven't gotten into how long the cells last and things like that, but we'll put that into some kind of scientific presentation.  But they kind of smell like that.

112.    Responding to a question about treatment of autoimmune disease, Defendant Harr said about SC291: "Is it possible [we] don't work as well or we work better than autologous cells? **I think both those things are still on the table. We don't know the answer.**"

113.    Harr's statements were misleading because: (a) he omitted to disclose that Sana's data showed that it had merely delayed an immune response, which then destroyed SC291 cells within two months; (b) according to Sana, autologous cells lasted three to six months; (c) again according to Sana, persistence of less than three months led to almost universal relapse; and (d) SC291 cells lasted less than two months.

114.    On May 8, 2024, Sana issued an earnings release and business update for Q1 2024 to its corporate website, which quoted Defendant Harr and was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy.  The earnings release stated that "***Early SC291 data from the ongoing ARDENT trial*** suggest the ability to dose safely, ***the desired immune evasion profile***, and early clinical efficacy."

115.    Defendants' statement misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather Sana's available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

116.    On May 13, 2024, Defendant Hardy presented at the Citizens JMP Life Sciences Conference. In response to a question about the difficulty of competing with autologous cells in oncology, he said, "I think we've been clear that we hope to be as good as autologous in efficacy, and ***I think they've proven that these work.***" Responding to a follow up question suggesting the positive ARDENT study data indicated potential for less severe diseases, Defendant Hardy said, "I will say we also were really encouraged and it was only four patients.  But in those four patients at lower doses to see three partial responses, and two complete responses, we were certainly encouraged by that. ***Combined with the fact that the immune assays that were ran also showed that we avoided the T-cells, B-cells, antibodies, and C and NK cells.***"

117.    Hardy's statements were misleading because he omitted to disclose that: (a) based on present data, Sana had not overcome immune response, it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted only two months; they omitted to disclose that Sana's data showed that it had merely delayed an immune response, which then destroyed SC291 cells within two months; (b) according

FIRST AMENDED CLASS ACTION
COMPLAINT - 33
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

to Sana, autologous cells lasted three to six months; (c) again according to Sana, persistence of less than three months led to almost universal relapse; and (d) SC291 cells lasted less than two months.

118.    On August 8, 2024, Sana issued an earnings release and business update for Q2 2024 to its corporate website, which quoted Defendant Harr and was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy  The earnings release stated that, after three months of additional clinical work had passed, that "***Early SC291 data from the ongoing ARDENT trial*** suggest the ability to dose safely, ***the desired immune evasion profile,*** and early clinical efficacy."

119.    Defendants' statement misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

120.    On September 5, 2024, Defendant Harr presented at the Wells Fargo Healthcare Conference.

121.    In prepared remarks, Defendant Harr said:

And so we now have four separate programs ongoing, seven different indications in human testing.  We've shown a little bit of human data early last year and it was in an allogeneic CAR T-cell in patients with lymphoma and chronic leukemia. ***Four patients, you saw what you hope you would see***, it's early data.  Two of them had a complete response, another had a partial response and well tolerated and ***generally the cells were not recognized by the immune system, right?  And so that's really, really what we were hoping to see earlier.***

122.    Later, in response to a question about Sana's go-no-go criteria for SC291, Defendant Harr said, in part:

The hard part about oncology kind of ***already know it works from four patients*** but it's a very competitive space with the high bar to move forward and ***we may or may not hit that bar, right?***

FIRST AMENDED CLASS ACTION
COMPLAINT - 34
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

123.    Defendant Harr's statement was false and misleading because: (a) S Defendants' statement was false because Sana had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months; (b) the "bar" referenced in Defendant Harr's statement is set by the performance of autologous CAR T-cells; (c) according to Sana, autologous cells lasted three to six months; (d) again according to Sana, persistence of less than three months led to almost universal relapse; (e) SC291 cells lasted less than two months; and, therefore, (f) it was not possible that Sana would hit the "bar" referenced in Defendant Harr's statement.

124.    On September 9, 2024, Sana's VP of Finance, Investor Relations, Nicole Keith, presented at the H.C. Wainwright 26th Annual Global Investment Conference. In prepared remarks discussing Sana's work in B-cell cancers, Keith said about the early ARDENT data:

> And you can see some of the early clinical data where four – three of four valuable patients had at least a partial response with two ongoing complete responses.  I won't go into the details today, but *the immune response data provide important early insights that we are seeing the desired immune evasion profile.* The ARDENT trial continues with enrollment and more data is expected in 2024.

