Hon. Barbara J. Rothstein

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| IN RE SANA BIOTECHNOLOGY, INC. SECURITIES LITIGATION | Case No. 2:25-cv-00512-BJR<br><br>**DEFENDANTS SANA BIOTECHNOLOGY, INC., STEVEN D. HARR, AND NATHAN HARDY'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**NOTE ON MOTION CALENDAR: January 29, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>[Proposed Order Lodged Concurrently] |

This case is about CAR T immunotherapy, a cutting-edge mode of treatments that use modified human blood "T cells" to treat diseases. Sana Biotechnology Inc. ("Sana"), a startup that has not yet brought a product to market, is developing several immunotherapies that it hopes will bring relief to underserved patients. CAR T therapies can be created with a patient's own ("autologous") cells or with donor ("allogeneic") cells. Although multiple autologous CAR T therapies have been approved for commercial use, these "one-patient-at-a-time" medicines, created custom for each patient, are costly, with limited availability. Companies are attempting to develop allogeneic treatments that are more scalable and accessible. To do so, one must either suppress the immune system (which can have harmful side effects) or evade immune rejection, the process by which a person's immune system tries to destroy foreign matter. Sana focuses on understanding immune evasion to make effective and scalable donor immunotherapies.

Sana has developed a proprietary hypoimmune platform ("HIP") that modifies the genome of treatment cells to evade immune rejection. One such treatment, SC291, is the focus of the Complaint (Dkt. 34). SC291 is a CAR T treatment focused on treating diseases that are associated with malfunctioning "B-cells", an immune cell that ordinarily makes antibodies to help fight off disease. SC291 is both (i) HIP-modified to avoid immune rejection, and (ii) edited to target CD-19, a protein found on B-cells and cancers of B-cells. During the class period, Sana ran two SC291 trials: ARDENT, which aimed to treat B-cell cancers, like lymphoma, and GLEAM, which aimed to treat B-cell autoimmune diseases, such as lupus. On January 9, 2024, Sana released early data from ARDENT and stated its belief that SC291 showed promise. Then, in November 2024, Sana announced that, due to cash constraints and competition, it would halt ARDENT but continue GLEAM to develop SC291 for autoimmune diseases. To this day, Sana continues to state publicly that ARDENT showed promise and to develop SC291 for autoimmune diseases.

Plaintiffs strain to portray this ordinary course of business as fraud. Plaintiffs' case is a string of suppositions: (i) as of January 9, 2024, "data in Defendants' hands showed" that in cancer patients dosed with SC291, their "B-cells recovered within two months"; (ii) detection of recovered B-cells in blood samples must mean that the "SC291 cells are completely gone"; and (iii) if B-cells recovered in 2 months, there could be no reasonable basis to believe that HIP or SC291 worked. Compl. ¶¶ 9; 52; 96. According to Plaintiffs' series of assumptions, Sana could not have believed that its early results were promising.

But no well-pleaded facts support Plaintiffs' string of assumptions. Plaintiffs have no well-pleaded



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

allegations that Sana had instant access to B-cell data to draw trial-level conclusions; that the data on B-cell recovery must mean that SC291 was destroyed (as opposed to, for example, the underlying illness being cured or SC291 having migrated from the blood to other tissue, such as the lymph nodes); ***or*** that the sole ***and necessary*** reason SC291 was not detected in certain blood tests was because HIP failed.

Without any concealed fraud, Plaintiffs' purported corrective disclosures are nothing of the kind. On May 8-9, 2024, Sana released its results, but said ***nothing*** new about ARDENT. Its stock declined $1.99 per share. On November 4-5, 2024, Sana announced that it would halt ARDENT and prioritize GLEAM. Sana's stock declined $0.37 per share. Critically, Sana continues to disclose and analysts continued to report that the early ARDENT data were promising and showed that HIP worked. Nothing previously disclosed ever has been (nor need be) "corrected". Stock drops alone are not securities fraud.

Plaintiffs have no plausible theory of falsity, no cognizable corrective disclosures linking the stock drop to a revelation that Sana had misled investors, nor factual allegations that could support the requisite strong inference of scienter. These claims should be dismissed.

## I. FACTUAL BACKGROUND

The facts below are those pleaded by Plaintiffs, including from documents that the Complaint incorporates by reference, or that are subject to judicial notice.

