# Exhibit 1

The Honorable Barbara J. Rothstein

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| IN RE SANA BIOTECHNOLOGY, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.  2:25-cv-00512-BJR<br><br>CLASS ACTION<br><br>~~FIRST~~[PROPOSED] SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT_____
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ...................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................. 6

III.  PARTIES ................................................................................................................... 7

IV.  DEFENDANTS' MISCONDUCT ............................................................................. 9

    A.  Sana Takes Its First Product, SC291, Into Clinical Trials ............................. 9

        1.  Sana Disappoints After Its Blockbuster IPO ................................... 9

        2.  Sana Joins a Crowded Field ........................................................... 10

        3.  Sana Genetically Modifies Existing CAR T Treatments To Evade the Immune System ........................................................................ 14

        4.  Defendants Claim Investors Will Know Whether Sana Works Within a Month Of Treating the First Few Patients ................................ 17

    B.  Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024 ...................................................................... 24

        1.  Defendants Claim ARDENT Is An Unqualified Success ............... 24

        2.  Defendants Concealed From Investors That Though CAR T Cells Must Survive At Least Three Months, SC291 Survived At Most Two Months 27

    C.  Defendants' Materially False and Misleading Statements & Omissions ............. 36

    D.  Additional Facts Further Probative Of Scienter ........................................... 49

        1.  In Their Stock 2023 Presentation, Defendants Maintained That Sana Would Collect Durability Data By Late 2023 Or Early 2024 And Present It To Investors ....................................................................... 49

        2.  The ARDENT Clinical Trial Protocol Required That Sana Collect Data Showing the Deterioration Of SC291 .................................... 53

        3.  Defendants' False Statements Helped Sana Raised Cash It Needed To Survive Past 2024 ........................................................................ 55

        4.  The Fraud Implicated Core Operations ......................................... 56

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - i
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

E.    The Truth Begins To Emerge ................................................................... 57

V.    NO SAFE HARBOR ................................................................................ 61

VI.    THE CLAIMS ARE TIMELY ................................................................. 62

VII.    LOSS CAUSATION / ECONOMIC LOSS ........................................... 63

VIII.    PRESUMPTION OF RELIANCE ........................................................... 65

IX.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ..................... 67

COUNT I ................................................................................................................ 70

COUNT II ............................................................................................................... 74

PRAYER FOR RELIEF ........................................................................................ 76

DEMAND FOR TRIAL BY JURY ....................................................................... 77

I.    NATURE OF THE ACTION ................................................................... 1

II.    JURISDICTION AND VENUE ............................................................... 6

III.    PARTIES .................................................................................................. 6

IV.    PLAINTIFFS' EXPERT ......................................................................... 8

V.    DEFENDANTS' MISCONDUCT ........................................................... 8

    A.    Sana Takes Its First Product, SC291, Into Clinical Trials ................ 8

        a.    Sana Joins a Crowded Field ................................................ 8

        b.    Sana Genetically Modifies Existing CAR T Treatments To Evade the
             Immune System ................................................................ 12

        c.    Sana Initiates ARDENT, A Phase 1 Clinical Trial ........... 14

    B.    The Presence of CD19+ B-Cells Within Three Months of Treatment Shows
         that the Treatment Has Failed ......................................................... 23

        a.    SC291 Cells Must Last At Least Three to Six Months to Be Effective
             ......................................................................................... 23

        b.    The Presence of CD19+ B-Cells Shows that the SC291 Cells Have
             Been Destroyed Or Are No Longer Functional ................. 29

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - ii
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

C. **Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024**.................................................30

    a. **Defendants Claim ARDENT Is An Unqualified Success**....................30

    b. **Defendants Concealed from Investors that In At Least Three of the Four Patients Whose Data They Presented, the SC291 Treatment Had Already Failed** ................................................32

D. **Defendants' Materially False and Misleading Statements and Omissions**... 41

E. **Additional Facts Further Probative Of Scienter**.............................................58

    a. **In Their Stock 2023 Presentation, Defendants Maintained That Sana Would Collect Durability Data By Late 2023 Or Early 2024 And Present It To Investors** ................................................58

    b. **Defendants' False Statements Helped Sana Raised Cash It Needed To Survive Past 2024** ................................................63

    c. **The Fraud Implicated Core Operations** .................................................64

F. **The Truth Begins To Emerge** .................................................65

G. **The ARDENT Results Paper Provided Enough Information To Infer Individual Patient Results** .................................................68

VI.  **NO SAFE HARBOR**.................................................71

VII.  **THE CLAIMS ARE TIMELY** .................................................72

VIII.  **LOSS CAUSATION / ECONOMIC LOSS** .................................................72

IX.  **PRESUMPTION OF RELIANCE** .................................................74

X.  **LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS** .................................................75

**COUNT I**.................................................77

**COUNT II**.................................................81

**PRAYER FOR RELIEF**.................................................82

**DEMAND FOR TRIAL BY JURY** .................................................82

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - iii
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - iv
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

1.      Lead Plaintiffs Shane Honey and Jonatan Kiskinen, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.      NATURE OF THE ACTION

2.      This is a federal securities class action brought on behalf of all persons and entities other than Defendants who purchased or otherwise acquired the securities of Sana Biotechnology, Inc. between January 9, 2024, and November 4, 2024, both dates inclusive ("Class Period") and held such securities through close of trading on May 8, 2024, or November 4, 2024, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

3.      A darling of the 2021 IPO market, by the beginning of the Class Period, Sana found itself in dire straits. With just enough cash to cover its 2024 expenses, the long-promised early results of its first Phase I clinical trials were at best mixed. Unable to complete the trials and continue with its programs without significant extra cash, Defendants concealed the poor results, misleadingly touted the good results, and told investors that Sana had successfully demonstrated that its product worked. One month later, Sana raised nearly $190 million. Yet as the trial continued, the results did not improve. With no good data to present, Sana first delayed an interim public data report and then cancelled development of its lead product candidate entirely. In both cases, Sana's share price fell, damaging investors who were unaware of Defendants' fraud.

4.      Sana's 2021 IPO raised almost $700 million at a nearly $5 billion valuation, an amazing feat for a three-year-old company formed less than three years prior. However,. But by late 2023, Sana had abandoned its most promising product candidates, and its share price was

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 1
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

downhad fallen 90% from its post-IPO peak.

5.    Sana develops treatments that evade the human immune system. In recent years, researchers have developed cancer treatments that are based on genetically modified cells, called CAR T-cells. Existing CAR T-ell-cell treatments are "*autologous*,"*.* meaning that the cancer--destroying T--cells are taken from the patient's own blood, changed in the lab by adding a CAR (chimeric antigen receptor) to help the T-cells attach to a specific cancer cell, and then injected back in the patient. While autologous cell therapies have demonstrated success because they are derived from a patient's own cells—and are thus not likely to be rejected by the patient's immune system—they are expensive and delayeddelay treatment because they are customized for each patient.

6.    Sana is one of nearly 200 companies attempting to develop an *allogeneic* CAR T treatment, meaning one made from donor cells. Sana's technology consists ofis a series of genetic modifications designed to enable cells to evade recognition and eradication by the immune system. Sana hopes that its genetic modifications will permit a donor's cells to evade the immune system of the recipient patient, thereby replacing expensive and time-consuming autologous treatments with an allogeneic, off-the-shelf remedy.

7.    Sana began its first clinical trial, ARDENT, in May 2023. ARDENT tested Sana's product, called SC291, in B-cell cancers. Sana told investors that because all SC291 did was modify existing approved treatments, the critical issue in determining the viability of SC291 was whether its genetically modified cells evaded the patient's immune system. Sana also told investors that it would know the answer to this all-important question within a month of treating just a few patients. Thus, while investors would have to wait longer to know whether the patients entered remission and did not relapse, they would know almost immediately whether Sana's

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 2
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

platform worked. Sana CEO Steven Harr boasted to investors that positive news on this front would immediately remove 80% of the risk in the company. Phase I trials like ARDENT are not typically sufficient to show efficacy, but Defendants told investors that because of SC291's mechanism of action and prior animal studies, Sana would know whether SC291 successfully evaded the immune system and was durable enough to potentially treat cancers within the first months of treating the first handful of patients.

8. Sana did not have enough cash to see its ambitions through to achievement. Despite Sana's massive IPO, Sana was rapidly burning cash and by the close of 2023, had only enough funds to cover its expected 2024 expenses. Long delays in starting clinical trials meant that Sana would not be able to complete Phase I clinical trials on its then lead drug with its available cash.

9. Sana had promised it would disclose early ARDENT data by the end of 2023. Sana did timely collect the data, but they were mixed. B-cell targeting CAR T-cells like SC291 work by *completely eliminating all* the target patient's B-cells. SC291 had eliminated B-cells about a month into the treatment. But Sana had previously told investors that patients with B-cell cancers whose B-cells recovered within three months would likely relapse. Yet data in Defendants' hands showed that B-cells recovered within two months, which is not possible unless SC291 cells are completely gone. The data called into question whether SC291 evaded, or merely delayed, the immune system's response.

10. Sana had no hope of timely developing other data, either on ARDENT or on another of its products, to support the capital raise it needed to survive past 2024. It was only just beginning clinical trials of its next most advanced product. So rather than honestly disclosing the mixed result and hoping that investors would interpret them favorably, when they presented the

FIRST[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT - 3
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

data on January 9, 2024, Defendants told investors only the good, that SC291 had apparently survived a month, while concealing the bad, that it had quickly degraded between month one and month two. Defendants even told investors Sana had "overcome"—past tense—the problem of immune evasion. A month later, Sana raised $190 million from selling its shares, enough cash to survive well past 2024.

11. Defendants' false and misleading statements artificially inflated Sana's stock price. This artificial inflation dissipated in two partial corrective disclosures.

8. Before the Class Period, Sana had told investors to expect SC291 durability data either in late 2023 or in early 2024. This data could slip into 2024 because Sana's cell might actually be durable; Sana would not know that SC291 cells could survive six months unlessOn January 9, 2024, Defendants held a special presentation to deliver the results from the first four ARDENT patients ("Original Patients"). The results were, in Defendants' telling, a home run. Through the Original Patients, Sana had: (a) demonstrated SC291's immune evasion; (b) shown its clinical efficacy; and (c) established that it destroyed B-cells, exactly as it was meant to. The stand-out result was the second patient Sana had treated, who was in an ongoing three-month complete remission.

9. The market took Defendants' boasts seriously. Sana's stock price rose 40% the next day. A cash-strapped Sana used this desperately needed good news to raise $190 million a month later. Without this capital raise, Sana would have barely had enough cash to scrape through 2024.

10. Yet the data Defendants possessed, but concealed from investors, showed that SC291 was failing, not succeeding, in oncology. As Defendants told investors, the disappearance of SC291 cells within less than three to six months of the treatment sets the patient up for a relapse

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 4
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

within a year. And as Defendants also told investors, the presence of B-cells is evidence that SC291 cells had already been destroyed. So it was terrible news that the same blood tests that established that Patient 2 had experienced a complete remission also showed that the B-cells of at least three of the four Original Patients—including Patient 2—had recovered within two months, as did at least two of the three other patients. At the doses Sana was using, for the cancers it was studying, SC291 just did not work.

12.11.  Sana had promised that it would present data on SC291's durability in early 2024. The data might take longer to collect because Sana would only know that SC291 lasted six months after six months had elapsed. As it happens, Sana's cells lasted less than two months in the patient's body, so the data was ready to be presented in January 2024. Not knowing this, investors expected the data to be presented either by May 2024 or at one of three conferences taking place from late April through June 2024. That's exactly what Defendants had previously told investors they would do in September 2023.

13.12.  On May 8, 2024, Sana issued an earnings release that contained neither durability data nor an indication that Sana would present such data at the two remaining forthcoming conferences. Sana did not present durability data because doing so would showhave shown that to date, the data suggested that SC291 did not evade the immune system and would only lead to relapse. Analysts concluded that Sana would not present data until the other major hematology conference, which would take place in December. Disappointed investors bid down Sana's shares, causing its stock price to fall $1.99/share (20.9721.0%) on May 9, 2024.

14.13.  Then, on November 4, 2024, Sana announced that it was suspending development of SC291 in oncology, halting enrollment in the ARDENT trial, reducing headcount, and redirecting cash resources.  This disclosure caused Sana's stock to fall $0.37 (9.849%) per share

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 5
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

on November 5, 2024.

15.14.  Defendants' fraud caused investors substantial damages.

## II.    JURISDICTION AND VENUE

16.15.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

17.16.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

18.17.  Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Sana is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

19.18.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

20.19.  Lead Plaintiff Shane Honey, as set forth in his prior-filed Certification (ECF 18-2), incorporated by reference herein, purchased Sana common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

21.20.  Lead Plaintiff Jonatan Kiskinen, as set forth in his prior-filed Certification (ECF 21-2), incorporated by reference herein, purchased Sana common stock at artificially inflated

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 6
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

22.21. Defendant Sana is incorporated in Delaware and has its Principal Executive Offices at 188 East Blaine Street, Suite 400, Seattle, Washington. It trades stock on the NASDAQ stock market under the ticker symbol "SANA."

23.22. Defendant Steven D. Harr, MD co-founded Sana and has served as Sana's CEO and President, and a member of its Board of Directors, at all relevant times. According to his Sana corporate website bio, before Sana, Defendant Harr previously served on Loxo Oncology's Board of Directors until early 2019, served as CFO and Head of Corporate Development for Juno Therapeutics until early 2018, co-founded JW Therapeutics and served on its Board of Directors. Earlier still, Defendant Harr was Managing Director and Head of Biotechnology Investment Banking at Morgan Stanley, after serving as a biotech research analyst and co-head of global healthcare research. Defendant Harr got his MD from Johns Hopkins University School of Medicine, served as an Internal Medicine resident at the University of California, San Francisco, and performed research at Harvard Medical School and Massachusetts General Hospital. Defendant Harr's medical degree, extensive medical research experience, and long history of leading, researching, and investing in pharmaceutical companies enabled him to fully understand the data and science discussed herein, underlying this complaint, how related disclosures are viewed and understood by analysts and investors, and the funding needs of pharmaceutical development. In 2020, before Sana went public, Harr earned $739,000 in non-equity compensation. Each year from 2021-2024, Harr earned more than $1 million in non-equity compensationDefendant Harr received his MD from Johns Hopkins University School of Medicine.