125.    Defendant's statement that the data provided "early insights that we are seeing the desired immune evasion profile" misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

126.    On October 1, 2024, Defendant Harr participated in the Goldman Sachs Cell Therapy Day conference.  In response to a question about when Sana would release further SC291 data—in either oncology or autoimmune—he said, "*We put these gene modifications and then we've shown you a few patients worth of data, and it looks like—they look pretty good.* They're

FIRST AMENDED CLASS ACTION
COMPLAINT - 35
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

early. There are no safety issues that we're seeing. ***They seem to avoid immune detection by the assays that we have.***"

127.    Harr's statement that the data provided "they look pretty good" and "they seem to avoid immune detection by the assays that we have" misleadingly omitted to disclose that: (a) Sana's data showed that B-cells recovered within at most two months, as shown by the fact that even at higher doses, SC291 cells lasted at most two months; (b) B-cells' recovery showed that SC291 cells were being destroyed by the patients' immune system, such that Sana was not seeing the desired immune evasion profile; (c) and, as to Harr's statement about assays, assays would include those showing B-cell recovery and CAR T-cell destruction, which showed that the immune system was destroying SC291.

**D.    Additional Facts Further Probative Of Scienter**

**1.    *In Their Stock 2023 Presentation, Defendants Maintained That Sana Would Collect Durability Data By Late 2023 Or Early 2024 And Present It To Investors***

128.    SC291 cell durability was an important metric for Sana. In Defendants' telling, it was the second of three sets of data that would retire critical risks that Sana faced.

129.    From its May 23, 2023 Research & Development Day through a December 6, 2023 presentation at the JMP Securities Hematology and Oncology Summit, Sana delivered nine presentations at investor-focused conferences. In six of these presentations, Defendants claimed that Sana would have durability data in late 2023 or early 2024:

(a)    During Sana's Research & Development Day, Harr stated:

So, the way to turn it into medicines is keep peeling back the evidence. So, we'll have immune evasion data. We can figure that out very quickly within a few patients. We'll do that. We have an ongoing enrolling study called ARDENT, which we'll talk about for the CD19 CAR. And if you have immune evasion, and you see cancer cells killed, and you now may persist that should lead to durable complete responses. ***We will know early evidence of just the complete responses and persistence, again, as we move through this year and into next.*** And the

FIRST AMENDED CLASS ACTION
COMPLAINT - 36
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

durable, complete responses, six months in and out, functional cures, hopefully we can begin to see that as we move into next year.

(b) During Sana's June 7, 2023 presentation, Harr stated:

You may have a minority of people, people who do. But we can show you all kinds of data to help you understand that. But we want—first we want to see survival of our cells. *The next thing that we want to see is we want to see high rates of complete responses with cellular persistence.* And then the last thing that will translate into is long-term durable complete remissions, right? And that's really the goal of turning it into a product. But so, we're going to gradually peel back that onion. We'll probably know the cell selection, right? *Enrichment, and the persistence of these cells this year.* It'll take us longer to have durable, complete responses.

(c) During Sana's June 12, 2023 presentation, Harr stated:

*So, the second layer of evidence will be first layer of evidence, dull enrichment. That's a great day and that day if we have it, we will change the way we invest internally because we will know the hypoimmune platform is going to translate.* The second will be, do you have a high level of complete responses with cellular persistence? That will tell you if you have a great product. There will be people who want to see—and by the way, we'll know the first, soon. *The second, we'll begin to figure that out this year.*

(d) During Sana's September 6, 2023 presentation, Harr stated:

Because now you've translate the nonhuman—all of the preclinical work in nonhuman primates and mice in the humans. That isn't that complicated to figure out. That's part one. Part two is then do these cells really grow and persist. That takes time to figure out, *you want to see cells persist for three to six months*. I think that's really where you see things. No, that may or—*we'll have that data over the next three to six months. I don't really know, maybe we'll have it this year, maybe early next year.*

(e) During Sana's September 7, 2023 presentation, Defendant Hardy stated:

So really, the next layer of evidence you want to see is persistence. And we believe that persistence will really translate to complete durable responses. What our goal is is that these cells survive kind of out three to six months, and that would be comparable to autos. So that puts us in a place where we think we're going to see good efficacy, plus we'll be able to manufacture these at significant scale. Obviously for this to happen, you not only need to see the immune invasion on the other side, but we have to make really good T-cells. The T-cells are going to need to expand. *And so, if you think about when we'll see this, this could take a bit longer than what you're seeing on the other. But again over the next call it three*

*to six months, we expect to kind of start to learn about kind of what this looks like in the early cells.*

(f)  During Sana's September 12, 2023 presentation, Defendant Harr stated:

Second level of evidence. You make good CAR T-cells. There, you probably want to see a nice level of complete responses and then ***you want to see the cells persist for a while, right, which is a combination of immunology and how well we make them.*** So that will take a decent amount of time, not forever. We should know the first question, hopefully, sometime this year. ***Second question, maybe, maybe not, right?***

130.    As Defendants' above-quoted statements made clear, Defendants needed extra time to collect and present durability data because, as they told investors, they expected SC291 cells to last three to six months.