### A. Key Challenges of CAR T Therapy and SC291

SC291 is a CAR T therapy that targets a protein on the surface of B-cells, CD-19. Compl. ¶ 33. Malfunctioning B-cells play a role in cancers such as lymphoma and leukemia, as well as in autoimmune diseases, such as lupus. *Id.* ¶¶ 33; 121. "CAR T-cell treatments destroy all the patient's B-cells, thereby eliminating" the malfunctioning B-cells. *Id.* ¶ 33. Correspondingly, B-cell depletion is one "indirect measure" of CAR T-cell presence, *id.* ¶ 82, which—as Sana disclosed—may occur in the blood, lymph nodes and other tissue, Ex. 1 (2023 Form 10-K ("10-K")) at 9, 31.

In cancer patients who have already unsuccessfully tried chemotherapy or radiotherapy, 50% of those who try autologous CAR T therapy may enter remission for some period (a "complete response" [1]).

[1] A complete response is "[t]he disappearance of all signs of cancer in response to treatment". Ex. 2 (National Institutes of Health ("NIH") National Cancer Institute ("NCI") Definition).



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

Compl. ¶¶ 34; 56. Ideally, the treatment would cause a ***durable*** complete response, long-term remission. *Id.* ¶ 56. Cell persistence—how long functioning CAR T-cells are detectable in patients—is one factor in determining if a durable complete response is likely. *Id.* ¶ 91. But as Plaintiffs' own supporting document states, depending on the type of CAR T-cell, "long-term persistence . . . seems not required for durable remission". Ex. 3 (Article re B-cell Depletion) at 1 (cited Compl. ¶ 82 n.6). Persistence of SC291 cells for three to six months would be on par with persistence in some autologous treatments. Compl. ¶ 83.

SC291 is made from healthy ***donor*** cells that, before they can be effective, must avoid being destroyed by the patient's immune system. Without some intervention, immune cells would attack SC291 as "foreign". *Id.* ¶¶ 40, 43. Sana modifies SC291 with its HIP technology, which, prior to the class period, had been shown to effectively evade immune detection in animals. *Id.* ¶ 50. Sana told investors that if ARDENT showed similar immune evasion in humans, that could open the door for SC291—but there was no guarantee. *See id.* ¶ 66, 129(b); Ex. 4 (6/7/2023 Conf. Tr.) at 5 (stating that ARDENT was "the most important proof-of-concept we'll get because you will now have a good sense that [HIP] is what we hope it will [sic]", but **"*it will take us a lot longer to have durable complete responses*"**) (emphasis added); Ex. 5 (9/12/2023 Conf. Tr.) at 5–6 (stating that "the most important question for the company", carrying "most of the risk", was whether "the data we've seen in monkeys and mice and all the non-clinical data translate into people", after which Sana would have to assess whether Sana made "good CAR T cells", whether "the cells persist for a while" and assess the "durable, complete response rate", which would require "a lot of patients out at least six months"); Ex. 6 (5/23/2023 R&D Day Tr.) at 5 (stating that if SC291 was not destroyed by immune cells, Sana would have "actually overcome the challenge of immune rejection" as in "mice, humanized mice, non-human primates", but that would not "mean we have a drug").

Any reasonable investor would have known the risks of this Phase 1 (safety) clinical trial. Compl. ¶ 50, 54. Sana warned that its business was cash intensive and that it may "be several years, if ever, before [it] ha[s] a commercialized product and generate[s] revenue from product sales". Ex. 7 (2024 10-K) at 130; Ex. 1 at 126. It warned that early success "does not ensure that later preclinical studies or clinical trials will be successful". Ex. 1 at 82; Ex. 8 (2022 10-K) at 82. And it warned of "intense competition" from other drug companies. Ex. 7 at 133; Ex. 1 at 131; Ex. 8 at 122–23; *see also* Ex. 9 (9/5/2024 Conf. Tr.) at 13 ("[I]t's a very competitive space with a high bar to move forward. And we may or may not hit



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

that bar, right. . . . [I]t may not be the best use of our capital to [] keep going forward.")

**B. ARDENT is Promising, But Sana Decides to Prioritize GLEAM**

SC291 has been studied in two Phase 1 clinical trials: ARDENT for oncology and GLEAM for autoimmune diseases. Compl. ¶¶ 94-95. ARDENT started first, in May 2023. *Id.* ¶ 147. On January 9, 2024, Sana released a batch of data from ARDENT, which included six patients that had been administered transfusions of SC291 at two low doses. *Id.* ¶ 54.