24.23. Defendant Nate Hardy served as Sana's Executive VP and CFO at all relevant

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 7
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

times, until his resignation, announced September 6, 2024, and effective October 4, 2024, shortly before the last corrective disclosure. According to his Sana corporate website bio, Defendant Hardy previously served as VP of Finance at Juno Therapeutics, leading the Business, Financial Planning, and Treasury organizations, and for over 10 years prior, served in a variety of senior finance and operations leadership positions at Amgen, culminating as the Executive Director and Head of Corporate Finance.

25.24.  Defendants Harr and Hardy are the "Individual Defendants."

26.25.  Sana and the Individual Defendants are the "Defendants."

## IV.    PLAINTIFFS' EXPERT

26.    Plaintiffs' expert, Dr. Stephen Schoenberger, is a Professor at the La Jolla Institute for Immunology and an adjunct professor at the division of hematology and oncology at the Moores Cancer Center at UC San Diego Health. He is the director of translational science at the San Diego Center for Precision Immunotherapy. Between July 2015 through November 2017, he served as the Head of Cancer Vaccines at Human Longevity, Inc., a company founded by the team that first sequenced the human genome. He specializes in translational cellular therapies. He has expertise in clinical trials.

## IV.V.  DEFENDANTS' MISCONDUCT

### A.    Sana Takes Its First Product, SC291, Into Clinical Trials

#### 1.    *Sana Disappoints After Its Blockbuster IPO*

27.    Sana was founded in July 2018. It completed its IPO in January 2021, less than three years later, raising an eye-popping $676.5 million at a nearly $5 billion valuation. It was, according to Renaissance Capital, the largest ever IPO of a biotech company that had yet to start clinical trials.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 8
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

28.    Since its IPO however, Sana has consistently disappointed investors. Sana told investors to expect that it would begin a wave of clinical trials in 2022. It started its first in May 2023, and its second only in early 2024. At the time of its IPO, Sana's most promising technology was a platform that could edit genes inside the human body, in one analyst's opinion rendering CAR T therapies obsolete; Sana dropped the platform in October 2023.

29.1.    In the meantime, Sana burned through its ample cash.  From 2021 through 2023, Sana's operating expenses totaled more than $920 million.

30.    Sana's share price has suffered. Sana sold its shares in its January 2021 IPO at $25 each. In February, they sold for more than $40 each. By the end of 2022, they had fallen to approximately $4/share, roughly the same price at which they sold at the end of 2023, just before the Class Period's start.

### 2.a.    Sana Joins a Crowded Field

27.    Sana is a development stage biotechnology company, with no approved FDA products.  It has not even completed any Phase I clinical trials.  It

31.28.  Sana develops treatments based on cells which have been genetically modified to evade the immune system.

32.29.  In recent decades, and accelerating since 2017, medical treatments have been developed that involve insertingin which genetically modified cells are injected into the patient's body to attack harmful organisms like malignant cancer cells. The cells, called CAR T-cells,[1] have primarily been usedemployed in oncology.

33.30.  One particular type of CAR T-cells is used to treat cancers arising from malignant

---

[1] The cells are called CAR T-cells because the genetic modification causes them to express (display) a lab-made marker, Chimeric Antigen Receptor (CAR), on their surface.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 9
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

B-cells, a type of immune cell. CAR T-cells ~~attach themselves to particular~~recognize specific markers on ~~target~~ targeT-cells and destroy the cells bearing the marker. Almost all B-cells bear the marker CD19. CD19-targeting CAR T-cell treatments destroy all the patient's B-cells that bear the CD19 marker, thereby eliminating the B-cell cancer. Five of seven approved CAR T-cell treatments for B-cell cancers target CD19.

~~34.~~31. CD19-targeting CAR T-cell treatments ~~have been shown to be~~are strikingly effective in B-cell cancers. Studies report remission rates well ~~in excess of~~above 50% in patients who had previously failed chemotherapy and/or radiotherapy. If the CAR T-cells last long enough in the patient's body (typically more than 6 months), the remissions are indefinite. Many patients are still alive and cancer-free because they received CAR T-cell treatments in 2017 or earlier.

~~35.~~32. But the ~~CAR T-cell treatments' availability has been limited by the~~ need to overcome the patient's immune system has limited CAR T-cell treatments' availability. Existing CD19-targeting CAR T-cell treatments on the market during the Class Period were autologous, i.e. manufactured by genetically modifying the patient's own cells to turn it into a CAR T-cell. The immune system uses markers or combinations thereof on the cells' surfaces to recognize whether the cells are foreign. Because CAR T-cells are the patient's own, the patient's immune system recognizes the cells as self and does not destroy them in the same way it would destroy the cells of a foreign donor.

~~36.~~33. Autologous treatments, for all their benefits, create bottlenecks, come with significant costs, and have other drawbacks. First, the treatment must occur at a treatment center. As of 2024, there were only slightly over 300 centers that could administer such cell therapies.

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 10
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

Many states had none. TheAnd existing treatment centers have limited capacity,[2] which may delay the treatment. Second, the treatment itself takes a long time to prepare. The patient must first donate a cell sample. Then, the cells in the sample must be genetically modified. After modification, the cells aremust be put through a process that causes them to multiply until there are enough cells for a treatment. Then, the genetically modified cells aremust be reinjected into the patient's body. This process takes three to five weeks, which is  a problem if athe patient has a fast-moving cancer. ExistingMoreover, each treatment centers have limited capacity,[3] which may delay the treatment. Patientsmust be individually prepared, limiting potential economies of scale. Third, patients and caregivers may have to travel to get to a treatment center; some patients may find travel difficult, some caregivers may have trouble taking time off work, and insurance may not cover the costs of travel and hotels. Moreover, each treatment must be individually prepared, limiting potential economies of scale.

37.34.  Because of these limitations, autologous CAR T-cell treatments, while FDA approved and available, have only been administered to a minority of patients who would otherwise be eligible for cell therapy. Defendants claimed in public statements that while in total 100,000 patients die of two B-cell cancers, lymphoma and myeloma, every year across the U.S., France, Germany, Italy, Spain, and the UK. They then added that in 2022, only 11,500 patients in these countries had received CAR T therapy in these countries in 2022.

38.35.  To address these limitations, a number ofshortcomings, Sana and other companies,

---

[2] Tony Berberabe, CAR T-Cell Therapy Remains Underutilized, Despite Improvements in Access, Targeted Therapies in Oncology Volume 13 Issue 9, available at https://www.targetedonc.com/view/CAR T-cell-therapy-remains-underutilized-despite-improvements-in-access

[3] Tony Berberabe, CAR T-Cell Therapy Remains Underutilized, Despite Improvements in Access, Targeted Therapies in Oncology Volume 13 Issue 9, available at https://www.targetedonc.com/view/car t cell therapy-remains-underutilized-despite-improvements-in-access

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 11
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

including Sana, are attempting to develop allogeneic treatments based on engineered donor cells. Allogeneic treatments take cells from donors,also genetically modify them, and thencells, put them through the samea manufacturing process that causes autologous, and inject them into the patient. But allogeneic treatments are made from donor cells to multiply.rather than the patient's own. Each manufacturing processrun can create hundreds of treatments. TheseThe treatments can be kept in storage. Patients can receive thesethe treatments immediately, without the delays associated withinherent in autologous treatment.

39.36.  But Sana operates in a crowded field. According to a September 6, 2023, article, there are almost 195 companies attempting to develop allogeneic treatments, a plurality of them in cancers.4 And despite these many aspirants, no allogeneic CAR T treatments have been approved to treat B-cell cancers.

37.     Thus, at the beginning of the Class Period, patients with B-cell cancers could benefit from effective—though inconvenient, delayed, and costly—autologous treatments. There were no allogeneic alternatives.

> **b.     Sana Genetically Modifies Existing CAR T Treatments To Evade the Immune System**

40.38.  The main obstacle to allogeneic CAR T-cell treatments is the need to overcome the patient's immune system. The immune system exists to protect the body from pathogens. It attacks, and destroys, harmful bacteria and viruses. But it also destroys organisms it recognizes as foreign. Thus, if the patient's immune system does not recognize the CAR T-cells as being the patient's own cell, then the immune system will attack and destroy them.

---

4 Anshul Mangal, *Scaling Hope: The Growth of Allogeneic Cell Therapy Sector*, September 6, 2023, available at https://www.precisionformedicine.com/blog/article-scaling-hope-the-growth-of-allogeneic-cell-therapy-sector/ .

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 12
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

41.    Well before the Class Period, doctors and researchers understood that CD19-targeting CAR T-cells must remain in the body for a significant amount of time for the patient to achieve and maintain remission. But the immune system usually rejects fully foreign cells within less than two weeks. While treatments can use chemotherapy to suppress the immune system, the suppression gravely harms patients and inhibits the CAR T-cells. No allogeneic CD19-targeting treatments have been created that could survive in the patient long enough to prevent relapse.

42.1.    Thus, at the beginning of the Class Period, patients with B-cell cancers could benefit from effective – though inconvenient, delayed, and costly – autologous treatments. There were no allogeneic alternatives.

### 3.a.    Sana Genetically Modifies Existing CAR T Treatments To Evade the Immune System

43.39.  The human immune system has two partsarms. The ***innate*** immune systemarm distinguishes between the patient's own cells and foreign objects, and attacks the latter, rapidly responding to an invasion. The innate arm relies heavily on Natural Killer, or NK, cells. The ***adaptive*** arm, based principally on T-cells and B-cells, recognizes novel pathogens and develops a specific and longer-term response. The innate and adaptive arms of the immune system employ complementary mechanisms to give the body the best chance possible to fight all pathogens.

44.    Allogeneic CAR T-cells must be genetically modified to evade both the adaptive and the innate arms. But while existing genetic modifications permit partial evasion of the adaptive immune system, these modifications generally make the cells more visible to the innate arm. Thus, while researchers have seen some success evading the adaptive immune system, no allogeneic treatment has successfully evaded both the adaptive and innate arms.

45.40.   While Sana's ultimate product is cells, its main technology (licensed from Harvard University) consists of specific genetic modifications that attempt to permit the foreign cells to

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 13
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

evade both the adaptive and innate arms of the patient's immune system.

46.41.  The adaptive arm relies on a class of markers to recognize foreign cells. It destroys cells which do not express (display) the right combination of these markers.[5] Sana genetically modifies its CAR T-cells so that they do not express the markers at all, so they are not recognized by the adaptive immune system.

47.42.  Failing to express these markers usually identifies the cells as foreign to the innate immune system, which then destroys the cells.But the genetic modifications Sana implements to evade the adaptive immune system makes cells more visible to the innate immune system. The innate immune system relies on the same markers to identify cells as self. Their absence tells the innate immune system that Sana's cells are foreign. So, if all Sana did was genetically modify the cells to evade the adaptive immune systems, the innate immune system would destroy the cells. To evade the innate immune system, Sana also genetically modifies the cells so that they overexpress a marker, called CD47. CD47 inhibits innate arm cells from recognizing the CAR T-Sana's cells. as foreign. As a result, the innate system's cells do not destroy Sana's cells.

48.43.  Thus, if Sana's genetic modifications work as Defendants claim, neither the adaptive immune system nor the innate immune system will recognize the cells.

49.    During the Class Period, Sana was pursuing four products in seven indications. Yet *all* of these products ultimately involve the application of these genetic modifications to evade the immune system. Showing that its immune evasion technology works is valuable even if the specific treatment evasion supposedly facilitates proves ineffective.

### c.    Sana Initiates ARDENT, A Phase 1 Clinical Trial

50.44.  Sana's lead product is SC291. Sana did not treat humans with SC291—or anything

---

[5] The markers are major histocompatibility ("MHC") Class I and II.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 14
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

else—until it started SC291's Phase I oncology trials in May 2023. Phase I trials are not designed to show efficacy. But Defendants told investors that, through a combination of prior animal studies and SC291's functioning, Sana would know very early in the Phase I trial whether SC291 worked1 oncology trial, ARDENT, in May 2023.

51. Prior to starting human trials, Sana had conducted extensive animal experiments with both primates and mice which had been genetically modified so their immune system resembled humans'. Defendants told investors that these experiments had demonstrated that SC291 remained in the body long term. Specifically, Defendants cited a study they conducted in which Sana successfully treated B-cell cancers in mice using SC291 and then reinjected the mice with cancer 83 days later. The mice quickly beat the cancerous cells. Defendants told investors this was evidence that SC291 cells survived three months.

52. Second, Sana makes SC291 by using an existing CD19 targeting CAR T-cell which Sana then genetically modifies to modified to evade the immune system. CD19-targeting CAR T-cells themselves have been shown to be safe and effective. Several have been approved by the FDA to treat B-cell cancers. Thus, it is unlikely that any failure of SC291 would be attributable to the ineffectiveness of the CAR T-cell itself. Instead, any such failure would likely result from SC291's novel portion—Sana's proprietary genetic modifications designed for immune evasion.

#### 4. Defendants Claim Investors Will Know Whether Sana Works Within a Month Of Treating the First Few Patients

53. SC291's first Phase I clinical trials tested its use in certain cancers caused by malignant B-cells, such as Non-Hodgkins Lymphoma.

54.45. Sana's Phase I SC291 oncology clinical trial, ARDENT, was a standard Phase I dose escalation study. Sana selectsselected three dose levels of SC291, 60 million cells, 120

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 15
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

million cells, and 200 million cells. Sana ~~starts~~started ARDENT by treating a cohort, or group, of three patients at the ~~lowest~~60 million cell dose level, with at least 28-day intervals between treating each patient. ~~If there are no~~If the patients did not experience side effects that would prevent ~~increasing~~higher doses, ~~then~~ Sana ~~repeats~~would repeat the process with the second dose, and then with the third.[6] These steps are all standard in dose escalation studies.