131.    Defendants' assumption that SC291 cells could last three to six months proved incorrect. In fact, SC291 cells lasted less than two months. Thus, Defendants had durability data in the earlier part of the period, or at least by January 9, 2024. They could have presented it then.

132.    In the September 6, 2023 presentation, Defendants told investors that they would present the data when available:

Q: So we'll get hopefully a handful of patients with that data in terms of the number of edited cells, maybe get some data on persistence, and we'll wait for next year for a more robust persistence data in addition to potentially durable response data?

DEFENDANT HARR: Yes.

133.    Asked at the September 6, 2023 conference where Sana would present the data, Defendants made it clear that they would present at the latest in spring or early summer 2024:

Q: Thoughts on how you're going to disclose the data? Should we think maybe ASH [an annual medical conference held in December], should we think of webcast –

DEFENDANT HARR: ASH, AACR [an annual conference held in April], ASCH [annual conference held in late May/early June], EHA [annual conference held in June], that's kind of where everybody in hematology goes. Three of those meetings are within a month of each other and the other one is in the winter, right? So ASH is a good place to start and we'll work our way through next spring then.

FIRST AMENDED CLASS ACTION
COMPLAINT - 38
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

134.    Yet having told investors they would produce durability data when available, Defendants did not publish durability data in their January 9, 2024 presentation. In fact, Defendants only published data on B-cell recovery, a proxy for durability, in January 2025, after they had abandoned ARDENT.

135.    That Defendants suggested Sana would publish durability data and then failed to shows that Defendants knew the data was bad and deliberately omitted it to avoid undermining their claim that Sana had SC291 worked exactly as promised, including that it evaded the immune system.

### 2.    *The ARDENT Clinical Trial Protocol Required That Sana Collect Data Showing the Deterioration Of SC291*

136.    Sana filed the ARDENT clinical trial protocol with the federal government. *See* Sana Biotechnology, Inc., *Study Evaluating SC291 in Subjects With r/r B-cell Malignancies (ARDENT)* ("ARDENT Protocol").[9]

137.    The ARDENT Protocol set out, among other things, what metrics Sana would measure.

138.    One of these metrics is the number of SC291 cells in the patient's blood over time. Sana's stated purpose for measuring SC291 count over time is to "[e]valuate cellular kinetics ***and persistence of SC291.***"

139.    Thus, pursuant to the ARDENT Protocol, Sana was required to obtain regular data from patients showing the persistence of SC291 cells.

140.    Sana evaluates cancer progression from blood samples. The same blood samples Sana used to evaluate cancer progression would also show that SC291 cells were rapidly deteriorating.

---

[9] Available at https://clinicaltrials.gov/study/NCT05878184.

FIRST AMENDED CLASS ACTION
COMPLAINT - 39
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

141.    Most clinical trials are placebo-controlled and double-blinded. But Sana's SC291's Phase I clinical trial was open-label, meaning that neither the patients nor the company was blinded to the results. There was no placebo group; in fact, all patients received SC291. Results were regularly collected and regularly passed on to the company. For instance, the data presented on January 9, 2024 was effective as of January 5, 2024. Thus, Defendants knew of the adverse results in near real-time.

142.    FDA regulations require that the sponsor determine whether any negative clinical development is related to the treatment, with these events called "adverse reactions". 21 C.F.R. §312.32(a). If the patient dies and the sponsor determines that the death is an adverse reaction to the treatment, the sponsor must report it to the FDA within 7 calendar days. *Id.* at (c)(1)(2). Investigators notify sponsors of deaths well in advance of the 7 calendar-day deadline so the sponsors can determine whether the death is a reportable adverse reaction.

143.    In an open-label clinical trial, data from patient withdrawals and scans should be promptly entered into a database. Instances in which sponsors access the study database are typically logged.

144.    Sana either maintained the ARDENT database itself ("Database") or had unlimited real-time access to it.

145.    Using the Database, Sana could create comprehensive reports on ARDENT's progress. These reports would have informed Sana's management how each patient had fared or was faring, including the date of every blood test, the status of the patient's B-cells, and durability of SC291 cells.  Because ARDENT was Sana's most advanced trial, Sana's personnel, including Harr and Hardy, would have frequently accessed the Database to keep abreast of developments.