Later that day, Sana disclosed a chart that showed that "3 of 4 evaluable patients had at least a partial response[2], with 2 ongoing complete responses". *See id.* ¶ 89. The chart also showed that one patient had "stable disease", in which the cancer "is neither decreasing nor increasing in extent or severity". Ex. 11 (NIH NCI Definition). And it identified when, if at all, patients had returned to "progressive disease", with "[c]ancer that is growing, spreading, or getting worse". Ex. 12 (NIH NCI Definition). On the topic of immune evasion, Sana disclosed that SC291 had encountered immune attack cells. Compl. ¶¶ 102–103. Importantly, fully HIP-modified SC291 cells were able to avoid immune detection, while the immune system recognized and killed any SC291 cells that lacked the complete HIP gene modifications. *Id.* As the slide heading explained, Sana deemed these "important early insights translating preclinical data to people". Ex. 13 (1/9/2024 Form 8-K ("8-K")) at 13–18. Sana also shared a slide of its preliminary conclusions—"Early data suggest ability to dose safely, the desired immune evasion profile, and clinical efficacy"—with the information it expected to collect going forward, which would include data on "[r]esponse rate", "[c]ell persistence" and "[d]urability of responses". *Id.* at 19. In discussing GLEAM, Sana showed data from Patient 4 in the ARDENT trial, demonstrating that, as of Day 28, B-cells were not detectable in the patient's blood. *Id.* at 22. The title explained that "SC291 treatment leads to deep B cell depletion in oncology patient". *Id.* ***Plaintiffs do not allege that any of this disclosed data was inaccurate.***

Over the next months, Sana reiterated its views that these early results were promising for SC291. Specifically, at quarterly releases, Sana stated that "***Early SC291 data from the ongoing ARDENT trial*** in relapsed/refractory NHL and CLL suggest ability to dose safely, ***demonstrate the desired immune***

[2] A partial response is a "decrease in the size of a tumor, or in the extent of cancer in the body, in response to treatment". Ex. 10 (NIH NCI Definition).



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

***evasion profile,*** and early clinical efficacy using hypoimmune technology". Compl. ¶ 109 (2/29/24); ¶ 114 (5/8/24); ¶ 118 (8/8/24); *see also id.* ¶ 124 (9/9/24) ("***[T]he immune response data provide important early insights that we are seeing the desired immune evasion profile***".).

On March 6, 2024 *(id.* ¶¶ 111–12), May 13, 2024 (*id.* ¶ 116), September 5, 2024 (*id.* ¶¶ 121–22), September 9, 2024 (*id.* ¶ 124), and October 1, 2024 (*id.* ¶ 126), Sana reiterated the historical data it reported on January 9, 2024 and its interpretation thereof. *Id.* ¶ 116 ("***I think they've proven that these work***".); *id.* ¶ 126 ("***We put these gene modifications and then we've shown you a few patients worth of data, and it looks like—they look pretty good. . . . They seem to avoid immune detection by the assays that we have***".). Sana continued to warn investors that the trial might not succeed. For example, on March 6, 2024, Dr. Harr said: "Is it possible [we] don't work as well or we work better than autologous cells? ***I think both those things are still on the table. We don't know the answer***". *Id.* ¶ 112.

Plaintiffs identify two "corrective disclosures" that, they allege, revealed some earlier concealed ARDENT-related fraud. *Id.* ¶ 157. On May 8, 2024, Sana released ***no new news*** about ARDENT, but its stock declined by $1.99 (20.97%) the next day. *Id.* ¶ 162. On November 4, 2024, at the end of the class period, Sana announced a change in its research priorities. Sana stated that "[g]iven alternative opportunities within its pipeline as well as increased competition within blood cancers and uncertainty about the best path to regulatory and commercial success, Sana [would] halt[] enrollment and further internal investment in the Phase 1 ARDENT trial". Ex. 14 (11/4/2024 Press Release) at 1. Sana reaffirmed that the "[e]arly clinical data with [HIP] suggest[ed that] HIP-modified cells evade immune detection", but said that it would focus on GLEAM and diabetes treatments to "reduce [its] cash burn" and "ensure that [Sana] [is] directing [its] investments" to "have the greatest impact for patients". *Id.* It cited "early clinical data with [SC291] in both oncology and autoimmune diseases" as evidence that "SC291 can predictably lead to the deep B-cell depletion that appears to drive an immune 'reset'" in patients with B-cell autoimmune diseases. *Id.* Sana said it was "actively seeking a licensing partner" to continue ARDENT. *Id.*

Sana's stock declined $0.37 (9.84%) per share the next day. Compl. ¶ 164. Analysts did not react with surprise. Instead, JMP stated it "believe[d] the data generated to date suggest the hypoimmune platform should . . . be shielded from the host's immune system". Ex. 15 (11/5/2024 JMP Securities



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

Report) at 1. H.C. Wainwright was "not particularly surprised by the decision to discontinue development in oncology," which other companies had done due to competition, and said it "continue[d] to believe SC291 in oncology provided positive [proof of concept] for the hypoimmune platform which could be applicable to other indications." Ex. 16 (11/5/2024 H.C. Wainwright Report) at 1.