~~55.~~46.  As is common, ARDENT also planned for another cohort of patients called a dose expansion cohort. After demonstrating that SC291 was safe enough for clinical trials, Sana had to select a dose which it would test for efficacy in subsequent pivotal trials. Often denoted as Phase 1b, a dose expansion cohort tests the product at a single dose which the company hopes to use in ~~these~~ pivotal trials. The expansion cohort is a much larger group of patients—Sana planned for about 40—but the study proceeds more quickly because there is no delay between treating patients. ~~Sana elected to~~Starting before the Class Period, Sana told investors it would give the expansion cohort a dose of 200 million cells.

~~56.~~47.  Sana's ultimate goal is to show that SC291 effectively treats cancers. An effective treatment is one that induces a durable complete response. A complete response means that the cancer is not detectable. While no hard and fast rule dictates when a complete response is "durable," researchers often look at responses relative to existing standard of care. Thus, a durable complete response typically means complete remission that lasts at least as long as existing treatments.

48.    It is true that Phase 1 trials are not designed to show efficacy. But Defendants ~~claimed that~~told investors that, through a combination of prior animal studies and SC291's

---

[6] The protocol also included steps Sana was required to take if there were dose-limiting side effects, but there were no such side-effects.

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 16
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ Aᴠᴇ. W., Sᴜɪᴛᴇ 103
Lʏɴɴᴡᴏᴏᴅ, WA 98036
Tᴇʟ: (206) 621-6566

functioning, Sana would not have to wait long to know ifvery early in the Phase I trial whether SC291 worked.

49.    Being able to prove to skeptical investors that SC291 worked with the first handful of patients in its Phase I trial was a key part of the Sana story. Sana did not have enough cash to complete ARDENT, let alone take SC291 or another drug through to FDA approval. But its history as a public company gave investors grounds to look skeptically on any attempt to raise cash without concrete results.

50.    Sana was founded in July 2018. It completed its IPO in January 2021, less than three years later, raising an eye-popping $676.5 million at a nearly $5 billion valuation. It was, according to Renaissance Capital, the largest-ever IPO of a biotech company that had yet to start clinical trials.

51.    Since its IPO, however, Sana has disappointed investors. Sana told investors to expect that it would begin a wave of clinical trials in 2022. It started its first in May 2023, and its second only in early 2024. At the time of its IPO, Sana's most promising technology was a platform that could edit genes inside the human body, which in one analyst's opinion would render CAR T therapies obsolete; Sana dropped the platform in October 2023. Sana's share price has suffered. Sana sold its shares in its January 2021 IPO at $25 each. In February, they sold for more than $40 each. By the end of 2022, they had fallen to approximately $4/share, roughly the same price at which they sold at the end of 2023, just before the Class Period's start.

52.    In the meantime, Sana burned through enormous cash reserves. From 2021 through 2023, Sana's operating expenses totaled more than $920 million.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 17
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

| | Operating expenses | Net cash used in operating activities | Remaining cash, cash equivalents, and marketable securities (as of December 31) |
|---|---|---|---|
| 2021 | $356.9 million | $251.1 million | $762.8 million |
| 2022 | $272.6 million | $290.1 million | $434.1 million |
| 2023 | $293.1 million | $253.6 million | $205.2 million |
| *Total 2021-2023* | *$922.6 million* | *$794.8 million* | |

53. Sana lacked the cash to take its products through clinical trials. As of December 31, 2023, just before the Class Period, Sana only had $205.2 million in its coffers, which was roughly how much it planned to spend in 2024. Sana would have to provide positive data even before ARDENT's end because it did not even have enough cash to complete that Phase 1 trial.

57.54. So Defendants had to, and did, promise investors that Sana would be able to derisk its product well before the end of ARDENT.

58.55. Beginning around May 2023, Defendants claimed to investors that Sana could, within ARDENT, isolate and test various aspects of Sana's platform and SC291, thus serially ruling out risks as the test results came in.and quickly test the elements of SC291 that might cause it to fail. Defendants described the discoveries they would make as a "data onion" and described not only what the data would show but when the data would be presented to investors.

59.56. Defendants told investors the first risk they would retire is that Sana's genetic modifications might not evade the immune system, with results they claimed they would achieve within a month of treating patients. Defendants' tests to retire the risk exploitsthe first few patients, Sana would know whether its cells evaded the immune system. They planned to leverage flaws in the process through which Sana genetically modifies cells to confer immune evasion. In

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 18
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

about 15-20% of cells, the gene modification process fails. Then, the cells The process does not successfully modify every cell; instead, a certain proportion of the cells are left without one or another of the necessary modifications. These defective cells do not receive allhave the modifications Defendants claim are necessary to evade the immune system. These cells, and they do not: they are vulnerable and will bepromptly destroyed promptly by a functional immune system.

60.57. TheHowever, the defective cells are not destroyed as soon as they are injected because patients receive chemotherapy before SC291. The chemotherapy knocks out the patient's immune system, which is then unable to kill the defective cells. The CAR T-cells then engraft and multiply in the patient's body.

61.58. But as the immune system recovers, it begins toits attack SC291. . If SC291 works, Defendants claimed, the patient's immune system will quickly destroy all the 15-20% ofdefective cells that did not receive all genetic modifications, but it will not destroy the 80-85% offully-modified cells in which all the genetic modifications were successfully implemented.

62.59. As a result, Defendants statedtold investors that they would examine the patient's SC291 cell count after one month, long enough to give the patient's immune system a chance to recover. If the only remaining SC291 cells have all the genetic mutations, then the patient's immune system has recovered, because it has killed all the defective cells, but SC291 works, because the immune system has not killed the fully modified cells, using a blood test that allows them to determine the number of SC291 cells and the proportion that are defective. If the immune system had recovered, there would be no partially-modified cells remaining; the patient's immune system would have killed them all. If there were SC291 cells, then the SC291 cells evaded the immune system. So if the blood test found ample fully-modified SC291 cells and no defective

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 19
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

SC291 cells, then, Defendants said, SC291 evaded the immune system.

63.60.  As Defendant Harr explained in a September 12, 2023, presentation:

The question number one. We have a lemon, right? You take a healthy volunteer's cells and you gene edit them, it turns out that not 100% of cells get gene edited. It's about 80%-85% have all the gene edits. We can make lemonade. Because what happens here, what we know is that in every allogeneic CAR T-cell to date, the patient's immune system is suppressed. The cells CAR Ts grow. The immune system comes back. Then within a few days, all of the CAR T-cells are gone.

So what should happen here if our drug works like we think it does, that when the immune system comes back, instead of all of it going away, we'llwill go from 85% to 100% of cells being fully edited. Because then what you know is you have cell survival in the context of an intact immune system. *So that's really, I think, most of the risk of the company, right? Have you actually solved the problem of allogeneic transplant rejection? And that's not a very complicated question to answer, right? You need to see cells grow, then you need to see the non-edited cells go away if it comes back.*

64.61.  And as Defendants showed in Sana's December 2023 corporate presentation: included a slide making the point. See Exhibit 1, hereto.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 20
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

ARDENT trial will provide rapid insight into hypoimmune immune evasion

| Day 0 | 2-4 weeks | 1 month + |
| --- | --- | --- |

SC291 is a mixture of HIP and non-HIP CAR T cells

Triple Knockout and CAR expression:
40-50% are fully modified cells
80-85% have all three gene knockouts

Knockout
No CAR
expression

CAR
expression:
incomplete
knockout

Triple
knockout+
CAR
expression

T cells and NK cells recover

Non-HIP cells
eliminated by patient
immune system

Knockout
No CAR
expression

CAR
expression:
incomplete
knockout

HIP CAR T cells survive after immune recovery

Triple Knockout and CAR expression:
With success, ~100% of surviving cells fully modified

Triple knockout+
CAR expression

+ CD47

+ CAR

Sana

65.    Moreover, Defendants told investors that they could prove immune evasion

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 21
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

~~worked without waiting for complete Phase I results, but instead with just a few patients. For instance, on Sana's May 23, 2023 Research & Development Day, Defendant Harr stated:~~

62. Defendants also repeatedly made two related points: (1) it would only take a few patients; and (2) positive results would demonstrate that Sana had overcome immune rejection.

So the way to turn it into medicines is to keep peeling back the evidence. So, we'll have immune evasion data. *We can figure that out very quickly within a few patients.*

~~66.~~63. Harr repeated himself at the June 7, 2023, Jefferies Global Healthcare Conference:

What we'll see if ~~we'll~~we actually have really done what we think we will have done is that at the end of a month, two months, three months, it will be a 100% fully modified cells. That's it. So in one or two patients you can know, have all of the data we've generated, more than 40 non-human primates as an example, which show that we can evade the immune system in an allogeneic transplant. Does that translate into people? ~~You 'll~~*You'll know in a couple patients. This is actually really straightforward.*

~~67.~~64. ~~According to~~ Defendants~~, this "straightforward" finding in "a~~ themselves told investors that the first few ~~patients"~~patients' results would ~~substantially derisk~~remove 80% of the risk from SC291 and Sana~~. As~~ itself. On January 9, 2024, Defendant Harr ~~claimed on January 9, 2024~~delivered a presentation at the 42nd Annual J.P. Morgan Healthcare Conference, where he said:

The real goal is to figure out, do we have a drug here? And the first part of understanding, do you have a drug, is can we overcome allogeneic immune rejection? *If we can do that, that's probably 80% of the risk of the program and 80% of the risk of the company.*

~~68.~~65. ~~Then, Sana~~Defendants would ~~retire the risk~~also have to show that ~~its~~Sana's cells were ~~not~~ durable.

66. Sana makes SC291 by using an existing CD19-targeting CAR T-cell. CD19-targeting CAR T-cells themselves have been shown to be safe and effective. Several have been approved by the FDA to treat B-cell cancers. ~~Defendants explained~~Because it is well established

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 22
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

that, just as with the initial CAR T-cells are durable, any failure would likely result from SC291's novel portion—Sana's proprietary genetic modifications designed for immune evasion, Sana could present conclusions from just a small number of.

69.67.   As with immune evasion, Defendants told investors that Sana would be able to determine durability with the first few patients. It would take slightly longer to establish durability than immune evasion, but only if the cells were durable. Sana would not know that SC291 cells could last 6 months until 6 months had passed. As Defendant Harr stated in atold investors on September 6, 2023 presentation. while presenting at the Citi 18th Annual BioPharma Conference:

> Part two is then do these cells really grow and persist. That takes time to figure out, you want to see cells persist for three to six months. I think that's really where you see things. Now, that may or—*we'll have that data over the next three to six months. I don't really know, maybe we'll have it this year, maybe early next year.*

68.      Thus, Sana could determine whether the cells persisted from the same patients that would allow it to establish immune evasion. While durability data might be delayed, that's because Sana told investors to expect that the cells would last three to six months. If the cells did not persist as long, Sana would know earlier.

**B.      The Presence of CD19+ B-Cells Within Three Months of Treatment Shows that the Treatment Has Failed**

**a.      SC291 Cells Must Last At Least Three to Six Months to Be Effective**

70.69.   Defendants also explained that Sana's goal was to create cells that were as durable as autologous enough to match the results of CAR T-cells. As Defendant Harr stated on Sana's May 23, 2023, Research & Development day:

> And our goal is very simple, we want allogeneic cells that behave at least as well as autologous cells. We're not trying to make them kind of good, we're not trying— it won't be a success. There we want them to work at least as well as autologous cells, and we have reasons to believe that they could be better.

71.      Well before the Class Period, doctors and researchers understood that CD19-

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 23
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

targeting CAR T-cells must remain in the body for a significant amount of time for the patient to achieve and maintain remission. But the immune system usually rejects fully foreign cells within less than two weeks. While treatments can use chemotherapy to suppress the immune system, the suppression Thus, Sana could determine whether the cells persisted from the same patients that would allow it to establish immune evasion. While durability data might be delayed, that's because Sana expected that its cells would last three to six months. Sana cannot determine that its cells last six months until six months have passed.

### B.A.    Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024

#### 1.a.    Defendants Claim ARDENT Is An Unqualified Success

72.    Sana is in the earliest stage of FDA trials, and many years away from producing any revenues. Yet Sana consumes cash prodigiously.

|  | Operating expenses | Net cash used in operating activities | Remaining cash, cash equivalents, and marketable securities |
|---|---|---|---|
| 2021 | $356.9 million | $251.1 million | $762.8 million |
| 2022 | $272.6 million | $290.1 million | $434.1 million |
| 2023 | $293.1 million | $253.6 million | $205.2 million |
| Total 2021-2023 | $922.6 million | $794.8 million | |

73.    Sana lacked the cash to take its products through clinical trials. Even as it ran ARDENT, Sana's cash was dwindling. As of December 31, 2023, Sana only had $205.2 million in its coffers, which was roughly how much it planned to spend in 2024. Indeed, it did not even have enough cash to take product through the end of Phase I clinical trials. To raise sufficient

FIRST[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT - 24
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

cash to permit it to complete Phase I clinical trials, Sana had to convince investors that these trials were already bearing fruit. If the initial data showed SC291 evades the immune system, then Sana would be able to raise the cash it needed. Without such a showing, investors might shun Sana, precipitating its downfall.

74. Defendants presented data from the first six patients in ARDENT on January 9, 2024. Three patients had received the lowest 60-million cell dose; three more had received the 120 million cell dose. These data showed, Defendants claimed, evidence of efficacy, with two patients undergoing ongoing complete responses (complete remission).

75. Defendants' presentation focused on their claim that they had demonstrated immune evasion. Defendants presented a video purporting to show a patient's immune system responding to SC291 in days 13 through 28 after administration. The video showed the immune system attacking the defective SC291 cells that had not been fully modified. The last still of the video, which was also presented as a slide, showed that all the defective cells had been destroyed, but not the fully modified SC291 cells.

76. Defendants told investors the immune evasion data was the most critical part of the presentation. Defendant Harr called the slide the "killer slide," the "most important slide in many regards." And Defendant Harr explained why: "[B]ecause it tells you that with real patient blood, real patient samples, *we've overcome the large challenge in the field*, which is NK cell recognition of [allogeneic] cells." Defendant Harr continued, that SC291 "is working *exactly as we hoped it would*."