FIRST AMENDED CLASS ACTION
COMPLAINT - 40
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1

2

3.      *Defendants' False Statements Helped Sana Raised Cash It Needed To Survive Past 2024*

3

146.    During the Class Period, Sana raised funds while the price of its securities was inflated by the alleged fraud.

4

147.    Sana only began Phase I trials in May 2023. It is years away from earning any revenues.

5

6

148.    As of December 31, 2023, Sana had $205.2 million in cash, cash equivalents, and marketable securities. Sana anticipated that it would spend approximately $200 million in 2024.

7

8

149.    Defendants were motivated to make misleading statements so that Sana could proceed with an offering to raise enough cash to make it through the year.

9

10

150.    Defendants' false statements at the January 9, 2024 presentation caused its stock price to increase 40% in one day.

11

12

151.    Sana then raised $189.5 million from selling its shares a month after presenting the January 9, 2024 data.

13

14

4.      *The Fraud Implicated Core Operations*

15

152.    The fraud alleged herein implicates the core operations of Sana.

16

153.    Sana is in the earliest stage of clinical trials. While Sana had multiple product candidates, SC291 in oncology was its most advanced product candidate, the subject of Sana's first Phase 1 trial (ARDENT), and the first product for which Sana presented clinical data. Moreover, SC291 remained the only product for which Sana had provided data through the program's de-prioritization in November 2024.  SC291's success or failure was a critical consideration for Sana's investors and for the analysts that covered Sana and participated in its quarterly earnings calls.

17

18

19

20

21

22

23

24

154.    Similarly, SC291's durability was critical to Sana's operations.  Defendants told investors that there were three sets of data that would retire risks Sana faced. Defendants identified durability as one of these risks. Defendants also told investors that they would collect durability data.

155.    Moreover, Defendants were aware that investors were focusing on ARDENT durability data. In a December 6, 2023 presentation, Defendant Hardy stated:

> Yes. I would say a few things and I don't know if I would rank order them. I would say there's obviously a lot of attention and questions related to two pieces of data. One, more data on our SC291 oncology program. Specifically, the early data which will tell us a lot about hypoimmune and *are those cells surviving*?

156.    It is absurd to suggest that the Individual Defendants and executive management did not know the facts and circumstances of the alleged fraud.  Moreover, such knowledge is imputable to the Individual Defendants, given the implication of core operations, the Individual Defendants' roles and status within Sana, the Individual Defendants' specific professional and educational backgrounds, the Individual Defendants' oversight and extensive involvement in Sana's clinical trials and product development efforts, the Individual Defendants' frequent public statements to analysts and investors detailing Sana's clinical trials and product development efforts, and their personal involvement in the key events and circumstances at issue, as otherwise alleged herein.

**E.      The Truth Begins To Emerge**

157.    Defendants' false statements artificially inflated Sana's share price.  Two partial corrective disclosures incrementally revealed aspects of Defendants' fraud, removing the artificial inflation.

158.    The first partial corrective disclosures began after hours on May 8, 2024 and continued during trading on May 9, 2024, as follows. On May 8, 2024, after market close, Sana

FIRST AMENDED CLASS ACTION
COMPLAINT - 42
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

published the May 8, 2024 earnings release.  But in the earnings release, Sana's pipeline updates announced no new ARDENT data. Providing a pipeline update without new data contradicted prior statements by Defendants that the data would be available by that point, such as Defendant Harr's statement on January 9, 2024, that "[w]e'll have a lot more data as we get through dose escalation or able to enroll patients very and treat patients very rapidly. And we'll have a lot more as the year goes on."

159.    Nor did Sana provide any indication that it intended to present any data at either of the forthcoming professional conferences. Before the Class Period, Defendants had stated that Sana would have durability data by early 2024. According to Defendants' own publicly-stated timeline, by May 2024, Sana was bound to have the data. As alleged above, in a September 6, 2023, presentation Defendants stated that Sana would present ARDENT data at two medical conferences taking place from late May through late June (ASCH and EHA). The May 8, 2024 earnings release was Sana's last chance to announce that it would present data at these upcoming conferences. Notably, Defendants had used Sana's Q3 2023 earnings release to announce that it would present data at a forthcoming December 2023 presentation.  Investors expected that Sana would use the Q1 2024 earnings release to announce its attendance at these conferences and that it would present early durability data, just as it had told investors it would.  Sana's failure to make such an announcement suggested that it would not be presenting data until an annual conference taking place in December 2024 (ASH). Defendants' failure to deliver a presentation was a materialization of the risk concealed by their false statements, in that the durability data Defendants would have presented showed that SC291 was not durable, and that's why Defendants didn't present it.