### C. Sana Maintains Its Interpretation of ARDENT Even After Suspending Efforts

Sana has not abandoned SC291 or retracted its view that ARDENT data were promising. To the contrary, on January 13, 2025, Sana released additional ARDENT data and reiterated the same conclusion: SC291 could achieve "deep, dose-dependent B-cell depletion". Compl. ¶ 85. Sana reiterated that finding on March 17, 2025: "Data from the suspended ARDENT trial . . . demonstrated the ability to safely dose SC291 with the desired deep B-cell depletion". Ex. 17 (3/17/2025 8-K) at 5. ***After the filing of the Complaint,*** Sana and external scientists published in a peer-reviewed journal article an analysis of the ARDENT data through September 19, 2024 and concluded that it "supports the reliability of the HIP concept to evade allogeneic cellular immunity". Ex. 18 (9/4/2025 Article in Cell Stem Cell) at 1363.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). "Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)". *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud". Fed. R. Civ. P. 9(b).

## III. ARGUMENT

### A. Plaintiffs' Fail to Properly Plead Any Alleged Misstatements

The crux of Plaintiffs' Complaint is that, on January 9, 2024, Sana must have known that HIP did not work and that SC291 could not work in the oncology context. The problems with Plaintiffs' theories are many. *First*, there is no allegation Sana failed to accurately present the results of ARDENT. *Second*,



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

Sana gave only measured interpretations that would not mislead anyone as to the fully-disclosed and well-known risks of drug development; most statements were non-actionable opinions or optimism. *Third*, Plaintiffs cannot meet the heightened pleading standards of the PSLRA because, at most, Plaintiffs simply assume that Sana *must have* had data that *must have* shown the failure of Sana's immune evasion platform. There are no well-pleaded facts supporting those assumptions. To the contrary, Sana continues to report to this day that its immune evasion platform ***does work***. Plaintiffs fail to plead that any statement of historical results was false or that anything about Sana's interpretation of the data was misleading. "[T]he disclosure of accurate historical data accompanied by general statements of optimism . . . is [not] actionable". *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483–84 (N.D. Cal. 1992), *aff'd sub nom. In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) (citation omitted). The Complaint should be dismissed.

*i. Plaintiffs Fail to Adequately Plead Any False Statement of Fact.*

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time". *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 768 (N.D. Cal. 2024) (citation omitted). Plaintiffs allege as misstatements Sana's ***description*** of historical results of the ARDENT data. Compl. ¶ 103 (alleging that explanation of a slide showing that immune cells did not attack SC291 was misleading); *id.* ¶ 105 ("***what you see here is that very rapidly we can completely deplete the B-cells***"); *id.* ¶¶ 111, 116, 126 (referring to results of prior "assays" or blood tests); *id.* ¶¶ 121, 124 (both recounting results for four early patients). Plaintiffs do not allege that any responses, blood test or other data were inaccurately reported by Sana. No relevant data have ever been changed or corrected. In fact, the data and its interpretation have subsequently been supported in peer-reviewed scientific journals. *See supra* ¶ I.C. Accurately reporting and describing data is not fraud. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993).

*ii. Plaintiffs Fail to Adequately Plead Any Misleading Statement.*

Even if a statement is not false, it may be misleading if it omits material information that "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists". *Brody v. Trans. Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The "central inquiry is whether a reasonable investor would have been misled about the nature of his investment". *VeriFone*, 11 F.3d at 869. That is an objective inquiry as to "whether an investor who had been reasonably diligent


CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

in reviewing" the statement or omission at issue "would have been misled". *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987).

Courts routinely dismiss securities fraud claims based on statements about early results of clinical trials because no reasonable investor would think that preliminary conclusions about early results promise a drug ultimately will succeed. *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 156 (2d Cir. 2013) (affirming dismissal of fraud claims based on omissions in statements describing Phase 2 drug trial results); *Zhou v. NextCure, Inc.*, 2023 WL 4493541, at *8 (S.D.N.Y. July 12, 2023) (dismissing claims that positive statements about a drug misleadingly omitted negative data when the complaint "ignore[d] numerous indicators contained within the [statements] that any picture of [the drug's] efficacy painted by a [Phase 1 trial] was bound to be incomplete"); *Sarafin v. BioMimetic Therapeutics, Inc.*, 2013 WL 139521, at *1 (M.D. Tenn. Jan. 10, 2013), *aff'd sub nom. Kuyat v. BioMimetic Therapeutics*, Inc., 747 F.3d 435 (6th Cir. 2014) (dismissing fraud claims based on statements about clinical trials for flagship product); *Biondolillo v. Roche Holding Ag*, 2018 WL 4562464, at *1, *5–8 (D.N.J. Sept. 24, 2018) (dismissing fraud claims based on initial reporting of clinical study results before publishing full data); *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225 (D. Mass. 2014) (dismissing fraud claims based on reporting Phase 2 interim results). The same is true here.