77.1. Moreover, Defendants also represented that SC291 successfully demonstrated rapid B-cell depletion. Defendants presented a slide claiming that the concentration of B-cells in the blood of one patient (patient 4) was measured as zero 28 days after treatment. In oral

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 25
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

comments, Defendant Harr added that "what you can see here is that very rapidly we can completely deplete the B-cells."

78.1.   This positive news caused the price of Sana's shares to spike. On January 9, 2024, Sana's stock price closed at $5.16. The next day, it closed at $7.18, a single-day increase of nearly 40%, with trading volume of almost 30 times that of the prior day.

79.   But the data collected by and known to Defendants were far more mixed than Defendants' own statements represented. As Sana's own Head of T Cell Therapeutics acknowledged in 2023, before Sana had any data from ARDENT, a B-cell recovery shows that the CAR T-cells have already been destroyed. B-cell recovery *in less than three months* also leads to all but universal relapse within a year. Yet the data Sana had in hand as of the January 9, 2024 presentation showed that B-cells had recovered, and SC291 cells deteriorated, in less than two months. This falls far short of Sana's stated goal of lasting at least as long as autologous cells, or three to six months. Thus, Defendants knew, but did not disclose to investors, that the data suggested Sana had not overcome immune response but only delayed it.

80.   On February 8, Sana sold $189.75 million of its shares in an underwritten offering.

2.   *Defendants Concealed From Investors That Though CAR T Cells Must Survive At Least Three Months, SC291 Survived At Most Two Months*

81.   As Defendant Harr himself stated during the January 9, 2024 presentation, "the best B-cell depleter man has created is actually a CD19-targeted CAR T-cell."

82.1.   Indeed, CAR T-cells targeting CD19 are so effective at killing B-cells that the mere presence of B-cells is treated as showing that the CAR T-cells have been destroyed.[7]

---

[7] *E.g.* Uri Greenbaum et al, Chimeric Antigen Receptor T-Cells in B-Acute Lymphoblastic Leukemia: State of the Art and Future Directions, Frontiers in Oncology, Volume 10, Article 1594, at 6, available at https://pubmed.ncbi.nlm.nih.gov/32984022/ .

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 26
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

According to one article, "B-cell aplasia [i.e., B-cell depletion] ... is an indirect measure of anti-CD19 CAR T-cell presence."[8]

70.    As Defendant Harr himself acknowledged,leaves the patients open to microbial infections. No allogeneic CD19-targeting treatments have been shown to survive in the patient long enough to prevent a rapid relapse.

71.    According to Plaintiffs' expert Dr. Schoenberger, immunologists had established well before the Class Period that CAR T-cells must persistlast at least six months to cause a lasting therapeutic benefit. The patients whose CAR T-cells disappear within six months and who have long-lasting remissions are extreme outliers. That consensus is reflected in papers like Maria Gabelli et al, Maintenance therapy for early loss of B-cell aplasia after anti-CD19 CAR T-cell therapy, Blood advances, 2024 8 (8) 1959, 1959[9] ("Early ($\leq$ 6 months from infusion) loss of [B-cell aplasia] was associated with high relapse risk in studies with … CD19 CAR T-cell products.").

83.72.  Defendants themselves acknowledged that SC291 cells would have to last a very long time in the body to effectively treat cancers.or the patient would almost certainly relapse. For example, in a June 6, 2023, presentation, Defendant Harr stated that "I think the data are very clear. You need three months to six months. These CAR T-cells need to stick around that long." Harr reiterated this in a September 6, 2023, presentation, stating "you want to see cells persist for three to six months. I think that's where you see things." The clinical literature likewise states

---

[8] Maria Gabelli et al, Maintenance therapy for early loss of B-cell aplasia after anti-CD19 CAR T-cell therapy, Blood advances, 2024 8 (8) 1959, 1959, available at https://ashpublications.org/bloodadvances/article/8/8/1959/498307/Maintenance-therapy-for-early-loss-of-B-cell

[9] Available at https://ashpublications.org/bloodadvances/article/8/8/1959/498307/Maintenance-therapy-for-early-loss-of-B-cell

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 27
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

that CAR T-cells must persist for some time, though it suggests a slightly higher estimate: six months. Gabelli at al, supra note 7, at 1 ("Early (≤ 6 months from infusion) loss of [B-cell aplasia] was associated with high relapse risk in studies with … CD19 CAR T-cell products.").During the Class Period, Harr acknowledged that, at least in acute leukemia, SC291 cells had to last at least six months.

84.73.  Thus, rapid B-cell recovery is not only a negative indicator for clinical outcomes, it also shows that the CD19-targeting CAR T-cells were quickly destroyed. As Terry Fry, Sana's head of T-Cell Therapeutics, explained at Sana's May 23, 2023, Research & Development Day, B-cell recovery within three months of treatment shows that the CAR T-cells did not persist, and resultssets the patient up, in the "vast majority" of cases, the patient relapsed withinfor a yearquick relapse:

> [T]he other pattern that we saw was that with early B-cell recovery within the first three months after CAR T-cell infusion, as evidence of lack of functional CAR T-cell persistence, ***the vast majority of those patients ultimately relapsed*** with leukemia that retained expression of the CD19 protein on the surface, again indicating the problem with lack of cell persistence.

74.    But Sana told investors it already had data suggesting three-month durability. Before starting human trials, Sana had conducted extensive animal experiments with both primates and mice which had been genetically modified so their immune system resembled humans'. Defendants told investors that these experiments had demonstrated that SC291 remained in the body long term. Defendants cited a study in which Sana successfully treated B-cell cancers in mice using SC291 and then reinjected the mice with cancer 83 days later. The mice quickly beat the cancerous cells. Defendants told investors this was evidence that SC291 cells survived three months. Sana just needed to confirm this result in humans.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 28
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

### b.    The Presence of CD19+ B-Cells Shows that the SC291 Cells Have Been Destroyed Or Are No Longer Functional

75.    Doctors use blood tests to determine whether B-cells are present in the patient. According to Dr. Schoenberger, the mere presence of CD19+ B-cells in the bloodstream is evidence that there are no effective CAR T-cells, either because all of the cells have disappeared or because they are no longer functional. That is because while bone marrow persistently generates B-cells, CAR T-cells persistently kill them, either in the bone marrow itself or as they enter the bloodstream. Thus, if the CAR T-cells still exist, then there will be no detectable levels of B-cells. Conversely, if there are detectable levels of B-cells, then the CAR T-cells are gone.

76.    The literature supports Dr. Schoenberger. CAR T-cells targeting CD19 are so effective at killing B-cells that the mere presence of B-cells is treated as showing that the CAR T-cells have been destroyed.[10] According to one article, "B-cell aplasia [i.e., B-cell depletion] ... is an indirect measure of anti-CD19 CAR T-cell presence."[11]

77.    Likewise, in reporting partial ARDENT results, Sana scientists wrote that "[t]he presence of CD19 B-cell depletion in the peripheral blood has previously been shown to serve as a surrogate to gauge the functional persistence of CD19 CAR T-cells." ("ARDENT Results Paper").[12]

78.    And Defendant Harr himself stated during the January 9, 2024, presentation that

---

[10] *E.g.* Uri Greenbaum et al, Chimeric Antigen Receptor T-Cells in B-Acute Lymphoblastic Leukemia: State of the Art and Future Directions, Frontiers in Oncology, Volume 10, Article 1594, at 6, available at https://pubmed.ncbi.nlm.nih.gov/32984022/ .

[11] Maria Gabelli et al, Maintenance therapy for early loss of B-cell aplasia after anti-CD19 CAR T-cell therapy, Blood advances, 2024 8 (8) 1959, 1959, available at https://ashpublications.org/bloodadvances/article/8/8/1959/498307/Maintenance-therapy-for-early-loss-of-B-cell

[12] Xiaomeng Hu et al, Hypoimmune CD19 CAR T-cells evade allorejection in patients with cancer and autoimmune disease, Cell Stem Cell 32, 1356, 1358 (September 4, 2025).

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 29
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

"the best B-cell depleter man has created is actually a CD19-targeted CAR T-cell."

79.    According to Dr. Schoenberger, the presence of CD19+ B-cells in the blood is also evidence that SC291 is not working in the patient's lymph nodes or bone marrow. If SC291 were present and functional in the lymph nodes or bone marrow, there would still not be any CD19+ B-cells in the blood because the cells would be destroyed in the lymph nodes and bone marrow. Rather, the presence of CD19+ B-cells in the blood is evidence that SC291 cells have either disappeared or stopped working.

80.    In sum, the blood can contain either CD19+ B-cells or functional SC291 cells, but not both. The presence of one is evidence of absence of the other.

—————

C.    **Defendants Conceal Mixed Clinical Trial Results So Sana Can Raise Enough Money To Survive Past 2024**

a.    **Defendants Claim ARDENT Is An Unqualified Success**

81.    Defendants presented data from the first four patients in ARDENT on January 9, 2024 ("Original Patients").[13] Three patients (patients 1, 2, and 3) had received the lowest 60-million cell dose; Defendants also reported results from one additional patient who had received an intermediate 120-million cell dose (collectively, the "Original Patients").

82.    According to Defendants, these early results were an unqualified success.

83.    Defendants claimed that the data showed evidence of efficacy because: (1) Patient 1 had experienced a partial response (partial remission) for 3 months; (2) Patient 2 was experiencing an ongoing complete responses (complete remission) at 3 months; and (3) Patient 4

_____
[13] The presentations also referenced two other patients who had been treated, patients 5 and 6, but provided no data about them.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 30
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

was experiencing an ongoing complete response at 2 months. Of these, Patient 2 was the stand-out success story. The slide Defendants presented is copied below; a larger version is attached as Exhibit 2 hereto.



84.    Defendants also claimed the data showed that SC291 successfully demonstrated rapid B-cell depletion.  Defendants presented a slide claiming that the concentration of B-cells in the blood of one patient (patient 4) was measured as zero 28 days after treatment. In oral comments, Defendant Harr added that "what you can see here is that very rapidly we can completely deplete the B-cells."

85.    Finally, Defendants claimed that they had demonstrated immune evasion.

86.    Summing up, Defendant Harr stated:

*So the drug is working exactly as we hoped it would and the immune evasion that we saw in the preclinical setting seems to be translating into people.*

87.    The market saw Sana's presentation as a home run. On January 9, 2024, Sana's stock price had closed at $5.16. The next day, it closed at $7.18, a single-day increase of nearly 40%, with trading volume of almost 30 times that of the prior day.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 31
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

88.    13. On February 12, 2024, Sana sold almost $190 million of its shares, raising capital it needed to survive past early 2025,.

   b.  **Defendants** filed with**Concealed from Investors that In At Least Three of** the SEC slides**Four Patients Whose Data They Presented, the SC291 Treatment Had Already Failed**

89.    Yet the data Defendants concealed from investors showed that their January 9 statements were, at best, misleading.

90.    As alleged above, the presence of CD19+ B-cells within three months of treatment is an all-but-certain indication that the patient will relapse.

91.    As Defendants set out in the ARDENT Results Paper, Defendants used two methods to test for the presence of CD19+ B-cells. The first measured CD19+ B-cells directly; the second measured it indirectly by monitoring for the presence of antigens specific to SC291.

92.    Sana creates SC291 by modifying cells (1) to express antigens that prevent the innate immune system from targeting those cells, and (2) so that they do not express antigens that cause the adaptive immune system to target them. Sana's process is not perfect, and a presentation during substantial number of cells will lack either or both modifications. Cells lacking the modifications disarming the *adaptive* immune system will generate an adaptive immune response, including the long-term creation of B-cells targeting the specific antigens expressed by SC291. SC291-specific antibodies can only have been created after the patient received the SC291 treatment. Thus, as Defendants explained in the ARDENT Results Paper, the presence of SC291-specific antibodies is evidence that B-cells are returning which they presented data showing that patients in Ardent experienced is, in turn, evidence that the SC291 cells are gone.

85.93. According to Plaintiffs' expert Dr. Schoenberger, the presence of SC291-specific antibodies is an earlier signal of B-cell recovery within two months:than direct tests for B-cells.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 32
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

Once SC291 has disappeared from the patient's bloodstream, the patient will begin to accumulate CD19+ B-cells over time. Direct tests will only detect relatively high levels of CD19+ B-cells. Tests for drug-specific antibodies are far more sensitive than tests for CD19+ B-cells. Thus, the drug-specific antibody tests can reveal that the patient lacks working SC291 cells before tests can detect CD19+ B-cells directly.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 33
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

SC291 can be safely administered and results in deep, dose-dependent B-cell depletion in oncology

**ARDENT Safety Data (N=16)**

- No cases of Grade 2 or higher CRS
- 3 cases of Grade 1 CRS
- No cases of ICANS
- 1 case of Grade 1 IEC-HS

Deep B-cell depletion seen in NHL patients

Data cutoff Nov 2024.
Abbreviations: CRS, cytokine release syndrome; ICANS, immune effector cell-associated neurotoxicity syndrome; IEC-HS, immune effector cell associated HLH-like syndrome.

© 2020-2025 Sana Biotechnology. All rights reserved.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 34
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

86. Defendants presented data for patients who received the highest dose, 200 million cells. The data Defendants presented showed that all patients who had measurable B-cells in their bloodstream before the treatment were well on their way to recovering to pre-treatment B-cell levels within two months of treatment. Indeed, two patients actually exceeded their pre-treatment B-cell blood concentration levels within two months. Thus, SC291 cells did not survive past two months in any patients even at the highest dose. More, during the first month, Sana measured patients' B-cell concentration every few days, but only tested monthly thereafter. The B-cells could have easily recovered at day 30. Thus, at most, Defendants can say that the CAR T-cells survived at least 28 days, but no more than two months.

87. In the slide header, Defendants claimed that they had observed "*dose-dependent B-cell depletion.*" This means that patients who received higher doses saw better results.[14] Thus, patients who received lower doses would have seen shorter depletion, on average.

94. Only six patients received a dose of less than 200 million cells. Sana had two-month data on four of the six patients by the time Defendants delivered their Indeed, the ARDENT Results Paper itself argues that the presence of treatment-specific antibodies is a better signal that the treatment T-cells have been destroyed than the presence of B-cells.