FIRST AMENDED CLASS ACTION
COMPLAINT - 43
Case No. 2:25-CV-00512-BJR

**Badgley Mullins Turner PLLC**
19910 50ᵀᴴ Ave. W., Suite 103
Lynnwood, WA 98036
Tel: (206) 621-6566

1    160.    Thereafter, and before the close of the markets on May 9, 2024, analysts covering

2  Sana noted the lack of new data. For instance, on May 8, 2024, TD Cowen published a report

3  noting "[e]nrollment in dose escalation is progressing, and Sana expects to share more data in H2

4  (presumably ASH) when it has 'handfuls' of patients at 6+ months of follow-up." It noted as a

5  "Forthcoming Catalyst[]: Add'l data from SC291's . . . Ph I trial (2024)."  It concluded "[d]espite

6  the compelling opportunity set, we see significant translational risk and are on the sideline pending

7  early translational/persistence data."

8    161.    Additional analyst reports followed before the market opened on May 9, 2024. H.C.

9  Wainwright & Co. published a report that included an update on the SC291 ARDENT study,

10  reiterating initial results, but noted analysts are "expecting an update on the ARDENT study in

11  2024 where we are expecting to see additional data from Cohort 1 (60M cells dose) and Cohort 2

12  (120M cells dose)."  It emphasized the need for additional data: "We are focusing on initial

13  durability data this year and seeing how that compares to other allogeneic cell therapy players and

14  the approved autologous CAR-T therapies."

15    162.    With no data disclosed in the Q1 2024 earnings release and no explanation that

16  data was forthcoming, Sana's stock price fell on heavy volume from a close of $9.49 per share on

17  May 8, 2024, to close at $7.50 per share on May 9, 2024, down $1.99 (20.97%) per share.

18    163.    On November 4, 2024, after market close, Sana published a press release to its

19  corporate website.  The release announced that Sana would "***suspend development of*** both ***SC291***

20  ***in oncology*** and of SC379, its glial progenitor cell program," purportedly to instead prioritize

21  future development activity for SC291 in B-cell mediated autoimmune diseases and increase

22  investment in its type 1 diabetes program. The modified strategy included a headcount reduction

23  to reduce cash burn and purportedly extend Sana's cash runway into 2026.  The release said about

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 44
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

suspending SC291 in oncology: "Given alternative opportunities within its pipeline as well as increased competition within blood cancers and uncertainty about the best path to regulatory and commercial success, Sana is halting enrollment and further internal investment in the Phase 1 ARDENT trial." Between Sana's issuing the earnings release and close of the markets on November 5, 2024, analysts covering Sana negatively reacted to Sana's announcement that it was suspending SC291's development. Several analysts issued reports before the market opened on November 5, 2024. JMP Securities published a report downgrading Sana stock and withdrawing JMP's price target due to Sana's delays in reporting clinical data and after "remov[ing] the projected revenues from SC291," due to the reprioritization. H.C. Wainwright published a report lowering its price target and noting that while Sana did not provide a data related reason to de-prioritize the SC291 oncology program, "Our understanding is likely that *the efficacy profile did not continue to hold up* once the company enrolled more patients…." The report noted "that *this program was the most advanced in Sana's pipeline* and clinical data for other programs have not yet been presented."

164.    With Sana's odd withdrawal of its leading product, Sana's stock price fell on heavy volume, from a close of $3.76 per share on November 4, 2024, to close at $3.39 per share on November 5, 2024, down $0.37 (9.84%) per share.

165.    As a result of Defendants' materially false and misleading statements and omissions, and the precipitous decline in market value of Sana's stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## V.    NO SAFE HARBOR

166.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Most, if not

FIRST AMENDED CLASS ACTION
COMPLAINT - 45
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any were so labelled, they included statements of then-historical or then-present fact, and there were no accompanying, meaningful, cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Sana's then-ongoing misconduct. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

167. Alternatively, to the extent that the statutory safe harbor does apply to any false or misleading statements pleaded herein that the Court deems to have been forward-looking, Defendants are still liable for those statements because at the time each of them was made, the particular speaker knew that the forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Sana who knew that those statements were false or misleading when made.

168. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VI. THE CLAIMS ARE TIMELY

169. The claims set forth herein were timely filed.

170. The market was not arguably aware until May 8, 2024, at the earliest, that credible allegations existed as to misconduct alleged herein concerning Sana's clinical trials and product development programs.