The Ninth Circuit's decision in *In Re Sorrento Therapeutics, Inc. Sec. Litig.* is instructive. 97 F.4th 634 (9th Cir. 2024). There, plaintiffs tried to rest a fraud claim on statements from a financially-distressed biotech company that its results related to a COVID-19 antibody, STI-1499, might lead to a cure—which came with an increase in stock price, followed by a decline after others expressed skepticism of defendant's interpretation. *Id.* at 638. The Ninth Circuit affirmed the district court's dismissal, finding that the alleged misstatement was not false and that accompanying statements of optimism that there "was a cure" were not misleading. *Id.* at 642. The Ninth Circuit further rejected plaintiffs' allegation that because "there still is no cure for COVID-19, that Defendants could not, in good faith, have thought that STI-1499 was a cure". *Id.* at 641–42. The Ninth Circuit reasoned that "many initially promising discoveries do not survive the testing required for FDA approval; failure to survive testing is hardly evidence that the developer's initial enthusiasm was unwarranted or inherently false at the time". *Id.*

Just like the plaintiffs in *Sorrento Therapeutics*, Plaintiffs here argue that Sana could not have



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

possibly believed that the early SC291 results were promising because it ultimately moved on from ARDENT, but reasonable investors know that companies often move on from initially promising drugs. Here, Plaintiffs' theory is particularly implausible because Sana and third parties still state that ARDENT demonstrated that HIP works, SC291 had positive B-cell depletion, and that the treatment resistant cancer patients in the ARDENT trial had early evidence of clinical benefit. *See supra* ¶ I.B-C. Plaintiffs have no well-pleaded allegations that Sana learned any information between January 9, 2024, and January 13, 2025, that could have precluded its interpretation that ARDENT was promising.

Just as in *Sorrento Therapeutics*, Plaintiffs rely on unsupported assumptions to argue falsity. They seem to assume that as the treatment days passed, Sana had results instantaneously. Compl. ¶ 141 (alleging that because "the data presented on January 9, 2024 was effective as of January 5, 2024", Sana "knew of the adverse results in near real-time".). Plaintiffs' naked assumption that "data is gathered, cleaned, analyzed and summarized in real time" is not a reasonable inference. *Dresner v. Silverback Therapeutics, Inc.*, 2023 WL 2913755, at *10 (W.D. Wash. Apr. 12, 2023) (rejecting inference that clinical sites "were continuously cleaning and aggregating data, reviewing it, and summarizing it, and making it available before the data cutoff date, and that the [defendants] had access to that information at any given moment".). Indeed, Sana's January 9, 2024 release identified that two patients were not "evaluable" because they had not undergone a disease assessment. Ex. 13 at 12; Compl. ¶ 89. Plaintiffs seem to assume that a return of B-cell levels two months later could ***only*** be caused by immune rejection and had to rule out SC291 as an oncology treatment. Compl. ¶ 79. But immune rejection is rapid—happening in less than two weeks. Compl. ¶¶ 41; 43. By contrast, cell persistence is assessed over months and is impacted by multiple factors, such as the quality of the cells produced via the Sana manufacturing process. *See supra* ¶ I.A. Plaintiffs do not plead any time when Sana interpreted its own data to close the door on an oncological application. To the contrary, Sana has consistently interpreted the ARDENT data as a positive indication for both HIP's immune evasion and the therapeutic use of SC291, even saying so most recently in a September 2025 peer-reviewed article. *See supra* ¶ I.C. Sana deprioritized ARDENT due to cost constraints—a business decision—not because of any failure of its HIP technology.