88. As of January 9, 2024 presentation.[15]

89.95. It is not possible that the response was dose dependent, that at the highest dose B-cell count rebounded within two months, but that B-cell count took longer to rebound in patients 1-4 because they accounted for two thirds, at least three of the patients who received lower

---

[14] National Cancer Institute, definition of dose-dependent, available at https://www.cancer.gov/publications/dictionaries/cancer-terms/def/dose-dependent
[15] While the slide claims that it is presenting data as of January 5, 2023, that is clearly a typo because Sana did not begin human trials until May 2023.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 35
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

doses:Sana presented, and possibly all four, had detectable levels of B-cells at two months.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 36
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566



**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 37
Case No. 2:25-CV-00512-BJR

90.    Sana claimed to have had 2-month data on patient 4. Further, because Sana had to wait at least 28 days between each treatment, Sana had at least five-month data on patient 1, four-month data on patient 2, and three-month data on patient 3. With these data in hand, Defendants had actual knowledge that that all the patients' SC291 cells had been destroyed within two months.

96.    For the reasons set out in ¶¶168-180, below, hereto, the ARDENT Results Paper provides enough information to individually identify Patients 1, 2, 3, and 4. The ARDENT Results Paper also shows:

(a) Both patients 1 and 2 had recovered CD19+ B-cells within two months. Both patients tested positive for CD19-specific antibodies. At least one of the patients, and possibly both, also had levels of CD19+ B-cells that were sufficiently high so that they could be detected with a direct test. Thus, neither patient had working SC291 cells at 2 months.

(b) One patient, who was not identified in the ARDENT Results Paper, withdrew consent and so was not included. That patient was Patient 3. But as shown in the January 9 presentation, SC291 failed in Patient 3 too, because that patient's cancer never experienced any remission.

97.    Patient 4 was the only patient who even conceivably could have had a positive reaction. Patient 4 had a complete response at two months. But there was a one in three chance that Patient 4 had recovered B-cells at two months. See ¶¶177-180, below. Moreover, Sana did not have any data on Patient 4's response at three months. Thus, even if Patient 4 had active SC291 cells at two months, Sana did not know whether she had active SC291 cells at three months, the minimum duration to have a shot at efficacy.

98.    Thus, the data Defendants had on hand as of January 9, 2024 showed that SC291

FIRST[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT - 38
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

had fallen short of the very minimum requirement for efficacy requirement they had publicly acknowledged.   Defendants knew when they made their presentation in January 2024 that the patients it had treated were among the "vast majority" who would relapse.

91.99.  That the cells deteriorated within two months in all patients with a validated CAR T-cell tends to rule out any cause exceptsuggests an immune response from the adaptive immune system. The greatest impediment to allogenic CAR T therapy is immune rejection by the recipient. There is no evidence that SC291 overcame rejection, and strong evidence that the transferred cells were rapidly eradicated through immune rejection within a few weeks. Indeed, in a May 15, 2023, presentation at the JMP Securities Life Sciences Conference, Defendants themselves linked cell deterioration in less than three months to an immune response:

> We believe that persistence matters and that persistence will translate to durable complete responses. And if we get data in the three to six month range, we could be comparable to what auto[logous] CAR- T, say, but with a manufacturing platform that lets us provide much more access to patients. If we're in the two to three month range, it looks more like a best-in-class allo[geneic] CAR- T and less than that we're probable seeing responses closer to what we've seen with other allo players.

92.100.        CAR T-cells last much longer. One research paper found persistent CAR T-cells in two patients 10 years after the treatment.[16] That allogeneic cells tended to deteriorate beforewithin three months, while autologous cells lasted at least three to six months, showslast far longer, suggests that when allogeneic cellsthe rapid decay rapidly, it is because of results from an immune response.

93.    The results did not necessarily mean that SC291 would not work at higher doses. It was possible that at higher doses, enough SC291 cells would survive long enough to deplete B-

---

[16] J. Joseph Melenhorst et al, Decade-long leukaemia remissions with persistence of CD4+ CAR T-cells, February 2022, Nature, available at https://pubmed.ncbi.nlm.nih.gov/35110735/

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 39
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

cells for enough time that the treatment will be effective.

94.101.     Nor did the data preclude SC291's use inShowing that the immune evasion technology works is valuable to Sana even if the specific treatment that the evasion supposedly facilitates proves ineffective. During the Class Period, Sana was pursuing four products in seven indications, all of which ultimately involve the application of these genetic modifications to evade the immune system. Poor durability did not preclude SC291's use in at least some of these other indications. For example, Sana was also pursuing SC291 in autoimmune diseases. As Defendant Harr explained in a September 6September5, 2024, presentation, a treatment can be effective in the autoimmune context even with less B-cell depletion than for cancers:

> I mean, one of the things that we learned in oncology is these cells [SC291] have to stick around for a while to have time to survey the whole body and get rid of all the tumor cells. You're gonna get rid of most likely all B-cells and tumor cells to do that, right, CD19. It's probably true that you have to stick around a lot less long to get rid of all B-cells, right? So the persistence that you need is probably less, which may mean that more allogenic players can compete with us, rather, than could in oncology.

102.   That's because the premise of CAR T treatment for autoimmune diseases is that the body merely needs to reset the immune system through B-cell depletion, which only requires killing all active B-cells, rather than eliminating all active B-cells and cancerous cells. Indeed, Sana cited the January 13, 2025 slide showing that SC291 did not persist long enough to treat cancers as evidence that SC291 could effectively treat autoimmune diseases. and destroying B-cells as they are produced.

103.    The results also did not completely rule out the possibility that SC291 might work at higher doses. It was possible that at higher doses, enough SC291 cells would survive long enough to deplete B-cells for enough time that the treatment would be effective. But the data showed that SC291 was not effective, and did not evade the immune system, at the doses Sana

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 40
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

had tried so far.

95.104.    Thus, Sana had a reason to continue with the SC291 oncology trial, either because the drug might be effective at a higher dose, or because the data from the SC291 oncology trial might show that SC291 was effective enough for autoimmune diseases.

105.    ButIn the data showed that Sana had end, the higher dose did not demonstrated immune evasionprove effective. Collectively, 11 patients were treated at the 60 and 120 million and 200 million cell doses. Three of them had pre-existing antibodies that managed to destroy SC291 cells, notwithstanding their purported immune evasion, and undercut efficacy in cancer treatment at another only had 30 days of follow-up, leaving only 7 patients to examine: 3 in the 120 million cell group, and 4 in the 200 million cell group.

106.    Of these doses. Defendants' past-tense statement, 1 (in the 120 million cell group) had detectable B-cells at 2 months. The 6 remaining patients did not have detectable B-cells. But Sana only presented 3-month data for 2 patients. Thus, the ARDENT Results Paper shows that Sana had overcome immune rejectionsomewhere between 14% and 43% of patients treated with SC291 met what Defendants publicly acknowledged was just not truethe minimum requirement to have a chance of efficacy.  See ¶¶180, below.

96.107.    ARDENT ultimately showed that SC291 was a failure in oncology.

**C.D.    Defendants' Materially False and Misleading Statements &and Omissions**

97.108.    Beginning on January 9, 2024, with the release of preliminary data for Sana's ARDENT trial, Defendants made material misrepresentations and omissions about the early success of the study, suggesting that Sana had solved the immune evasion problem in humans with its allogeneic CAR- T SC291 cells. Defendants also claimed that SC291 was working exactly as Defendants had hoped. Finally, Defendants claimed that the Original Patients'

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 41
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

results showed efficacy.

98.109.    On January 9, 2024, Sana filed a Corporate Presentation as Exhibit 99.1 to a Form 8-K with the SEC signed by Sana's Executive VP and General Counsel, Bernard Cassidy. The January 9 8-K explained that Sana intended to discuss theDefendant Harr delivered a presentation at the 42nd Annual J.P. Morgan Healthcare Conference, at which Defendant Harr presented that day.. The purpose of Sana's presentation was to disclose new data from ARDENTthe Original Patients' results. In his presentation, Defendant Harr stated:

> The real goal is to figure out, do we have a drug here? And *the first part* of understanding, do you have a drug, *is can we overcome allogeneic immune rejection?  If we can do that, that's probably 80% of the risk of the program and 80% of the risk of the company, right?*  That is something that we've seen in non-human studies that we are really quite good at. *We want to make sure that the animal data translate into people.*  If they do, can we make great CART-cells? And that's measured by safety and efficacy of the program early.  And then we want to see how does that translate over time into durable, complete responses, and finally, we need to make sure that we have a real scale manufacturing process.

99.110.    Defendant Harr's statement was false and misleading because: (a) Sana had merely delayed immune rejection, rather than demonstrate immune evasion, in that SC291 cells were destroyed by the immune system within two months; (b) even if Sana had not demonstrated immune evasion, it had instead delayed immune rejection by an immaterial amount; (b) the demonstration did not takeremove 80% of the risk out of SC291 because Sana had data showing that SC291 cells were not durable because B cells recovered within two months; (c) if Sana's data shows that its cells are probably not durable enough for an from SC291 in oncology treatment, then Sana hasbecause Defendants knew that in at least 3 of the 4 Original Patients, SC291 cells deteriorated to quickly to be effective, and Sana did not at the time have 3-month data on the last patient, so the available evidence suggested that SC291 did not retired 80% of the riskwork in oncology; and (c) Sana had previously boasted that SC291 cells lasted three months

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 42
Case No. 2:25-CV-00512-BJR

in animal studies, and Sana's cells lasted less than two months in humans, so ~~Defendants already knew~~the available evidence suggested that SC291's animal data did not translate into humans.

~~100.~~111.    In prepared remarks on January 9, 2024, Defendant Harr claimed that Sana saw with SC291 that:

> [A]s a patient's immune system reconstitutes, ***our fully hypoimmune cells live***. And we'll know the immune system is reconstituted because you will generate an immune response against the partially edited cells. ***So this is the test of does this really work in humans.  So what we see is what we hoped we would see***.

~~101.~~112.    Defendant Harr's ~~statement that "this really work[s] in humans" was misleading for omitting evidence, known to Sana, that SC291 did not work in humans, namely that SC291 cells deteriorated within two months of treatment. Harr's statement that "what we see is what we hoped we would see" was~~ statements were misleading because ~~Harr had previously communicated that Sana hoped to see SC291 cells survive three to six months and, as of the time of Harr's statement, Sana's evidence suggested that SC291 cells survived less than two months.~~Sana had told investors exactly what it "hoped to see," and SC291 did not meet this threshold: (a) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy and (b) Sana had told investors that it hoped that animal results showing that SC291 lasted three months would translate into human, but (c) Sana knew that in 3 of 4 patients, SC291 did not even last 2 months, and Sana did not have three-month data on the fourth patient. For the same reason, data from the Original Patients showed that, at least at the doses Sana tested, SC291 did not work in humans. Harr's statement that "our fully hypoimmune cells live" was misleading because the evidence available to Sana at that time showed that SC291 cells survived for less than two months.

~~102.~~    Defendant Harr also presented ~~a~~the slide ~~purportedly showing that SC291 had evaded the immune system:~~

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 43
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 44
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 45
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

In the far right image, the slide states, "*NK cells do NOT kill CAR T cells*."

103.113.    set out at ¶84, above. Presenting the slide, Defendant Harr stated:

*So this next slide is, in many regards, my favorite slide in the whole presentation. So it's kind of the killer slide. It's the picture of what happens.* So this is actual, these are NK cells from patients 28 days after being treated. And what you see is when you have double knockout cells. This is what a lot of the field has done with Class I and Class II.

The green cell is the CART-cell and the rest is the NK cell. And very rapidly, the NK cells will recognize and eat and destroy the CART-cell. We're often asked, well, what happens if you knock out Class I and Class II and over express HLA-E? So, we can try that system for you. And, again, the patient's NK cells will rapidly recognize and destroy those cells.

And what you see here on the right-hand side is *what happens to the NK cells and our fully modified CAR T-cells*. And they bump up against it, *but there's absolutely no killing.* And *this is the most important slide in many regards, because it tells you that with real patient blood, real patient samples, we've overcome the large challenge in the field, which is NK cell recognition of these cells.*

And just to be sure, we said, hey, what if there's something else in the blood that might kill these cells? And what you see is against wild-type CAR T-cells, as expected, they're dead. Again, that's just an allogeneic cell, my cells into you. If you knock out Class I and Class II, the blood from the patient will kill those cells. But what you see in the right-hand side is *our fully gene-modified cells, they really do work.*

*So the drug is working exactly as we hoped it would. And the immune evasion that we saw in the preclinical setting seems to be translating into people.* So stay tuned. The early data suggests that we have the safety, the desired immune evasion and the clinical impact that we're hoping to see. We'll have a lot more data as the year goes forward and we'll share it across all these different parameters.

104.    Harr's statement that Sana had overcome immune evasion misleadingly omitted that, based on present data, Sana had not overcome immune response, it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted only two months. Harr's statement that "the drug is working exactly as we hoped it would" misleadingly omitted that SC291 cells were lasting less than two months, which is less

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 46
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

than the three to six month benchmark Defendants had told investors they hoped Sana met because meeting the benchmark was necessary to prevent relapse. Harr's statement that preclinical work was translating into humans was false because Harr had previously boasted that SC291 cells lasted three months in animal studies, and Sana's cells lasted less than two months in humans, so Defendants already knew that SC291's animal data did not translate into humans.

105.    In prepared remarks, Defendant Harr also stated:

We've actually used this exact same drug, SC291, in cancer patients. And so we can look at the B-cells in the cancer patients. *And what you see here is that very rapidly we can completely deplete the B-cells.*

106.    Harr's statement misleadingly omitted that even if B-cells were rapidly depleted, they recovered within two months of treatment, far too quickly for an effective cancer treatment.

What you can see is that three of the four patients have had at least a partial response *even at these low doses and two of the four patients are in an ongoing complete response. So the drug is working as we hoped it would on the safety and efficacy side.*

114.    Defendant Harr's statement that Sana has "proven that [the cells] work" was misleading because: (a) Defendant Harr had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed; (d) as a result, it was overwhelmingly likely that Patient 2 would relapse. Further, Harr's statement that "the drug is working as we hoped it would on the … efficacy side" was misleading because Sana had told investors exactly what it "hoped to see," and SC291 did not meet this threshold: (a) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy and (b) Sana had told investors that it hoped that animal results showing that SC291 lasted three months would translate into human, but (c) Sana

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 47
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

knew that in 3 of 4 patients, SC291 did not even last 2 months, and Sana did not have three-month data on the fourth patient.