171. It was also not until May 8, 2024, that Lead Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to

FIRST AMENDED CLASS ACTION
COMPLAINT - 46
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    investors during the Class Period.  In the absence of publicly available information prior to then

2    suggesting that Sana's pronouncements in its SEC filings and other public statements during the

3    Class Period were materially false and/or misleading, Lead Plaintiffs were not under any duty to

4    inquire as to the truthfulness of Sana's public statements.  Therefore, Lead Plaintiffs' duty in that

5    regard arose no earlier than May 8, 2024.

6        172.    Prior to May 8, 2024, Lead Plaintiffs and Class members could not have been on

7    any inquiry notice of possible claims under the Exchange Act.  Even assuming this early date for

8    inquiry notice, Lead Plaintiffs' Exchange Act claims against Defendants were brought within two

9    years. Thus, Lead Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

10   **VII.    LOSS CAUSATION / ECONOMIC LOSS**

11       173.    The market for Sana shares was open, well-developed, and efficient at all relevant

12   times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct

13   and a scheme to deceive investors that artificially inflated Sana securities and that operated as a

14   fraud or deceit on Class Period purchasers or acquirors thereof by misrepresenting the material

15   facts alleged herein.   As detailed above, as Defendants' prior misrepresentations were

16   incrementally revealed to the public, the price of Sana securities fell, as artificial inflation came

17   out.  Accordingly, as a result of their purchases or acquisitions of Sana shares during the Class

18   Period, Lead Plaintiffs and the Class members suffered economic loss, i.e., damages, under the

19   federal securities laws.

20       174.    During the Class Period, Defendants presented a misleading picture of Sana's

21   financial condition, performance, and business prospects, including as regards Sana's then-

22   ongoing clinical trials and its product development efforts.  Defendants' false and misleading

23   statements and omissions had the intended effect and caused Sana's securities to trade at

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 47
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    artificially inflated prices throughout the Class Period and until the truth was incrementally

2    revealed to the market by the partial corrective disclosures pled herein.

3            175.    As detailed herein, the price of Sana shares dropped, on high volume, in response

4    to the issuance of each corrective disclosure alleged herein.  These stock drops removed inflation

5    from the price of Sana securities, causing real economic loss to investors who had purchased or

6    acquired them during the Class Period.

7            176.    These declines were a direct and proximate result of the nature and extent of

8    Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the

9    price declines in Sana securities negate any inference that the loss suffered by Lead Plaintiffs and

10   the other Class members was caused by changed market conditions, macroeconomic factors or

11   Sana-specific facts unrelated to Defendants' fraudulent conduct.

12           177.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class

13   members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate

14   the price of Sana's securities and the subsequent declines in the value thereof when Defendants'

15   prior misrepresentations and other fraudulent conduct were revealed.

16   **VIII.   PRESUMPTION OF RELIANCE**

17           178.    At all times, the market for Sana shares was an efficient market, supporting a

18   presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among

19   others:

20           (a)     Sana met the requirements for listing and was listed and actively traded on the

21   NASDAQ, a highly efficient and automated market, under the ticker symbol "SANA;"

22           (b)     Sana had approximately 220.45 million shares outstanding as of February 22,

23   2024, early in the Class Period, such that its stock was liquid.  During the Class Period, numerous

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 48
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    shares of Sana stock were traded on a daily basis, with moderate to heavy volume, demonstrating

2    an active and broad market for Sana stock and permitting a strong presumption of an efficient

3    market;

4          (c)    As a regulated issuer, Sana filed periodic public reports with the SEC;

5          (d)    Sana regularly communicated with public investors via established market

6    communication mechanisms, including regular dissemination of press releases on the national

7    circuits of major newswire services and other wide-ranging public disclosures, such as

8    communications with the financial press and other similar reporting services;

9          (e)    Sana was followed by several securities analysts employed by major brokerage

10   firms who wrote reports that were distributed to the sales force and certain customers of their

11   respective brokerage firms during the Class Period; and

12         (f)    Unexpected material news about Sana was rapidly reflected and incorporated into

13   its stock price during the Class Period.

14         179.   As a result of the foregoing, the market for Sana stock promptly digested current

15   information regarding Sana from all publicly available sources and reflected such information in

16   the prices of the stock.  Under these circumstances, all purchasers of Sana securities during the

17   Class Period suffered similar injury through their purchase thereof at artificially inflated prices,

18   and a presumption of reliance applies.