The reasoning in *Silverback Therapeutics*, 2023 WL 2913755, illustrates the flaws in Plaintiffs' omission arguments. There, Judge Pechman dismissed a claim based on qualified statements interpreting

results for six patients from a Phase 1 clinical trial. The court rejected arguments that the defendants' statements were misleading because they were "accompanied by detailed clinical data that puts the statements into context", including by identifying which patients had "partial responses" or "stable disease". *Id.* at *12. The court likewise rejected an argument that the defendant had a duty to disclose evidence showing disease progression. *Id.* The court reasoned that "even if Silverback had data showing disease progression, a reasonable investor would not be surprised by such a report given that the first dose cohort were on the lowest dose and all the patients had advanced metastatic tumors and failed all prior therapies". *Id.* at 7. The court further highlighted that the allegedly misleading statements, which said the results were "consistent with" certain outcomes, were not "an absolute statement declaring the drug efficacious". *Id.* Rather, "a reasonable investor able to follow and understand the technicalities of a cancer drug's development would not construe statements that discuss the 'potential mechanism of action' and 'associations with tumor regression' as claims of efficacy". *Id.* Here, just as in *Silverback*, "Plaintiffs may disagree with [Defendants'] conclusion and the import of the data used in support of these conclusions, but it does not make the statements false or misleading". *Id.* at *12.

***Non-Actionable Opinions***. As in both *Sorrento Therapeutics* and *Silverback*, much of what Plaintiffs say misled was opinion. Compl. ¶¶ 100, 103, 107, 109, 114, 118, 121, 122, 124. These statements use phrases like, "***what we see is what we hoped we would see***", *id.* ¶ 100, "***working exactly as we hoped it would***", *id.* ¶ 103, 122 "***demonstrate the desired immune evasion profile***", *id.* ¶¶ 109, 114, 118 etc. Courts routinely find similar statements of opinion inactionable in the context of clinical trials. *Sorrento Therapeutics*, 97 F.4th at 639; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 879 (9th Cir. 2012) (difference of opinion on analysis is not securities fraud); *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("Interpretations of clinical trial data are considered opinions".). For the same reasons that Plaintiffs fail to plead any misleading statement, they also do not clear *Omnicare*'s high bar to plead falsity of an opinion. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (requiring allegations that "'the speaker did not hold the belief she professed' and that the belief is objectively untrue"; "the supporting fact [the speaker] supplied [within the opinion] [is] untrue"; or "alleg[ing] 'facts going to the basis for the issuer's opinion'") (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,


CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

186, 194 (2015)). And Sana's further investment in ARDENT and GLEAM studies for SC291 after the initial results is consistent with a "good faith belief that [its] optimistic statements were accurate and not misleading" and that Defendants had a "reasonable basis for their optimism about [the product], given the novelty of [its] technology [and] the positive responses [Defendants] had received" from early testing. *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).

***Non-actionable Optimism.*** Other statements were merely "vague statements of optimism," which are not actionable under the securities laws because investors "know how to devalue the optimism of corporate executives". *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Statements that Defendants were "really encouraged" by the early data, Compl. ¶ 116, that the data "look pretty good," *id.* ¶ 126, and that a particular slide in a presentation is "my favorite slide . . . kind of the killer slide," fall into this category. *Id.* ¶ 103. *See Sorrento Therapeutics*, 97 F.4th at 639 (finding non-actionable statements that "there is a cure," "[t]here is a solution that works 100 percent" and "if we have the neutralizing antibody in your body . . . [y]ou can open up a society without fear"); *Tadros v. Celladon Corp.*, 2016 WL 5870002, at *11 (S.D. Cal. Oct. 7, 2016), *aff'd*, 738 F. App'x 448 (9th Cir. 2018) (holding that "Defendants' statements regarding the 'encouraging results' of Mydicar and 'Mydicar's unique characteristics' are all projections of general optimism"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (finding statements that "[w]e are very pleased with the learning from our pilot launch", "we are very pleased with our progress", and "everything is clicking" were not actionable); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (9th Cir. 2005) (holding that "excellent results", a "blowout winner" product, "significant sales gains" and "10% to 30% growth rate over the next several years" were not actionable).

**B. Plaintiffs Fail to Plead Any Scheme**

Plaintiffs' alleged scheme is just a restatement of their faulty misstatement claims: that Sana misled the public about immune evasion or B-cell depletion. Compl. ¶¶ 57–65. That is improper. Courts in the Ninth Circuit routinely dismiss scheme claims that merely challenge statements alleged to be false or misleading. *See In re AGS, Inc.*, *Sec. Litig.*, 2024 WL 581124, at *4 (D. Nev. Feb. 12, 2024) (dismissing scheme claim where not "independent of [plaintiffs' unsuccessful] misrepresentation claim"); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. Aug. 8, 2022) (dismissing where "alleged


CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

scheme consists entirely of (and fails for the same reasons as) the misstatements"); *In re Illumina, Inc. Sec. Litig.*, 2025 WL 2739655, at *4 (S.D. Cal. Sept. 26, 2025) ("This 'scheme consists entirely of' the allegations underlying Plaintiffs' first claim under Rule 10b-5(b), so it 'fails for the same reasons.'").