107.115.    On January 9, 2024, at the J.P Morgan conference, Harr also sat for a special CEO chat with Flagship Studio. During the interview, Defendant Harr said:

> And so, we were optimistic that, as we moved through 2023, we started to treat humans. And what we found is we moved from the early patients, and we'll talk about the technicalitytechnology in a second. Sorry, from the preclinical studies into early patient data is *we're seeing exactly what we hoped we would see.*

108.116.    Harr's statement that "we're seeing exactly what we hoped we would see" misleadingly omittedwas misleading because Sana had told investors exactly what it "hoped to see," and SC291 did not meet this threshold: (a) Sana had told investors that SC291 cells were lasting less than two had to last at least three-to-six months, which is less than the three to six for SC291 to have a shot at efficacy and (b) Sana had told investors that it hoped that animal results showing that SC291 lasted three months would translate into humans, but (c) Sana knew that in 3 of 4 patients, SC291 did not even last 2 months, and Sana did not have three-month benchmark Defendants had told investors they hoped Sana met because meeting the benchmark was necessary to prevent relapse. data on the fourth patient.

109.117.    On February 29, 2024, Sana issued an earnings release and business update for Q4 2023 and YE 2023 to its corporate website ("2/29/2024 Earnings Release"), which quoted Defendant Harr and was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy ("2/29/2024 8-K"). The release said "*Early SC291 data from the ongoing ARDENT trial* in relapsed/refractory NHL and CLL suggest ability to dose safely, *demonstrate the desired immune evasion profile, and early clinical efficacy using hypoimmune technology.*"

110.    Defendants' statement misleadingly omitted to disclose that data from ARDENT had not demonstrated the desired immune evasion profile or clinical efficacy, but rather Sana's

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 48
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

118.    Defendants' statement was misleading both in claiming that SC291 had shown immune evasion and that it had demonstrated clinical efficacy. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period. As to clinical efficacy, (a) Defendant Harr had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients.

111.119.    On March 6, 2024, Defendant Harr presented at the TD Cowen 44th Annual Healthcare Conference. In response to a question about the ARDENT trial data released to that point, Defendant Harr said:

> ***And so what we saw is two of the first four patients were on a complete – ongoing complete response. One had a partial response and one had stable disease, so it smells like it should, right?*** There were no drug-related side effects, no things like the cytokine release syndrome, or neurotoxicity.
>
> …
>
> So what should happen in a CAR T-cell is that if you have an intact immune system, you should generate—should generate an immune response to your unedited cells. And your fully edited cells, which the immune—your—my immune system shouldn't see. So what we showed you is that's exactly what happened, right?

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 49
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

So patients generated a——and patients who've been dosed, the study have generated T-cell response, it kills the unedited cells.  They will generate—they will—their NK cells will kill cells that don't overexpress CD47. They generate an antibody response, generally, they come back that the second, some of them will just generate an antibody response to unedited cells. And edited cells are completely wide, right?  And the immune system just doesn't see them, right?  So that's what we've shown you. ***There's no immune response as we look out over time to our edited cells.***  We haven't gotten into how long the cells last and things like that, but we'll put that into some kind of scientific presentation.  ***But they kind of smell like that.***

~~112.~~120.      Responding to a question about treatment of autoimmune disease, Defendant Harr said about SC291: "Is it possible [we] don't work as well or we work better than autologous cells? ***I think both those things are still on the table. We don't know the answer.***"

~~113.    Harr's statements were misleading because: (a) he omitted to disclose that Sana's data showed that it had merely delayed an immune response, which then destroyed SC291 cells within two months; (b) according to Sana, autologous cells lasted three to six months; (c) again according to Sana, persistence of less than three months led to almost universal relapse; and (d) SC291 cells lasted less than two months.~~

121.    Defendant Harr's statements were misleading. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period. As to clinical efficacy, (a) Defendant Harr had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 50
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

was not effective in the Original Patients. As to Defendant Harr's statement that "I think both those things are still on the table," Sana already knew that SC291 did not perform as well as CAR T-cells.

122.    On the same call, Defendant Harr stated:

*I think we've shown that we can get rid of allogeneic rejection in non-human primates and humanized mice. The real question is how do these data translate into people? We can come back to why we think what we're seeing in humans in the early settings is highly encouraging. But that really is the question. I mean because the data have been translated into people, right? It's not—and nothing's been that surprising.*

123.    Defendant Harr's statement that the data were "highly encouraging," "have been translated into people" and have not "been that surprising" were misleading because: (a) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy and (b) Sana had told investors that it hoped that animal results showing that SC291 lasted three months would translate into humans, but (c) Sana knew that in 3 of 4 patients, SC291 did not even last 2 months, and Sana did not have three-month data on the fourth patient.

~~114.~~124.    On May 8, 2024, Sana issued an earnings release and business update for Q1 2024 to its corporate website, which quoted Defendant Harr and was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy.  The earnings release stated that "*Early SC291 data from the ongoing ARDENT trial* suggest the ability to dose safely, *the desired immune evasion profile, and early clinical efficacy.*"

~~115.    Defendants' statement misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather Sana's~~

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 51
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

116.125. Defendants' statement was misleading both in claiming that SC291 had shown immune evasion and that it had demonstrated clinical efficacy. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period. As to clinical efficacy, (a) Defendant Harr had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients. On May 13, 2024, Defendant Hardy presented at the Citizens JMP Life Sciences Conference. In response to a question about the difficulty of competing with autologous cells in oncology, he said,: "I think we've been clear that we hope to be as good as autologous in efficacy, and *I think they've proven that these work.*" Responding to a follow up question suggesting the positive ARDENT study data indicated potential for less severe diseases, Defendant Hardy said, "I will say we also were really encouraged and it was only four patients. *But in those four patients at lower doses to see three partial responses, and two complete responses, we were certainly encouraged by that. Combined with the fact that the immune assays that were ~~ran~~ run also showed that we avoided the T-cells, B-cells, antibodies, and C-—and NK cells.*"

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 52
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

117. Hardy's statements were misleading because he omitted to disclose that: (a) based on present data, Sana had not overcome immune response, it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted only two months; they omitted to disclose that Sana's data showed that it had merely delayed an immune response, which then destroyed SC291 cells within two months; (b) according to Sana, autologous cells lasted three to six months; (c) again according to Sana, persistence of less than three months led to almost universal relapse; and (d) SC291 cells lasted less than two months.

126. Defendant Hardy's statements that "I think they've proven that these work," that Sana saw "three partial responses, and two complete responses," and that Sana "were certainly encouraged by that" were misleading because: (a) Sana had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period.

118.127. On August 8, 2024, Sana issued an earnings release and business update for Q2 2024 to its corporate website, which quoted Defendant Harr and was filed with the SEC

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 53
Case No. 2:25-CV-00512-BJR

that day as Exhibit 99.1 to a Form 8-K signed by Defendant Hardy  The earnings release stated that, after three months of additional clinical work had passed, that "***Early SC291 data from the ongoing ARDENT trial*** suggest the ability to dose safely, ***the desired immune evasion profile, and early clinical efficacy.***"

119.   Defendants' statement misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

128.   Defendants' statement was misleading both in claiming that SC291 had shown immune evasion and that it had demonstrated clinical efficacy. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period. As to clinical efficacy, (a) Defendant Harr had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients.

120.   On September 5, 2024, Defendant Harr presented at the Wells Fargo Healthcare Conference.

121.129.   In prepared remarks, Defendant Harr said:

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 54
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

And so we now have four separate programs ongoing, seven different indications in human testing. We've shown a little bit of human data early last year and it was in an allogeneic CAR T-cell in patients with lymphoma and chronic leukemia. *Four patients, you saw what you hope you would see*, it's early data. *Two of them had a complete response, another had a partial response and well tolerated and generally the cells were not recognized by the immune system, right? And so that's really, really what we were hoping to see earlier.*

~~122.~~130.    Later, in response to a question about Sana's go-no-go criteria for SC291, Defendant Harr said, in part:

The hard part about oncology kind of *already know it works from four patients* but it's a very competitive space with the high bar to move forward and *we may or may not hit that bar, right?*

~~123.    Defendant Harr's statement was false and misleading because: (a) S Defendants' statement was false because Sana had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months; (b) the "bar" referenced in Defendant Harr's statement is set by the performance of autologous CAR T-cells; (c) according to Sana, autologous cells lasted three to six months; (d) again according to Sana, persistence of less than three months led to almost universal relapse; (e) SC291 cells lasted less than two months; and, therefore, (f) it was not possible that Sana would hit the "bar" referenced in Defendant Harr's statement.~~

131.    Defendant Harr's statement that Sana "already know [SC291] works from four patients," that two patients had a complete response, and that Sana "saw what you hope you would see" were misleading because: (a) Sana had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies to SC291, showing that SC291 cells had already

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 55
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period. As to Harr's statement that "we may or may not hit that bar" (CAR T-cell efficacy), for the reasons stated in this paragraph, Sana already knew that it did not.

124.132.    On September 9, 2024, Sana's VP of Finance, Investor Relations, Nicole Keith, presented at the H.C. Wainwright 26th Annual Global Investment Conference. In prepared remarks discussing Sana's work in B-cell cancers, Keith said about the early ARDENT data:

> *And you can see some of the early clinical data where four three of four* valuable*evaluable patients had at least a partial response with two ongoing complete responses.*  I won't go into the details today, but *the immune response data provide important early insights that we are seeing the desired immune evasion profile.* The ARDENT trial continues with enrollment and more data is expected in 2024.

125.   Defendant's statement that the data provided "early insights that we are seeing the desired immune evasion profile" misleadingly omitted to disclose that data from ARDENT had not suggested the desired immune evasion profile or clinical efficacy, but rather its available evidence suggested it had merely delayed the immune system's destruction of SC291 cells, as shown by the fact that even at higher doses, SC291 cells lasted less than two months.

133.   Defendant's statement concerning efficacy were misleading because: (a) Sana had highlighted two patients with complete responses, Patient 2 and the first patient treated with 120 million cells; (b) the most impressive result was Patient 2, with a three-month complete response at a 60 million cell dose; (c) but within 2 months of treatment, Patient 2 had developed antibodies

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 56
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

to SC291, showing that SC291 cells had already been destroyed. Moreover, (d) Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (e) 3 of the 4 Original Patients had lost SC291 cells within two months of treatment; (f) Sana did not have three-month data on the fourth Original Patient, and therefore (g) the data available to Sana showed that SC291 was not effective in the Original Patients. As to immune evasion, Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune rejection for an immaterial period.

126.134.    On October 1, 2024, Defendant Harr participated in the Goldman Sachs Cell Therapy Day conference.  In response to a question about when Sana would release further SC291 data—in either oncology or autoimmune—he said, "*We put these gene modifications and then we've shown you a few patients worth of data, and it looks like—they look pretty good.* They're early. There are no safety issues that we're seeing. *They seem to avoid immune detection by the assays that we have.*"

127.135.    Harr's statement that the data provided "~~they~~ look pretty good" and "~~they~~that "[the cells] seem to avoid immune detection by the assays that we have" misleadingly omitted to disclose that: (a) ~~Sana's data showed that B-cells recovered~~ Sana had told investors that SC291 cells had to last at least three-to-six months for SC291 to have a shot at efficacy (b) 3 of the 4 Original Patients had lost SC291 cells within ~~at most~~ two months~~, as shown by the fact that even at higher doses, SC291 cells lasted at most two months; (b) B cells' recovery~~ of treatment; (c) Sana did not have three-month data on the fourth Original Patient, and therefore (d) the data available to Sana showed that SC291 ~~cells were being destroyed by the patients' immune system, such that Sana~~ was not ~~seeing the desired~~effective in the Original Patients. As to immune evasion~~ profile; (e) and, as to Harr's statement about assays,~~

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 57
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

assays would include those showing B cell recovery and CAR T cell destruction, which showed that the , Sana had not shown immune evasion, but had instead shown that SC291 only delayed immune system was destroying SC291.rejection for an immaterial period.

D.E.  **Additional Facts Further Probative Of Scienter**

1.a.  **In Their Stock 2023 Presentation, Defendants Maintained That Sana Would Collect Durability Data By Late 2023 Or Early 2024 And Present It To Investors**

128.136.  SC291 cell durability was an important metric for Sana. In Defendants' telling, it was the second of three sets of data that would retire critical risks that Sana faced.

129.137.  From its May 23, 2023 Research & Development Day through a December 6, 2023 presentation at the JMP Securities Hematology and Oncology Summit, Sana delivered nine presentations at investor-focused conferences. In six of these presentations, Defendants claimed that Sana would have durability data in late 2023 or early 2024:

(a)  During Sana's Research & Development Day, Harr stated:

So, the way to turn it into medicines is keep peeling back the evidence. So, we'll have immune evasion data. We can figure that out very quickly within a few patients. We'll do that. We have an ongoing enrolling study called ARDENT, which we'll talk about for the CD19 CAR. And if you have immune evasion, and you see cancer cells killed, and you now may persist that should lead to durable complete responses. *We will know early evidence of just the complete responses and persistence, again, as we move through this year and into next.* And the durable, complete responses, six months in and out, functional cures, hopefully we can begin to see that as we move into next year.

(b)  During Sana's June 7, 2023 presentation, Harr stated:

You may have a minority of people, people who do. But we can show you all kinds of data to help you understand that. But we want—first we want to see survival of our cells. *The next thing that we want to see is we want to see high rates of complete responses with cellular persistence.* And then the last thing that will translate into is long-term durable complete remissions, right? And that's really the goal of turning it into a product. But so, we're going to gradually peel back that

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 58
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

onion. We'll probably know the cell selection, right? *Enrichment, and the persistence of these cells this year.* It'll take us longer to have durable, complete responses.