19         180.   Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption

20   of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

21   *United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in

22   their Class Period statements in violation of a duty to disclose such information, as detailed above.

23

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 49
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    **IX.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS**

2    181.    Lead Plaintiffs bring this federal securities action as a class action pursuant to Fed.

3    R. Civ. P. 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities, other than

4    Defendants and other excluded parties (identified below), who purchased or otherwise acquired

5    the securities of Sana (NASDAQ: SANA) during the Class Period of January 9, 2024 through

6    November 4, 2024, both dates inclusive, seeking to recover damages caused by Defendants'

7    violations of the U.S. federal securities laws and to pursue remedies under Exchange Act §§10(b)

8    and 20(a) and Rule 10b-5 promulgated thereunder, against Defendants Sana, Harr, and Hardy.

9    182.    Excluded from the Class are Defendants, the officers and directors of Sana during

10    the Class Period, members of their immediate families and their legal representatives, heirs,

11    successors or assigns, and any entity in which Defendants have or had a controlling interest.

12    183.    The Class members are so numerous that joinder of them all is impracticable.

13    Throughout the Class Period, Sana securities were actively traded on the NASDAQ.  While the

14    exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained

15    only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands

16    of members in the proposed Class.  Record owners and other Class members may be identified

17    from records maintained by Sana or its transfer agent and may be notified of the pendency of this

18    action by mail or email, using the forms of notice similar to those customarily used in securities

19    class actions.

20    184.    Lead Plaintiffs' claims are typical of the claims of the Class members, as Class

21    members are similarly affected by Defendants' wrongful conduct in violation of federal law that

22    is complained of herein.

23    185.    Lead Plaintiffs will fairly and adequately protect the Class members' interests,

24

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1  have no interests antagonistic to or in conflict with those of the Class, and retained counsel

2  competent and experienced in class and securities litigation.

3      186.    Common questions of law and fact exist as to all Class members and predominate

4  over any questions solely affecting individual Class members.  Among the questions of law and

5  fact common to the Class are:

6      •    whether the federal securities laws were violated by Defendants' acts as alleged
          herein;

7

8      •    whether statements made by Defendants to the investing public during the Class
          Period materially misrepresented material facts about the business, operations and
          management of Sana;

9

10     •    whether the Individual Defendants caused Sana to issue materially false or
          misleading financial statements during the Class Period;

11

12     •    whether Defendants acted knowingly or recklessly in issuing materially false or
          misleading financial statements;

13     •    whether the prices of Sana securities during the Class Period were artificially
          inflated because of the Defendants' conduct complained of herein; and

14

15     •    whether the Class members have sustained damages and, if so, what is the proper
          measure of damages.

16     187.    A class action is superior to all other available methods for the fair and efficient

17  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

18  the damages suffered by individual Class members may be relatively small, the expense and

19  burden of individual litigation make it impossible for Class members to individually redress the

20  wrongs done to them.  There will be no difficulty in the management of this action as a class

21  action.

22     188.    As alleged herein, Lead Plaintiffs will rely, in part, upon the presumption of

23  reliance established by the fraud-on-the-market doctrine inasmuch as Defendants made public

24  misrepresentations or failed to disclose material facts during the Class Period; the

FIRST AMENDED CLASS ACTION
COMPLAINT - 51
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Sana's securities; and Lead Plaintiffs and the Class members purchased or otherwise acquired Sana's securities between the time the Defendants failed to disclose or misrepresented material facts and the times true and corrective facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

### (Against All Defendants for Violations of §10(b) and Rule 10b-5 Promulgated Thereunder)

189.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

190.    This Count is asserted against Defendants and is based upon Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

191.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sana securities; and (iii) cause Lead Plaintiffs and other Class members to purchase or otherwise acquire Sana securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions pled herein.

192.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sana securities.  Such reports, filings, releases and statements, as alleged herein, were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sana's finances, operations, and business prospects.

193.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Sana, and intended thereby to deceive Lead Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

194.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of Sana, and in accordance with the Code of Conduct and the Governance Guidelines, the Individual Defendants had knowledge of the details of Sana's operations, business, and internal affairs.

195.    The Individual Defendants are liable both directly and indirectly for the wrongs

FIRST AMENDED CLASS ACTION
COMPLAINT - 53
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1    complained of herein.  Because of their positions of control and authority, they were able to and

2    did, directly or indirectly, control the content of the statements of Sana.  As officers and/or

3    directors of a publicly held company, the Individual Defendants had a duty to disseminate timely,

4    accurate, and truthful information with respect to Sana's businesses, operations, financial

5    condition, and prospects.  As a result of the dissemination of the aforementioned false and

6    misleading reports, releases and public statements, the market price of Sana securities was

7    artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning

8    Sana's business and financial condition that were concealed by Defendants, Lead Plaintiffs and

9    the other Class members purchased or otherwise acquired Sana securities at artificially inflated

10    prices and relied upon the price of those securities, the integrity of the market for those securities

11    and/or upon statements disseminated by Defendants, and were damaged thereby.