The securities laws create "scheme liability" for one who "employ[s] any device, scheme, or artifice to defraud" or "engage[s] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person". 17 C.F.R. § 240.10b-5(a), (c). Such liability requires concealed, deceptive conduct. *See e.g.*, *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *17 (N.D. Cal. Feb. 15, 2018) (secretly hiring companies to pose as financial advisors and post articles to inflate the company's stock); *SEC v. Richman*, 2021 WL 5113168, at *2, *8 (N.D. Cal. Nov. 3, 2021) (submitting fake records to insurance companies); *SEC v. Hui Feng*, 935 F.3d 721, 737 (9th Cir. 2019) (secretly controlling foreign companies and directing clients to pay improper commissions). And scheme claims "are subject to the heightened pleading requirements of [Rule] 9(b) and the [PSLRA]". *In re AGS*, 2024 WL 581124, at *4 (citing *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)).

Plaintiffs fail to allege any deceptive conduct. Instead, Plaintiffs plead that Sana had disappointed since its IPO, Compl. ¶ 28; Sana burned through cash, Compl. ¶ 29; and Sana entered a crowded field, Compl. ¶ 31. But those allegations, some of which far pre-date the class period, are not concealed deceptive conduct. Indeed, Sana discloses its cash burn on a quarterly basis. *See* Ex. 19 (11/8/2023 8-K) at 5; Ex. 20 (2/29/2024 8-K) at 6; Ex. 21 (5/8/2024 8-K) at 5; Ex. 22 (8/8/2024 8-K) at 5; Ex. 23 (11/8/2024 8-K) at 5; Ex. 17 at 5. These allegations cannot fill the gaping hole in Plaintiffs' scheme theory.

**C. Plaintiffs Fail to Plead Loss Causation**

"The securities laws do not protect against ordinary investment losses", such as those from "a change in economic circumstances or investor expectations". *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). "The loss causation prong 'is simply a variant of proximate cause'", whereby a plaintiff must show that a defendants' allege fraud, "as opposed to some other fact, foreseeably caused [its] loss". *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (citation omitted). Here, Plaintiffs rely on two alleged "corrective disclosures", "which occur when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market'". *Id.* (citation omitted). "A corrective disclosure, . . . must by definition reveal new information to the market", *In re Bofl*, 977 F.3d at 794, via


CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

"new facts that, taken as true, render some aspect of the defendant's prior statements false and misleading". *Id.* at 790. Newness is critical "[b]ecause publicly available information in an efficient market is generally reflected in the price of a security, [so] the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price". *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020). Plaintiffs do not meet their burden.

***May 8, 2024***. The May 8, 2024, results release cannot be "corrective" because it contained no new information about ARDENT. Rather, the release included a verbatim recitation of an already-disclosed, non-actionable opinion: "***Early SC291 data from the ongoing ARDENT trial*** suggest the ability to dose safely, ***the desired immune evasion profile***, and early clinical efficacy". Compl. ¶ 114. Such "confirmatory information . . . will not cause a change in stock price" and cannot suffice to plead loss causation as a matter of law. *Grigsby*, 979 F.3d at 1205.

Unable to plead any new information on May 8-9, 2024, Plaintiffs try to invoke "materialization of the risk," Compl. ¶ 159, a theory of loss causation that the Ninth Circuit has not adopted. To plead this theory, a plaintiff must show that the "misstatements and omissions concealed" some risk "that materialized" and caused a defendant's stock to fall. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). But nothing new "materialized" about SC291 on May 8 or 9. Plaintiffs assert: "Defendants' failure to deliver a presentation was a materialization of the risk concealed by their false statements, in that the durability data Defendants would have presented showed that SC291 was not durable, and that's why Defendants didn't present it". Compl. ¶ 159. But Sana never said it would deliver a presentation on May 8 or 9, and Plaintiffs have not pleaded that Sana had any information that was inconsistent with its actual statements. *See supra* ¶ III.A.

At a minimum, the May alleged corrective disclosure, by which Plaintiffs seek to recover for a 20% stock drop although Sana literally said nothing new about SC291, should be dismissed from this case.

***November 4, 2024***. On November 4, 2024, Sana did reveal new information about ARDENT—that, with its limited dollars, it would pause ARDENT and prioritize GLEAM and other products. While Plaintiffs allege that the "truth" of Sana's "fraud" came out that day, Compl. ¶ 157, the allegations in the Complaint are to the contrary. In that same announcement, Sana reaffirmed its view (which it continues to hold today) that its "[e]arly clinical data. . . .[suggests that] HIP-modified cells evade immune


CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

detection". Ex. 14 at 1. So too did the analysts that Plaintiffs cite. Compl. ¶ 163. JMP "believe[d] the data generated to date suggest the hypoimmune platform should . . . be shielded from the host's immune system"[3]. Ex. 15 at 1. H.C. Wainwright was "not particularly surprised by the decision to discontinue" ARDENT and "continue[d] to believe SC291 in oncology provided positive [proof of concept] for the hypoimmune platform which could be applicable to other indications". Ex. 16 at 1. Because Sana has continued to promote its ARDENT results and to use SC291, and analysts' reactions are as described above, Plaintiffs have not pleaded that a reasonable investor would have understood Sana's November news as corrective.