(c)   During Sana's June 12, 2023 presentation, Harr stated:

*So, the second layer of evidence will be first layer of evidence, dull enrichment. That's a great day and that day if we have it, we will change the way we invest internally because we will know the hypoimmune platform is going to translate.* The second will be, do you have a high level of complete responses with cellular persistence? That will tell you if you have a great product. There will be people who want to see—and by the way, we'll know the first, soon. *The second, we'll begin to figure that out this year.*

(d)   During Sana's September 6, 2023 presentation, Harr stated:

Because now you've translate the nonhuman—all of the preclinical work in nonhuman primates and mice in the humans. That isn't that complicated to figure out. That's part one. Part two is then do these cells really grow and persist. That takes time to figure out, *you want to see cells persist for three to six months*. I think that's really where you see things. No, that may or—*we'll have that data over the next three to six months. I don't really know, maybe we'll have it this year, maybe early next year.*

(e)   During Sana's September 7̶11, 2023 presentation, Defendant Hardy stated:

So really, the next layer of evidence you want to see is persistence. And we believe that persistence will really translate to complete durable responses. What our goal is is that these cells survive kind of out three to six months, and that would be comparable to autos. So that puts us in a place where we think we're going to see good efficacy, plus we'll be able to manufacture these at significant scale. Obviously for this to happen, you not only need to see the immune invasion on the other side, but we have to make really good T-cells. The T-cells are going to need to expand. *And so, if you think about when we'll see this, this could take a bit longer than what you're seeing on the other. But again over the next call it three to six months, we expect to kind of start to learn about kind of what this looks like in the early cells.*

(f)   During Sana's September 12, 2023 presentation, Defendant Harr stated:

Second level of evidence. You make good CAR T-cells. There, you probably want to see a nice level of complete responses and then *you want to see the cells persist for a while, right, which is a combination of immunology and how well we make them.* So that will take a decent amount of time, not forever. We should know the

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 59
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

first question, hopefully, sometime this year. ***Second question, maybe, maybe not, right?***

130.138.    As Defendants' above-quoted statements made clear, Defendants needed extra time to collect and present durability data because, as they told investors, they expected SC291 cells to last three to six months.

131.139.    Defendants' assumption that SC291 cells could last three to six months proved incorrect. In fact, SC291 cells lasted less than two months. Thus, Defendants had durability data in the earlier part of the period, or at least by January 9, 2024. They could have presented it then.

132.140.    In the September 6, 2023 presentation, Defendants told investors that they would present the data when available:

Q: So we'll get hopefully a handful of patients with that data in terms of the number of edited cells, maybe get some data on persistence, and we'll wait for next year for a more robust persistence data in addition to potentially durable response data?

DEFENDANT HARR: Yes.

133.141.    Asked at the September 6, 2023 conference where Sana would present the data, Defendants made it clear that they would present at the latest in spring or early summer 2024:

Q: Thoughts on how you're going to disclose the data? Should we think maybe ASH [an annual medical conference held in December], should we think of webcast –

DEFENDANT HARR: ASH, AACR [an annual conference held in April], ASCH [annual conference held in late May/early June], EHA [annual conference held in June], that's kind of where everybody in hematology goes. Three of those meetings are within a month of each other and the other one is in the winter, right? So ASH [in 2023] is a good place to start and we'll work our way through next spring then.

142.    As the ARDENT Results Paper shows, Sana used two metrics to determine SC291 cells' durability: direct tests for B-cells and tests for drug-specific antibodies. ARDENT evaluated

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 60
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ Aᴠᴇ. W., Sᴜɪᴛᴇ 103
Lʏɴɴᴡᴏᴏᴅ, WA 98036
Tᴇʟ: (206) 621-6566

SC291 in blood cancers. For blood cancers, clinical response is also measured using blood tests. Because they are all run on the same blood sample, the tests that measure clinical response, the existence of B-cells, and drug specific antibodies, are all run at the same time. Thus, because they had efficacy data, Defendants also had durability data. That data—the very data Defendants told investors they were closely monitoring—showed that none of the patients' SC291 cells had survived even for two months.

143.    Most clinical trials are placebo-controlled and double-blind. But Sana's SC291's Phase I clinical trial was open-label, meaning that neither the patients nor the company was blinded to the results. There was no placebo group; in fact, all patients received SC291. Results were regularly collected and regularly passed on to the company. For instance, in the January 9, 2024 presentation, Defendants stated that they were sharing data available as of January 5, 2024, just 4 days before. Thus, Defendants knew of the adverse results in near real-time.

134.144.    Yet having told investors they would produce durability data when available, Defendants did not publish durability data in their January 9, 2024 presentation. In fact, Defendants only published data on B-cell recovery, a proxy for durability, in January 2025, after they had abandoned ARDENT.

135.145.    That Defendants suggested Sana would publish durability data and then failed to shows that Defendants knew the data was bad and deliberately omitted it to avoid undermining their claim that Sana had SC291 worked exactly as promised, including that it evaded the immune system.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 61
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

2.    *The ARDENT Clinical Trial Protocol Required That Sana Collect Data Showing the Deterioration Of SC291*

136.    Sana filed the ARDENT clinical trial protocol with the federal government. *See Sana Biotechnology, Inc., Study Evaluating SC291 in Subjects With r/r B-cell Malignancies (ARDENT)* ("ARDENT Protocol").[17]

137.    The ARDENT Protocol set out, among other things, what metrics Sana would measure.

138.    One of these metrics is the number of SC291 cells in the patient's blood over time. Sana's stated purpose for measuring SC291 count over time is to "[e]valuate cellular kinetics *and persistence of SC291.*"

139.    Thus, pursuant to the ARDENT Protocol, Sana was required to obtain regular data from patients showing the persistence of SC291 cells.

140.    Sana evaluates cancer progression from blood samples. The same blood samples Sana used to evaluate cancer progression would also show that SC291 cells were rapidly deteriorating.

141.1.    Most clinical trials are placebo-controlled and double-blinded. But Sana's SC291's Phase I clinical trial was open-label, meaning that neither the patients nor the company was blinded to the results. There was no placebo group; in fact, all patients received SC291. Results were regularly collected and regularly passed on to the company. For instance, the data presented on January 9, 2024 was effective as of January 5, 2024. Thus, Defendants knew of the adverse results in near real-time.

142.    FDA regulations require that the sponsor determine whether any negative clinical

[17] Available at https://clinicaltrials.gov/study/NCT05878184.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 62
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

development is related to the treatment, with these events called "adverse reactions". 21 C.F.R. §312.32(a). If the patient dies and the sponsor determines that the death is an adverse reaction to the treatment, the sponsor must report it to the FDA within 7 calendar days. *Id.* at (c)(1)(2). Investigators notify sponsors of deaths well in advance of the 7 calendar-day deadline so the sponsors can determine whether the death is a reportable adverse reaction.

143.    In an open-label clinical trial, data from patient withdrawals and scans should be promptly entered into a database. Instances in which sponsors access the study database are typically logged.

144.    Sana either maintained the ARDENT database itself ("Database") or had unlimited real-time access to it.

145.    Using the Database, Sana could create comprehensive reports on ARDENT's progress. These reports would have informed Sana's management how each patient had fared or was faring, including the date of every blood test, the status of the patient's B-cells, and durability of SC291 cells.  Because ARDENT was Sana's most advanced trial, Sana's personnel, including Harr and Hardy, would have frequently accessed the Database to keep abreast of developments.

### 3.b.    Defendants' False Statements Helped Sana Raised Cash It Needed To Survive Past 2024

146.    During the Class Period, Sana raised funds while the price of its securities was inflated by the alleged fraud.

146.    Defendants used their false statements to raise desperately-needed cash.

147.    Sana only began Phase I trials in May 2023. It is years away from earning any revenues.

148.    As of December 31, 2023, Sana had $205.2 million in cash, cash equivalents, and marketable securities. Sana anticipated that it would spend approximately $200 million in 2024.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 63
Case No. 2:25-CV-00512-BJR

149.    ~~Defendants were motivated~~Thus, Defendants knew at the time of the January 9, 2024 presentation that Sana only had enough cash to make it through the end of 2024.

~~149.~~150.    Defendants thus had a motive to make misleading statements so that Sana could proceed with an offering to raise enough cash to make it through the year.

~~150.~~151.    Defendants' false statements at the January 9, 2024 presentation caused its stock price to increase 40% in one day.

~~151.~~152.    ~~Sana then raised~~Defendants immediately profited from the price increase by raising $189.~~5~~8 million from selling ~~its~~Sana's shares ~~a month~~on February 7, 2024.  Without this additional funding, Sana would have run out of money near the end of 2024 or soon after ~~presenting the January 9, 2024 data. ~~.

### **~~4.~~c.    The Fraud Implicated Core Operations**

~~152.~~153.    The fraud alleged herein implicates the core operations of Sana.

~~153.~~154.    Sana is in the earliest stage of clinical trials. While Sana had multiple product candidates, SC291 in oncology was its most advanced product candidate, the subject of Sana's first Phase 1 trial (ARDENT), and the first product for which Sana presented clinical data. Moreover, SC291 remained the only product for which Sana had provided data through the program's de-prioritization in November 2024. ~~SC291's success or failure was a critical consideration for Sana's investors and for the analysts that covered Sana and participated in its quarterly earnings calls.

~~154.~~155.    Similarly, SC291's durability was critical to Sana's operations. Defendants told investors that there were three sets of data that would retire risks Sana faced. Defendants identified durability as one of these risks. Defendants also told investors that they would collect durability data.

~~FIRST~~[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 64
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

155.156.    Moreover, Defendants were aware that investors were focusing on ARDENT durability data. In a December 6, 2023 presentation, Defendant Hardy stated:

> Yes. I would say a few things and I don't know if I would rank order them. I would say there's obviously a lot of attention and questions related to two pieces of data. One, more data on our SC291 oncology program. Specifically, the early data which will tell us a lot about hypoimmune and *are those cells surviving*?

156.157.    It is absurd to suggest that the Individual Defendants and executive management did not know the facts and circumstances of the alleged fraud.  Moreover, such knowledge is imputable to the Individual Defendants, given the implication of core operations, the Individual Defendants' roles and status within Sana, the Individual Defendants' specific professional and educational backgrounds, the Individual Defendants' oversight and extensive involvement in Sana's clinical trials and product development efforts, the Individual Defendants' frequent public statements to analysts and investors detailing Sana's clinical trials and product development efforts, and their personal involvement in the key events and circumstances at issue, as otherwise alleged herein.

### E.F.    The Truth Begins To Emerge

157.158.    Defendants' false statements artificially inflated Sana's share price.  Two partial corrective disclosures incrementally revealed aspects of Defendants' fraud, removing the artificial inflation.

158.159.    The first partial corrective disclosures began after hours on May 8, 2024 and continued during trading on May 9, 2024, as follows. On May 8, 2024, after market close, Sana published the May 8, 2024 earnings release.  But in the earnings release, Sana's pipeline updates announced no new ARDENT data. Providing a pipeline update without new data contradicted prior statements by Defendants that the data would be available by that point, such as Defendant Harr's statement on January 9, 2024, that "[w]e'll have a lot more data as we get

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 65
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

through dose escalation or able to enroll patients very and treat patients very rapidly. And we'll have a lot more as the year goes on."

159.160.    Nor did Sana provide any indication that it intended to present any data at either of the forthcoming professional conferences. Before the Class Period, Defendants had stated that Sana would have durability data by early 2024. According to Defendants' own publicly-stated timeline, by May 2024, Sana was bound to have the data. As alleged above, in a September 6, 2023, presentation Defendants stated that Sana would present ARDENT data at two medical conferences taking place from late May through late June (ASCH and EHA). The May 8, 2024 earnings release was Sana's last chance to announce that it would present data at these upcoming conferences. Notably, Defendants had used Sana's Q3 2023 earnings release to announce that it would present data at a forthcoming December 2023 presentation.  Investors expected that Sana would use the Q1 2024 earnings release to announce its attendance at these conferences and that it would present early durability data, just as it had told investors it would. Sana's failure to make such an announcement suggested that it would not be presenting data until an annual conference taking place in December 2024 (ASH). Defendants' failure to deliver a presentation was a materialization of the risk concealed by their false statements, in that the durability data Defendants would have presented showed that SC291 was not durable, and that's why Defendants didn't present it.

160.161.    Thereafter, and before the close of the markets on May 9, 2024, analysts covering Sana noted the lack of new data. For instance, on May 8, 2024, TD Cowen published a report noting "[e]nrollment in dose escalation is progressing, and Sana expects to share more data in H2 (presumably ASH) when it has 'handfuls' of patients at 6+ months of follow-up." It noted as a "Forthcoming Catalyst[]: Add'l data from SC291's . . . Ph I trial (2024)."  It concluded

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 66
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

"[d]espite the compelling opportunity set, we see significant translational risk and are on the sideline pending early translational/persistence data."

162. Additional analyst reports followed before the market opened on May 9, 2024. H.C. Wainwright & Co. published a report that included an update on the SC291 ARDENT study, reiterating initial results, but noted analysts are "expecting an update on the ARDENT study in 2024 where we are expecting to see additional data from Cohort 1 (60M cells dose) and Cohort 2 (120M cells dose)." It emphasized the need for additional data: "We are focusing on initial durability data this year and seeing how that compares to other allogeneic cell therapy players and the approved autologous CAR-T therapies."

163. With no data disclosed in the Q1 2024 earnings release and no explanation that data was forthcoming, Sana's stock price fell on heavy volume from a close of $9.49 per share on May 8, 2024, to close at $7.50 per share on May 9, 2024, down $1.99 (20.97%) per share.