12        196.    During the Class Period, Sana securities were traded on an active and efficient

13    market.  Lead Plaintiffs and the other Class members, relying on the materially false and

14    misleading statements described herein, which the Defendants made, issued, or caused to be

15    disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Sana

16    securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and

17    the other Class members known the truth, they would not have purchased or otherwise acquired

18    said securities or would not have purchased or otherwise acquired them at the inflated prices that

19    were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class

20    members, the true value of Comerica securities was substantially lower than the prices paid by

21    Lead Plaintiffs and the other Class members.  The market price of Comerica securities declined

22    upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class

23    members.

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 54
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

197.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Exchange Act §10(b) and Rule 10b-5 promulgated thereunder.

198.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and/or sales of Sana's securities during the Class Period, upon the disclosure that Defendants had been disseminating misrepresented financial and operational reports and information to the investing public.

## COUNT II

### (Violations of §20(a) of the
### Exchange Act Against the Individual Defendants)

199.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

200.    During the Class Period, the Individual Defendants oversaw and participated in the operation and management of Sana, and conducted and participated, directly and indirectly, in the conduct of Sana's business affairs.  Because of their senior positions, they knew the adverse non-public information about Sana's business, operations, financial condition, results, and prospects, including its clinical trial data, product development efforts, and fundraising activities.

201.    As officers and/or Directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sana's business, operations, financial condition, results, and prospects and to correct promptly any public statements issued by Sana which had become materially false or misleading.

202.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sana disseminated in the marketplace during the Class Period concerning

FIRST AMENDED CLASS ACTION
COMPLAINT - 55
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

Sana's business, operations, financial condition, results, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sana to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Sana within the meaning of Exchange Act §20(a). In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sana securities.

203. Each of the Individual Defendants, therefore, acted as a controlling person of Sana. By reason of their senior management positions and/or being Directors of Sana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sana to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of Sana and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other Class members complain.

204. By reason of the above conduct, the Individual Defendants are liable pursuant to Exchange Act §20(a) for the violations committed by Sana.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding other and further relief as the Court deems just and proper.

FIRST AMENDED CLASS ACTION
COMPLAINT - 56
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1

## DEMAND FOR TRIAL BY JURY

2          Lead Plaintiffs hereby demand a trial by jury.

3    DATED:  August 15, 2025                    Respectfully submitted,

4                                               BADGLEY MULLINS TURNER PLLC

5
                                               s/ Duncan C. Turner
6                                              Duncan C. Turner, WSBA No. 20597
                                               19910 50th Ave. W., Suite 103
7                                              Lynnwood, WA 98036
                                               Tel: (206) 621-6566
8                                              Email: dturner@badgleymullins.com

9                                              *Liaison Counsel for the Class*

10                                             **THE ROSEN LAW FIRM**

11
                                               */s/ Jonathan Horne*
12                                             Jonathan Horne (*pro hac vice*)
                                               Yitzchok Fishbach (*pro hac vice pending*)
13                                             275 Madison Avenue, 40th Fl.
                                               New York, New York 10016
14                                             Telephone: (212) 686-1060
                                               Facsimile: (212) 202-3827
15                                             jhorne@rosenlegal.com
                                               yfishbach@rosenlegal.com
16
                                               *Court-appointed Lead Counsel*
17
                                               **BRONSTEIN, GEWIRTZ &**
18                                             **GROSSMAN, LLC**
                                               Peretz Bronstein
19                                             60 East 42nd Street, Suite 4600
                                               New York, New York 10165
20                                             Telephone: (212) 697-6484
                                               Facsimile: (212) 697-7296
21                                             Email: peretz@bgandg.com

22                                             *Additional counsel for Lead Plaintiffs*

23

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 57
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on this 15th day of August, 2025, I electronically filed the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such

4

filing to all counsel of record.

5

6
<p style="margin-left:40%"><i>s/ Yonten Dorjee</i> _____<br>
Yonten Dorjee, Paralegal<br>
<b>BADGLEY MULLINS TURNER PLLC</b><br>
Email:  ydorjee@badgleymullins.com</p>

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FIRST AMENDED CLASS ACTION
COMPLAINT - 58
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566