**D. Plaintiffs Fail to Plead Scienter**

Even assuming *arguendo* that Plaintiffs had properly pled a misleading statement or scheme and loss causation, the Complaint should still be dismissed for lack of a strong inference of scienter. A complaint must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind", 15 U.S.C. § 78u-4(b)(2)(A), to "deceive, manipulate, or defraud" or "deliberate recklessness". *City of Dearborn*, 856 F.3d at 619. Even the least culpable state of mind, "deliberate recklessness", requires "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it". *Id.* A "proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir. 2002).

Plaintiffs' fail to identify any "specifics" from which one could conclude that Sana knowingly misled anyone. *Id.* at 1036. Plaintiffs try to argue that Sana promised to release durability data in late 2023 or early 2024 but, according to Plaintiffs, failed to release it. Compl. ¶¶ 128–130. But Sana did release data on just that timeline—the January 9, 2024 ARDENT data. *See* supra § I.B. Regardless, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Plaintiffs fail to plead that Defendants had any duty to disclose data other than when it did,

---

[3] Plaintiffs allege that JMP's reaction was in part due to "Sana's delays in reporting clinical data". Compl. ¶ 163. But, in fact, JMP was referring to Sana's expected timeline to report on other "ongoing programs (T1D, AID, and Fusogen)"—not anything related to ARDENT. Ex. 15 at 2.



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

much less that they were reckless or intentionally deceptive by not doing so.

Plaintiffs refer to the core operations theory. To avail themselves of that theory, Plaintiffs "must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring" or "witness accounts demonstrating that executives had actual involvement in creating false reports". *Intuitive Surgical*, 759 F.3d at 1062. Plaintiffs plead neither specific misleadingly withheld data nor any "core operations" style allegations.

Plaintiffs try to rely on Sana's February 8, 2024 follow-on public offering. Compl. ¶ 149. Courts have routinely held that "the mere allegation that Defendants had a motive of getting funding is insufficient to support a strong inference of scienter". *Applestein v. Medivation*, Inc., 861 F. Supp. 2d 1030, 1041 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *Sorrento Therapeutics*, 97 F.4th at 638 (rejecting similar argument where company "issued a 'going concern' qualification" "noting [its] high cash burn rate and over-leveraged capital structure"); *Pathogenesis*, 284 F.3d at 1038 (holding that if a wanting "to enhance a company's business prospects" pleaded scienter, "every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions").

These allegations are no help to Plaintiffs, who admit an obvious explanation for Sana's continued efforts to develop SC291: "because the drug might be effective at a higher dose, or because the data from the SC291 oncology trial might show that SC291 was effective enough for autoimmune diseases". Compl. ¶ 95. Deception or some other nefarious state of mind is implausible.

### E. Plaintiffs' Control Person Claim Must Also Fail

Because Plaintiffs fail to allege a § 10(b) violation, Plaintiffs' § 20(a) control person claim fails. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## IV. CONCLUSION

For the reasons set forth above, the Complaint should be dismissed. The Parties conferred by telephone on October 9, 2025 prior to the filing of this motion, without reaching agreement.



CRAVATH, SWAINE & MOORE LLP
Two Manhattan West; 375 Ninth Avenue
New York, NY 10001 (212) 474-1000

Dated: October 14, 2025

CRAVATH, SWAINE & MOORE LLP

*/s/ J. Wesley Earnhardt*
Keith R. Hummel (admitted *pro hac vice*)
Daniel Slifkin (admitted *pro hac vice*)
J. Wesley Earnhardt (admitted *pro hac vice*)
Ming-Toy Taylor (admitted *pro hac vice*)
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
khummel@cravath.com
dslifkin@cravath.com
wearnhardt@cravath.com
mtaylor@cravath.com

McNAUL EBEL NAWROT & HELGREN PLLC

*/s/ Daniel M. Weiskopf*
Daniel M. Weiskopf, WSBA No. 44941
600 University Street, Suite 2700
Seattle, WA 98101
(206)467-1816
dweiskopf@mcnaul.com

*Attorneys for the Defendants*