164. On November 4, 2024, after market close, Sana published a press release to its corporate website. The release announced that Sana would "***suspend development of*** both ***SC291 in oncology*** and of SC379, its glial progenitor cell program," purportedly to instead prioritize future development activity for SC291 in B-cell mediated autoimmune diseases and increase investment in its type 1 diabetes program. The modified strategy included a headcount reduction to reduce cash burn and purportedly extend Sana's cash runway into 2026. The release said about suspending SC291 in oncology: "Given alternative opportunities within its pipeline as well as increased competition within blood cancers and uncertainty about the best path to regulatory and commercial success, Sana is halting enrollment and further internal investment in the Phase 1 ARDENT trial." Between Sana's issuing the earnings release and close of the markets

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 67
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

on November 5, 2024, analysts covering Sana negatively reacted to Sana's announcement that it was suspending SC291's development.  Several analysts issued reports before the market opened on November 5, 2024.   JMP Securities published a report downgrading Sana stock and withdrawing JMP's price target due to Sana's delays in reporting clinical data and after "remov[ing] the projected revenues from SC291," due to the reprioritization.  H.C. Wainwright published a report lowering its price target and noting that while Sana did not provide a data related reason to de-prioritize the SC291 oncology program, "Our understanding is likely that *the efficacy profile did not continue to hold up* once the company enrolled more patients…."  The report noted "that *this program was the most advanced in Sana's pipeline* and clinical data for other programs have not yet been presented."

164.165.      With Sana's odd withdrawal of its leading product, Sana's stock price fell on heavy volume, from a close of $3.76 per share on November 4, 2024, to close at $3.39 per share on November 5, 2024, down $0.37 (9.84%) per share.

165.166.      As a result of Defendants' materially false and misleading statements and omissions, and the precipitous decline in market value of Sana's stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

**G.      The ARDENT Results Paper Provided Enough Information To Infer Individual Patient Results**

167.    Of the six patients identified in the January 9, 2024 presentation, three had received doses of 60 million cells, and another three had received doses of 120 million cells. The January 9, 2024 presentation lists each patient's dose and cancer

168.    The Ardent Results Paper lists each patient whose results are reported in the study, as well as their dose and cancer.

169.    Patients 1, 2, 4, 5, and 6 are identified in the January 9, 2024 presentation and are

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 68
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

also identified in the Ardent Results Presentation:

| January 9 patient number | Cancer identified in January 9 presentation | Dose listed in January 9 presentation | Ardent Results Paper Patient number | Cancer identified in ARDENT results paper | Dose listed in Ardent Results Paper |
|---|---|---|---|---|---|
| 1 | CLL | 60 million | 1 | CLL | 60 million |
| 2 | MCL | 60 million | 2 | MCL | 60 million |
| 4 | LBCL | 120 million | 3 | DLBCL[18] | 120 million |
| 5 | MZL | 120 million | 4 | MZL | 120 million |
| 6 | CLL | 120 million | 5 | CLL | 120 million |

170.    The ARDENT Results Paper only lists 2 patients who received the 60 million cell dose. However, the ARDENT Results Paper also explains that one patient withdrew consent and is not included in the results. That patient is Patient 3 in the January 9, 2024 presentation, because the ARDENT Results Paper does not list a patient who received a 60 million cell dose and had an LBCL.

171.    The ARDENT Results Paper categorizes patients into a low dose group (60 or 90 million cells), a middle dose group (120 million cells), and a high dose group (200 million cells). The ARDENT Results Paper reports on how many patients in each group had SC291-specific antigens or B-cells detected by direct tests at 2 months.

172.    The ARDENT Results Paper reports results of three patients 3 in the low dose group. Only 3 patients were ever treated at the 60 million cell dose and only 1 patient who received

---

[18] DLBCL, or Diffuse Large B-Cell Lymphoma, is a form of Large B-Cell Lymphoma, or LBCL.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 69
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

the 90 million cell dose was included in the ARDENT Results Paper, for a total of 4 patients. One of the 4 patients was Patient 3, whose results were not reported in the ARDENT Results Paper. Thus, results for all 3 of the other low-dose patients were reported in the ARDENT Results Paper.

173. The ARDENT Results Paper states that all 3 patients in the low-dose group 60 SC291-specific antigens at the 60 day mark. Thus, Patients 1 and 2 from the January 9, 2024 presentation both had SC291-specific antigens at the 60 day mark. For 2 of the 3 patients, direct tests reported the presence of CD19+ B-cells.

174. Out of the ARDENT trial, 3 patients had pre-existing antibodies to SC291, and so never saw any benefit. Another patient only had one month's follow up. All 4 were excluded from the dose analysis results.

175. Because the ARDENT Results Paper reported results from all 3 patients in the low-dose group, these 4 patients all received either the 120 million cell dose or the 200 million cell dose.

176. The ARDENT Results Paper states that 5 patients were treated at the 120 million cell dose and that 6 patients were treated at the 200 million cell dose. The ARDENT Results Paper reports the 60-day results of 3 patients who received the 120 million cell dose (or 2 fewer than were treated at that dose) and 4 patients treated at the 200 million cell dose (or 2 fewer than were treated at that dose). Thus, 2 of the excluded patients received the 120 million cell dose, and 2 of the excluded patients received the 200 million cell dose.

177. Patient 4 is one of the 3 patients who received the 120 million cell dose and whose results were reported. The January 9, 2024 presentation reported that Patient 4 was experiencing a complete response two months after treatment. Thus, Patient 4 is one of the 3 patients treated at the 120 million cell dose whose 60-day results were reported in the ARDENT Results Paper.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 70
Case No. 2:25-CV-00512-BJR

178.    One of 3 patients in the 120 million dose group had B-cells at two months. Thus, there is a 1 in 3 chance that the patient who had recovered B-cells is Patient 4.

179.    The ARDENT Results Paper claimed that 6 patients experienced durable CD19 depletion. The ARDENT Results Paper includes a chart showing results of tests for B-cells for each of these patients (Figure 5). Only 2 of the 6 patients (brown and blue) had 3-month data. One of the patients (green) only had 1-month data.

## V.VI.   NO SAFE HARBOR

166.180.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any were so labelled, they included statements of then-historical or then-present fact, and there were no accompanying, meaningful, cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Sana's then-ongoing misconduct.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

167.181.    Alternatively, to the extent that the statutory safe harbor does apply to any false or misleading statements pleaded herein that the Court deems to have been forward-looking, Defendants are still liable for those statements because at the time each of them was made, the particular speaker knew that the forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Sana who knew that those statements were false or misleading when made.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 71
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

168.182.     For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

### VI.VII.     THE CLAIMS ARE TIMELY

169.183.     The claims set forth herein were timely filed.

170.184.     The market was not arguably aware until May 8, 2024, at the earliest, that credible allegations existed as to misconduct alleged herein concerning Sana's clinical trials and product development programs.

171.185.     It was also not until May 8, 2024, that Lead Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period.  In the absence of publicly available information prior to then suggesting that Sana's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Lead Plaintiffs were not under any duty to inquire as to the truthfulness of Sana's public statements.  Therefore, Lead Plaintiffs' duty in that regard arose no earlier than May 8, 2024.

172.186.     Prior to May 8, 2024, Lead Plaintiffs and Class members could not have been on any inquiry notice of possible claims under the Exchange Act.  Even assuming this early date for inquiry notice, Lead Plaintiffs' Exchange Act claims against Defendants were brought within two years. Thus, Lead Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

### VII.VIII.     LOSS CAUSATION / ECONOMIC LOSS

173.187.     The market for Sana shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive investors that artificially inflated Sana securities and that

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 72
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50ᵀᴴ AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

operated as a fraud or deceit on Class Period purchasers or acquirors thereof by misrepresenting the material facts alleged herein. As detailed above, as Defendants' prior misrepresentations were incrementally revealed to the public, the price of Sana securities fell, as artificial inflation came out. Accordingly, as a result of their purchases or acquisitions of Sana shares during the Class Period, Lead Plaintiffs and the Class members suffered economic loss, i.e., damages, under the federal securities laws.

174.188.    During the Class Period, Defendants presented a misleading picture of Sana's financial condition, performance, and business prospects, including as regards Sana's then-ongoing clinical trials and its product development efforts. Defendants' false and misleading statements and omissions had the intended effect and caused Sana's securities to trade at artificially inflated prices throughout the Class Period and until the truth was incrementally revealed to the market by the partial corrective disclosures pled herein.

175.189.    As detailed herein, the price of Sana shares dropped, on high volume, in response to the issuance of each corrective disclosure alleged herein. These stock drops removed inflation from the price of Sana securities, causing real economic loss to investors who had purchased or acquired them during the Class Period.

176.190.    These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in Sana securities negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or Sana-specific facts unrelated to Defendants' fraudulent conduct.

177.191.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 73
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

inflate the price of Sana's securities and the subsequent declines in the value thereof when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.IX.    PRESUMPTION OF RELIANCE

178.192.    At all times, the market for Sana shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    Sana met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "SANA;"";

(b)    Sana had approximately 220.45 million shares outstanding as of February 22, 2024, early in the Class Period, such that its stock was liquid.  During the Class Period, numerous shares of Sana stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Sana stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, Sana filed periodic public reports with the SEC;

(d)    Sana regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Sana was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)    Unexpected material news about Sana was rapidly reflected and incorporated into its stock price during the Class Period.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 74
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

179.193. As a result of the foregoing, the market for Sana stock promptly digested current information regarding Sana from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Sana securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices, and a presumption of reliance applies.

180.194. Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.X.  LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

181.195. Lead Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities, other than Defendants and other excluded parties (identified below), who purchased or otherwise acquired the securities of Sana (NASDAQ: SANA) during the Class Period of January 9, 2024 through November 4, 2024, both dates inclusive, seeking to recover damages caused by Defendants' violations of the U.S. federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder, against Defendants Sana, Harr, and Hardy.

182.196. Excluded from the Class are Defendants, the officers and directors of Sana during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 75
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

183.197.    The Class members are so numerous that joinder of them all is impracticable.  Throughout the Class Period, Sana securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Sana or its transfer agent and may be notified of the pendency of this action by mail or email, using the forms of notice similar to those customarily used in securities class actions.

184.198.    Lead Plaintiffs' claims are typical of the claims of the Class members, as Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

185.199.    Lead Plaintiffs will fairly and adequately protect the Class members' interests, have no interests antagonistic to or in conflict with those of the Class, and retained counsel competent and experienced in class and securities litigation.

186.200.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period materially misrepresented material facts about the business, operations and management of Sana;

- whether the Individual Defendants caused Sana to issue materially false or misleading financial statements during the Class Period;

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 76
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

- whether Defendants acted knowingly or recklessly in issuing materially false or misleading financial statements;

- whether the prices of Sana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

187.201.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

188.202.    As alleged herein, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Sana's securities; and Lead Plaintiffs and the Class members purchased or otherwise acquired Sana's securities between the time the Defendants failed to disclose or misrepresented material facts and the times true and corrective facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

**(Against All Defendants for Violations of §10(b) and Rule 10b-5 Promulgated Thereunder)**

189.203.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 77
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

190.204.    This Count is asserted against Defendants and is based upon Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

191.205.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sana securities; and (iii) cause Lead Plaintiffs and other Class members to purchase or otherwise acquire Sana securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions pled herein.

192.206.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sana securities.  Such reports, filings, releases and statements, as alleged herein, were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sana's finances, operations, and business prospects.

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 78
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

193.207.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Sana, and intended thereby to deceive Lead Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

194.208.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of Sana, and in accordance with the Code of Conduct and the Governance Guidelines, the Individual Defendants had knowledge of the details of Sana's operations, business, and internal affairs.

195.209.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Sana.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sana's businesses, operations, financial condition, and prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sana securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Sana's business and financial condition that were concealed by Defendants, Lead Plaintiffs and

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 79
Case No. 2:25-CV-00512-BJR

BADGLEY MULLINS TURNER PLLC
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

the other Class members purchased or otherwise acquired Sana securities at artificially inflated prices and relied upon the price of those securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

196.210.    During the Class Period, Sana securities were traded on an active and efficient market. Lead Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Sana securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class members, the true value of Comerica securities was substantially lower than the prices paid by Lead Plaintiffs and the other Class members. The market price of Comerica securities declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

197.211.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Exchange Act §10(b) and Rule 10b-5 promulgated thereunder.

198.212.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and/or sales of Sana's securities during the Class Period, upon the disclosure that Defendants had been disseminating misrepresented financial and operational reports and information to the investing public.

FIRST[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT - 80
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

## COUNT II

### (Violations of §20(a) of the
### Exchange Act Against the Individual Defendants)

213.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.    During the Class Period, the Individual Defendants oversaw and participated in the operation and management of Sana, and conducted and participated, directly and indirectly, in the conduct of Sana's business affairs.  Because of their senior positions, they knew the adverse non-public information about Sana's business, operations, financial condition, results, and prospects, including its clinical trial data, product development efforts, and fundraising activities.

215.    As officers and/or Directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sana's business, operations, financial condition, results, and prospects and to correct promptly any public statements issued by Sana which had become materially false or misleading.

216.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sana disseminated in the marketplace during the Class Period concerning Sana's business, operations, financial condition, results, and prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sana to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Sana within the meaning of Exchange Act §20(a).  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sana

[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 81
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

securities.

203.217.    Each of the Individual Defendants, therefore, acted as a controlling person of Sana.  By reason of their senior management positions and/or being Directors of Sana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sana to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of Sana and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other Class members complain.

204.218.    By reason of the above conduct, the Individual Defendants are liable pursuant to Exchange Act §20(a) for the violations committed by Sana.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  August

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 82
Case No. 2:25-CV-00512-BJR

**BADGLEY MULLINS TURNER PLLC**
19910 50TH AVE. W., SUITE 103
LYNNWOOD, WA 98036
TEL: (206) 621-6566

Dated:  December __, 2025

Respectfully submitted,

**BADGLEY MULLINS TURNER PLLC**

s/ Duncan C. Turner
Duncan C. Turner, WSBA No. 20597
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
Tel: (206) 621-6566
Email: dturner@badgleymullins.com

*Liaison Counsel for the Class*

*/s/ Jonathan Horne*
**THE ROSEN LAW FIRM**

*/s/ Jonathan Horne*
Jonathan Horne (*pro hac vice)*
Yitzchok Fishbach (*pro hac vice pending*)
275 Madison Avenue, 40th Fl.
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jhorne@rosenlegal.com
yfishbach@rosenlegal.com

*Court-appointed Lead Counsel*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
Email: peretz@bgandg.com

*Additional counsel for Lead Plaintiffs*

FIRST[PROPOSED] SECOND AMENDED
CLASS ACTION
COMPLAINT - 83
Case No. 2:25-CV-00512-BJR